832 P.2d 593

**STATE of Arizona, Appellee,**

v.

**Frank Jarvis ATWOOD, Appellant.**

**No. CR–87–0135–AP.**

Supreme Court of Arizona,
En Banc.

April 9, 1992.

As Modified on Denial of Motions for
Reconsideration and Rehearing
July 10, 1992.

578

Grant Woods, Atty. Gen. by Bruce M. Ferg, Asst. Atty. Gen., Tucson, for appellee.

Carla G. Ryan, Tucson, for appellant.

## TABLE OF CONTENTS

DISPOSITION .................................................608
ISSUES PRESENTED ON DIRECT APPEAL ....................608
ISSUES PRESENTED ON CROSS–APPEAL .....................609
THE LENGTH OF THIS OPINION ...........................609
FACTS ....................................................609
I. The Disappearance ..................................609
II. The Preliminary Investigation ......................609
III. The Suspect........................................610
IV. The Arrest.........................................610

V. The Charges Against Defendant ........................................594
VI. The Case Against Defendant...........................................594
 A. The Sightings.....................................................595
 B. The Scientific Evidence..........................................595
 C. The Defendant's Actions and Statements..........................595
 D. The Evidence of Motive ..........................................596

DISCUSSION OF ISSUES PRESENTED ON DIRECT APPEAL

1. Sufficiency of Evidence to Support the Convictions .........................596
 A. The Kidnapping..................................................597
 B. The Murder ....................................................598
2. Alleged Ineffective Assistance of Counsel .................................599
3. Eyewitness Identifications................................................602
 A. Media Exposure .................................................602
 B. Other Pretrial Viewings .........................................603
4. Denial of Exhumation ....................................................604
5. Alleged Prosecutorial and Police Misconduct...............................605
 A. Alleged Investigative Misconduct
 1. Burial of Victim's Remains .......................................605
 2. Police Investigation .............................................605
 3. The "Cuckoo File" ..............................................606
 B. Alleged Misconduct Before the Grand Jury .........................607
 C. Alleged Prosecutorial Contact with the Media .......................607
 D. Alleged Trial Misconduct .........................................608
 1. Witness's Reference to Polygraph ................................608
 2. Emotional Witness .............................................609
 3. Testimony of Victim's Mother ....................................609
 4. Testimony Concerning Underpants Found Near Victim's Remains....609
 5. Comments Made by Prosecutor ..................................610
6. Consolidation and Severance .............................................611
7. Defendant's Arrest, Detention and Interrogation, and the Searches of Defendant's Car
 A. The Arrest ......................................................613
 B. The Detention and Interrogation...................................615
 C. The Searches ...................................................616
 1. The First Search...............................................616
 2. The Second Search ............................................618
 D. Defendant's Statements to the FBI ................................618
8. Defendant's Motion for Continuance.......................................620
9. Jury Selection ..........................................................621
10. "Death Qualification" of Jury ............................................624
11. Jury Instructions .......................................................624
 A. Kidnapping Instruction ...........................................624
 B. Felony Murder Instruction.........................................625
 C. Unanimous Verdict Instruction.....................................625
 D. Denial of *Willits* Instructions .....................................626
 E. Denial of Unlawful Imprisonment Instruction........................628
 F. Denial of Instructions on Lesser Included Offenses of First Degree
 Murder ........................................................629
12, 13 and 14. Publicity and the Jury .......................................630
15. Publicity and Fair Trial.................................................630
16. Courtroom Decorum .....................................................633
17. Evidentiary Rulings ....................................................634
 A. Defendant's Statements
 1. Defendant's Story.............................................635
 2. Defendant's Statement on the Telephone .........................636
 B. Defendant's Letter and Statements to Ernest Bernsienne ..............637
 C. Testimony of Paul Larmour .......................................639
 D. Testimony of Sam Hall...........................................640
 E. Limitation on Cross–Examination of James Corby ...................640
 F. Admission of Defendant's Knives ..................................641
 G. Admission of Underpants.........................................642

H. Videotapes of Defendant in Custody ...................................643
18. The Death Sentence ...........................................................645
 A. Constitutionality of Arizona's Death Penalty Statute.....................646
 B. Defendant's 1975 Conviction for Lewd and Lascivious Conduct as an
 Aggravating Circumstance............................................646
 C. The Trial Court's Finding of No Mitigating Circumstances under A.R.S.
 § 13–703(G)..........................................................648
 1. The Trial Court's Felony Murder Instruction ....................648
 a. The Felony Murder Instruction .............................648
 b. The Trial Judge's Failure to Make Specific *Enmund/McDaniel* Findings.........................................................649
 2. Defendant's Heavy Drug Use ...................................650
 3. Defendant's Demeanor During Trial ............................651
 4. Defendant's Parents' Support..................................652
 5. The Cause of the Victim's Death Was Not Established ...........652
 6. Defendant's Age ..............................................652
 7. Lingering Doubt of Guilt......................................653
 8. Defendant's Cooperation at the Time of His Arrest.............653
 9. Defendant's Sympathy for the Victim's Family .................653
 10. Defendant's I.Q. ............................................653
 11. Defendant's Concern for His Parents .........................654
 12. Defendant's Lack of a Violent Prior Record...................654
 13. Defendant's Not Causing His Prior Felonies ..................655
 14. Defendant's Adjustment to Incarceration and His Adoption of
 New Goals .....................................................655
 D. Victim Impact Evidence ..............................................655
 E. Conclusion ..........................................................657
19. The Kidnapping Sentence ....................................................657
20. Computerization of the Record ..............................................657
21. Limitation on Length of Defendant's Opening Brief..........................658
DISCUSSION OF ISSUES PRESENTED ON CROSS–APPEAL.................................659
22. The Informant's Testimony ..................................................659
23. The Especially Heinous, Cruel, or Depraved Aggravating Circumstance ......660
24. The Rule in *Gillies*.......................................................660
CONCLUSION .....................................................................660
SPECIAL CONCURRENCE by Chief Justice Feldman ............................660
SPECIAL CONCURRENCE by Justice Corcoran...............................660
I. The *Enmund/McDaniel* Finding ...........................................660
II. The Kidnapping Sentence ..................................................661
III. The Informant's Testimony ...............................................663
 A. The Facts Surrounding Defendant's Incarceration, the Dates on Which
 the State Charged Defendant with Kidnapping and Murder, and the
 Trial Court's Ruling on Defendant's Motion to Suppress the Infor-
 mant's Testimony
 1. The Facts and the Dates .......................................663
 2. The Trial Court's Ruling ......................................665
 B. The Scope of the Sixth Amendment Right to Counsel and the Remedy
 for its Violation
 1. The Right to Counsel ..........................................666
 2. The Exclusionary Rule .........................................667
 C. Did the Trial Court Err in Excluding The Informant's Testimony During
 the Guilt Proceedings Against Defendant? ..........................667
 1. The Informant as a State Agent................................668
 2. Defendant's Sixth Amendment Right to Counsel..................668
 3. The Exclusionary Rule .........................................668
 D. Did the Trial Court Err in Excluding The Informant's Testimony During
 the Sentencing Proceedings Against Defendant as to the Murder
 Charge? ............................................................669
IV. Double Jeopardy Issues in the Event of Resentencing ......................672
V. CONCLUSION ................................................................672

## OPINION

CORCORAN, Justice.

Appellant Frank Jarvis Atwood (defendant) was convicted by a jury of kidnapping and first degree felony murder. The court sentenced him to concurrent sentences of life imprisonment without possibility of parole for 25 years for the kidnapping conviction and death for the murder conviction. He now appeals his convictions and sentences. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033, and –4035.

## DISPOSITION

Based on our analysis below, we affirm defendant's kidnapping conviction and sentence. We also affirm defendant's first degree murder conviction and death sentence.

## ISSUES PRESENTED ON DIRECT APPEAL

Defendant has raised 21 issues on appeal. Several of these issues are comprised of subordinate issues that are not listed below, but are discussed in relevant portions of this opinion. The principal issues on appeal are:

### Evidence Supporting Conviction

1. Were the murder and kidnapping convictions supported by sufficient evidence?

### Pretrial Issues

2. Was defendant denied effective assistance of counsel during the pretrial stage of his prosecution by actions or omissions of his first attorney?

3. Were pretrial identifications of defendant so tainted and unreliable that their admission at trial violated due process?

4. Was defendant denied a fair trial by the court's refusal to order exhumation of the victim's bones?

5. Did the police and prosecutor engage in misconduct that denied defendant a fair trial?

6. Did the trial court err by consolidating the kidnapping and murder charges and by denying defendant's motion for severance?

7. Were defendant's constitutional rights violated by his arrest, detention, interrogation, or the search of his car?

8. Did the trial court deny defendant's right to a fair trial by refusing to continue the trial date?

### Jury Process

9. Was defendant improperly denied a jury selected from a representative cross-section of the community?

10. Was the jury improperly "death qualified" during voir dire?

11. Was the jury properly instructed?

12, 13 and 14. Was the jury biased by the publicity surrounding defendant's case? Should the trial court have sequestered the jury during voir dire and trial? Did the trial court improperly deny defendant's motion to change venue?

### Publicity and Community Interference

15. Was defendant denied a fair trial because of the publicity surrounding the case?

16. Was defendant's trial disrupted by spectators, and, if so, was defendant prejudiced by these disruptions?

### Evidentiary Rulings

17. Did the trial court improperly rule on any evidentiary issues, and, if so, was defendant prejudiced by these rulings?

### Sentencing

18. Was defendant properly sentenced to death?

19. Was defendant properly sentenced for his kidnapping conviction?

### Issues Regarding Defendant's Brief

20. Were defendant's right to an appeal and his due process and equal protection

rights violated by this court's refusal to order that the record be computerized?

21. Were defendant's due process rights violated by this court's placement of page limitations on defendant's opening brief?

## ISSUES PRESENTED ON CROSS–APPEAL

The state has raised 3 issues on cross-appeal:

22. Did the trial court err in suppressing the testimony of an informant to whom defendant made incriminating statements?

23. Did the trial court err in finding that the state did not establish that defendant killed the victim in an especially heinous, cruel, or depraved manner?

24. Should this court overrule *State v. Gillies*, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983)?

## THE LENGTH OF THIS OPINION

This court has *not* adopted a partial publication rule. *See* rule 976.1, California Rules of Court; 9 B.E. Witkin, *California Procedure* §§ 585–89 at 577–80 (3d ed. 1985). Therefore, although many of the issues resolved in this opinion do not meet the criteria for publication under rule 111, Arizona Rules of the Supreme Court, *see also* rule 28, Arizona Rules of Civil Appellate Procedure, there is no vehicle for including these issues in a separate memorandum decision or order.

## FACTS

The facts of this case are lengthy and intricate. The crime was committed in September 1984, and defendant was not put on trial until January 1987. Defendant's trial lasted approximately two months and was preceded by extensive discovery and numerous motions. More than 75 witnesses testified at trial, and the record exceeds 20,000 pages. Defendant did not testify on his own behalf. This summary attempts to merge disparate sources of circumstantial evidence gleaned from the record—eyewitness accounts, scientific testimony, and evidence of defendant's motive—into a cohesive, if not exhaustive, reconstruction of the evidence presented in this case.

## I. THE DISAPPEARANCE

On the afternoon of September 17, 1984, the victim, an 8–year–old girl we will call Mary, left her home in Tucson to mail a birthday card at a nearby mailbox. When she did not return, her mother sent another daughter to locate her. That daughter returned within minutes and informed her mother that she had found the pink bicycle that Mary had been riding, but that she was unable to locate Mary. Mary's mother drove to the intersection of Root Lane and Pocito Place—a few blocks from their home and on the route Mary had taken to the mailbox. Mary's bike was laying in the street on Pocito near the intersection. Mary's mother put the bike in her car, drove home, and called the Pima County Sheriff's Department to report her daughter's disappearance.

## II. THE PRELIMINARY INVESTIGATION

An extensive search for Mary ensued, accompanied by significant media coverage of the event in both Tucson and Phoenix. As the investigation progressed, the authorities began to piece together the events surrounding Mary's disappearance and crucial evidence began to emerge. At this early stage of the investigation, the most significant information came from Sam Hall, a physical education teacher at a nearby elementary school, and from two teenagers from Mary's neighborhood.

Homer Davis Elementary, Mary's school, is only a few hundred feet from the spot where Mary's bike was found. Sam Hall had been outside the school on the afternoon of September 17 when he noticed a "dark Z car" in a nearby alley. Hall, who stood approximately 20 feet from the car, described the driver as a man with a medium frame, shoulder-length hair, and a dark beard and mustache. Hall noticed the driv-

er making strange gestures and shaking his head. Because he was somewhat unnerved by the driver's appearance and behavior, he wrote down the car's license plate number, but later convinced himself that he had overreacted. The next day, however, upon learning that Mary had disappeared, Hall informed authorities of what he had witnessed and gave them the license plate number.

The license plate number corresponded to a 1975 Black Datsun 280Z registered in California and belonging to defendant. Defendant, 28 years old at the time, had recently been paroled from prison after a 1981 California conviction for kidnapping an 8–year–old boy. Defendant also had been convicted in 1975 of lewd and lascivious conduct with a 14–year–old girl.

The information obtained from two teenage boys from Mary's neighborhood provided authorities with the linchpin linking defendant to Mary's disappearance. The two boys told Pima County Sheriff's Department officials that, while riding their bikes, they had seen a dark "Datsun Z car" driving very slowly at the intersection of Root and Pocito. The driver of the car had long dark hair, a mustache, and the beginnings of a beard. The boys passed the car and headed north on Pocito, where they saw Mary riding her bike south toward the intersection. Neither boy saw or heard Mary come in contact with the Datsun or its driver.

## III. THE SUSPECT

After he was released on parole in May 1984 from a California State Penitentiary (where defendant had been incarcerated pursuant to his 1981 kidnapping conviction), defendant officially resided with his parents in Los Angeles. His life-style, however, was more that of a transient's, and in reality, he lived out of his car while he traveled across the country. Defendant met Jack McDonald—who would become his traveling companion—in California in August 1984 and drove with him first to Tucson and then to Enid, Oklahoma. In Oklahoma, the two men visited Ernest Bernsienne, a man with whom defendant

had corresponded while he was in prison for his 1981 kidnapping conviction. The correspondence with Bernsienne and Bernsienne's testimony at trial later would provide crucial evidence concerning defendant's motive for committing the kidnapping and the murder.

Defendant and McDonald returned to California two weeks later. In mid-September, however, they again traveled to Tucson. Apparently, on both trips to Tucson, the two men spent considerable time at De Anza Park, a popular congregating spot for Tucson's transient population. The acquaintances defendant made through his contact with the park would also become important witnesses at his trial.

Defendant spent the first part of September 17 at De Anza Park. He left the park, however, in the mid-afternoon and did not return until approximately one hour before sunset. As defendant's acquaintances at the park would later testify, he returned with blood on his hands.

That evening, defendant and McDonald visited Thomas Parisien and went with him to a local tavern to play pool. They also returned a tire iron to Armour Watts' home. The defendant and McDonald left Tucson later that evening.

## IV. THE ARREST

The information received from Sam Hall and the teenagers, coupled with the investigation into defendant's prior felony history, led authorities to believe that probable cause existed to arrest defendant for Mary's kidnapping. Acting pursuant to an arrest warrant issued by a United States magistrate in Tucson, Federal Bureau of Investigation (FBI) agents arrested defendant in Kerrville, Texas, after learning from defendant's parents that he and McDonald had encountered car trouble in Kerrville en route to New Orleans. The arrest warrant charged defendant with kidnapping in violation of 18 U.S.C. § 1201.

The agents arrested defendant at the auto dealership where his car was being repaired. Defendant was read his *Miranda* warnings and was transferred to

the Kerrville Police Station where the agents again advised him of his rights and he signed Waiver of Rights and Consent to Search forms. The Consent to Search form provides a means through which a suspect can permit agents to search his or her "premises," and the form provides a blank space for agents to supply the location of the premises to be searched. On the form defendant signed, a line had been drawn through the word "premises." The agents added the word "vehicle" and a description of defendant's automobile in its place.

The FBI agents interviewed defendant for approximately two hours on the evening of his arrest. During the interview, defendant recounted his trip with Jack McDonald from California, through Tucson, to Texas. He also apprised the agents of his activities in Tucson on September 17. In brief, defendant told the agents that he and McDonald spent the evening of September 16 on Mount Lemmon outside Tucson and that they returned to the city in the late morning of September 17. The two men arrived at De Anza Park around noon. Some time later, however, defendant and McDonald argued and defendant left the park. He returned around 5:00 p.m. Defendant told the agents that, while he was away from the park, he met with Gary Cisco in the area of Wetmore and Romero Roads—near the victim's neighborhood—to discuss buying marijuana, and that he visited Watts at his home. Later, both men would deny meeting with defendant that afternoon.

The next day, defendant was transported to San Antonio, Texas, for his initial appearance. Prior to departing, he was again given his *Miranda* warnings. En route to San Antonio, defendant made additional statements to the agents concerning his activities on September 17. Particularly, he told the agents that, rather than returning to the park around 5:00 p.m., he had returned at 3:30 p.m.

After agents conducted an initial search of defendant's car in Kerrville, it was transported to San Antonio. FBI agents in San Antonio obtained a search warrant and

proceeded to conduct a more thorough search of the vehicle.

Defendant was held in federal custody until he was extradited to this state pursuant to an Arizona arrest warrant for kidnapping. On October 1, 1984, federal charges against defendant were dismissed.

## V. THE CHARGES AGAINST DEFENDANT

On September 27, 1984, defendant was charged with kidnapping "with the intent to inflict death, physical injury or a sexual offense on the victim, or to otherwise aid in the commission of a felony." *See* A.R.S. § 13–1304(A)(3) and (B).

At the time defendant was charged with Mary's kidnapping, authorities were uncertain of the child's fate. On April 11, 1985, however—almost 7 months after Mary disappeared—a child's skeletal remains were found in the desert of northwest Tucson. Although medical examiners were unable to determine the cause of death, they were able positively to identify the child as Mary through the use of dental records. On May 15, 1985, the Pima County Grand Jury indicted defendant for first degree felony murder pursuant to A.R.S. § 13–1105. The kidnapping and murder charges were consolidated for trial.

## VI. THE CASE AGAINST DEFENDANT

The state's theory of the crime can be briefly stated. Defendant, a convicted pedophile, was cruising Mary's neighborhood in search of a child. He saw Mary riding her bike near the mailbox and followed her on the street as she cut through a field on her way home. The field led to a short street—Pocito—that intersected with Root Lane. Defendant proceeded to Root Lane (where he was seen by the teenagers), intending to abduct Mary as she traveled down Pocito. Mary stopped briefly to talk with a friend who lived on Pocito, and then continued down the street. Defendant's car struck Mary's bike, leaving a pink paint smear on the car bumper, and he grabbed the child. He then proceeded toward northwest Tucson. En route, his car was sighted by three people, all of whom later

identified defendant and testified that they saw a young child in the passenger's seat. Defendant took the child to the desert, where he molested and murdered her. He then returned to De Anza Park in central Tucson, where he had been earlier in the day.

The state's substantiating evidence, however, was not as succinct. Because no witness saw defendant take Mary, and because experts were unable to determine the cause of her death, the state attempted to prove defendant's guilt through extensive circumstantial evidence. Specifically, the prosecution's case consisted of four discrete areas of evidence: (1) sightings of defendant, alone and with a young child, on the afternoon of September 17; (2) scientific evidence linking defendant's automobile with the victim's bicycle; (3) testimony concerning defendant's actions and statements after the victim's disappearance; and (4) defendant's prior statements concerning his sexual attraction to children.

A. *The Sightings*

At trial, the state presented 9 witnesses who testified that they saw defendant and/or his automobile on the afternoon of September 17. Some of these witnesses claimed to have seen defendant driving slowly through the victim's neighborhood, one witness testified that he saw defendant leaving the neighborhood with a young child in his car, and others placed defendant north of the neighborhood in an area where the child's remains were later found.

The specific events that occurred between the time that Mary was last seen and the time that defendant returned to De Anza Park cannot be known with certainty. What is known with relative certainty, however, is that Mary left her home at approximately 3:30 in the afternoon and that defendant returned to the park at least one hour before sunset. Therefore, two crucial aspects common to all of these sightings were the times at which they occurred and the sequence in which they transpired. To support the state's interpretation, the sightings must have occurred within the finite time period during which

defendant could have abducted the child, driven to northwest Tucson, and returned to the park. The credibility of each of these witnesses, therefore, was dependent to a considerable degree on when the sightings occurred both in time and in relation to the other sightings. Indeed, the defense made considerable efforts to stress apparent inconsistencies in the sequence and times of the sightings.

B. *The Scientific Evidence*

An additional element of the state's case consisted of scientific evidence concerning the pink paint smear found on the front bumper of defendant's car. The state presented two expert witnesses who both concluded that defendant's vehicle had come in contact with Mary's bicycle.

Paul Larmour, an accident reconstructionist, testified that he found a "nearly perfect match heightwise between the contact area on the backside of the bicycle and the [paint] transfer on the bumper." He also testified that the paint on the bumper appeared to match the paint on the bike exactly. Larmour further testified that marks on the car's gravel pan were consistent with the theory that it struck the bicycle at a low speed and caused the bike to lodge beneath the car.

James Corby, an FBI examiner, performed microscopic, microchemical, and instrumental analyses on the paint removed from the bumper. He concluded from his tests that the paint on the bumper either came from the victim's bike or from another source exactly like the bike. Corby also examined the bicycle and found nickel particles on it. This finding was significant because the pink paint on the bumper was located in an area where the chrome had flaked off and nickel was exposed. The combined results of his tests led Corby to conclude that the likelihood was "remote" that the cross-transfer of materials could have occurred other than by forcible contact between the bike and the bumper.

C. *The Defendant's Actions and Statements*

Defendant's actions and statements after the victim's disappearance comprised an-

other significant element of the state's case against him. McDonald, Gary Cisco, and Thomas Parisien all testified that defendant claimed to have stabbed a man in a drug transaction on the afternoon of September 17. McDonald and Parisien also testified that they had seen blood on defendant's hands, clothes, and knife, and that defendant had discussed with them whether he should dispose of his clothes. Defendant also told them that, after killing the man, he took the body to the desert near the mountains. He told McDonald and Parisien that, while in the desert, he was stuck by cactus. Both men observed cactus needles in defendant's arms and legs. McDonald also observed defendant sandpapering the blade of his knife. In addition, while defendant and McDonald were en route to Kerrville, McDonald overheard defendant say to his mother on the phone: "Even if I did do it, you have to help me." Regarding this statement, McDonald testified that defendant later told him that "they were trying to stick something on him about a little girl." Apparently, defendant's conversation with his mother occurred after FBI agents had contacted his parents about defendant's implication in Mary's disappearance.

Defendant later repudiated the story of the stabbing, claiming that he had fabricated it in an attempt to make himself look tough to his companions. The state argued at trial that defendant's story bore too many similarities to the events surrounding Mary's disappearance and the discovery of her remains in the desert of northwest Tucson to be entirely fictitious.

#### D. *The Evidence of Motive*

The final element in the state's case against defendant consisted of evidence of his sexual attraction to children and his fear of returning to prison. Portions of defendant's correspondence with Ernest Bernsienne revealed his predilections toward children. Particularly damaging were the following comments redacted from a letter written to Bernsienne two years before Mary was kidnapped:

Ya see, it's time for "true confessions." What I mean is, there is a fact

about me that I am ashamed of. I believe it is considered so wrong that I have kept this part of me hidden from you.

Rather than saying that I am attracted to people between the ages of seven and twelve, I felt a more complete explanation is necessary.

Another fear is that I am still attracted to kids but I can't handle another arrest!

The state also introduced, through Bernsienne, the following oral statements defendant made concerning children:

BERNSIENNE: He told me that he was upset because he had had a serious argument with his parents about his personal appearance, and I advised him at the time rather than stick around home and be angry, to go out for a ride and cool off, let his parents cool off, then go back and talk about it.

He told me that he had, and that he had also, in the course of doing so, he had considered going out and picking up a child.

. . . .

I told him that if he did that the child would certainly go and tell someone, and he said this time he would make sure the child wouldn't talk.

### DISCUSSION OF ISSUES PRESENTED ON DIRECT APPEAL

1. Sufficiency of Evidence to Support the Convictions

■ Defendant argues that neither the kidnapping nor the murder charge is supported by sufficient evidence to justify the guilty verdicts. In reviewing this claim, we do not sit as a 5-justice jury, reevaluating the evidence to determine whether we would have convicted defendant on the evidence presented at trial. Such an approach would nullify the jury's function in this case. Rather, we must view the evidence in the light most favorable to sustaining the verdict, and we must resolve all reasonable inferences against defendant. *State v. Guerra,* 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989).

If "substantial evidence" exists to support the verdict, we will not disturb the jury's decision. By "substantial evidence" we mean evidence that would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is presented. *See State v. Tison*, 129 Ariz. 546, 553, 633 P.2d 355, 362 (1981). As we stated in *Tison*, "If reasonable [persons] may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial." *Tison*, 129 Ariz. at 553, 633 P.2d at 362. We therefore review the record to determine whether, from the evidence presented, a rational trier of fact could have found the essential elements of the crimes of kidnapping and felony murder beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mincey*, 141 Ariz. 425, 432, 687 P.2d 1180, 1187 (1984). Applying this standard, we hold that substantial evidence exists to support both the kidnapping and murder convictions.

A. *The Kidnapping*

█ In his brief, defendant contrasts evidence presented by the prosecution with conflicting evidence presented by the defense. For example, defendant stresses that the victim's mother testified that the victim would not have gone with a stranger voluntarily, yet no one near the scene heard a child scream or heard sounds suggesting that an accident had occurred between the victim's bike and defendant's automobile. Defendant also emphasizes that some witnesses claimed to have seen the victim at a local mall several hours after she disappeared. In addition, defendant notes that no evidence was found in his car to suggest that the victim had ever been inside it.

This court has held that "[r]eversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction." *State v. Scott*, 113 Ariz. 423, 424–25, 555 P.2d 1117, 1118–19 (1976). Viewed in this light, our review of the record convinces us that the state presented ample evidence to permit the jury rationally to conclude that defendant kidnapped the victim. The following evidence is particularly damning:

—Defendant was in the neighborhood on the afternoon the victim disappeared, a fact made virtually unquestionable by Sam Hall's sighting of a 280Z with license plates registered to defendant and his identification of defendant as the driver.

—Testimony from one of the teenage boys placed defendant at the intersection where the victim's bike was found.

—Prosecution experts testified, albeit not without disagreement from defendant's own experts, that paint and nickel transfers between the vehicle and the bike indicated that the two had come in contact, and that damage to defendant's car was consistent with striking a bicycle.

—Three witnesses identified defendant and testified that they had seen a young child riding with him in his car.

—Defendant's letters revealed his sexual attraction to young children.

█ Defendant contends that, under the doctrine of corpus delicti, the state should have been precluded from introducing his letters to Bernsienne until it had established a reasonable inference of the corpus delicti of kidnapping through independent evidence. We disagree.

█ Two elements comprise the corpus delicti of a crime: (1) the basic injury, which in this instance is the disappearance of a young girl, and (2) the fact that the basic injury was the result of a criminal, rather than a natural or accidental, cause. *State v. Thomas*, 78 Ariz. 52, 59, 275 P.2d 408, 413 (1954). In Arizona, the prosecution must establish a reasonable inference of the corpus delicti before it may introduce defendant's extrajudicial confession or admission as additional evidence of the crime. *See State v. Gillies*, 135 Ariz. 500, 506, 662 P.2d 1007, 1013 (1983); *State v. Janise*, 116 Ariz. 557, 559, 570 P.2d 499, 501 (1977).

■ We note initially that even if defendant's letters to Bernsienne were admissions requiring corroboration under the corpus delicti doctrine, *see* Udall, *Arizona Law of Evidence* § 179 (1960), the evidence presented to the jury, independent of the statements in the letters, established—at the very least—a "reasonable inference" of the corpus delicti. When viewed as a whole, the circumstances of the child's disappearance, the expert testimony concerning the paint and nickel transfers, and the eyewitness testimony placing defendant in the neighborhood and in a 280Z with a young child would easily satisfy the requirement of proof independent of an extrajudicial confession or admission to create an inference that the victim's disappearance was the result of kidnapping.

We do not believe, however, that the state was required to satisfy the corroboration rule in this case. Defendant's letters to Bernsienne were written before the victim was kidnapped, and the law is well-established that pre-offense statements do not require corroboration because they contain none of the inherent weaknesses of admissions made after the fact. *See Warszower v. United States*, 312 U.S. 342, 347, 61 S.Ct. 603, 606, 85 L.Ed. 876 (1941); *United States v. Soulard*, 730 F.2d 1292, 1298 (9th Cir.1984); *Ogden v. United States*, 303 F.2d 724, 742 (9th Cir.1962). Because defendant's written statements to Bernsienne were written before Mary was kidnapped, and because they tended to establish the corpus delicti of kidnapping and were relevant as tending to show motive, defendant's letters to Bernsienne were properly admitted at the time they were admitted.

Of course, establishing the corpus delicti of the crime does not satisfy the requirement of proving defendant's guilt beyond a reasonable doubt. Based on our review of the record, however, we find that the evidence presented also was sufficient to justify the jury's guilty verdict on the kidnapping charge. Viewing the evidence in the light most favorable to sustaining the verdict, certainly a juror presented with this evidence would not be unreasonable in concluding beyond a reasonable doubt that defendant kidnapped the victim.

### B. *The Murder*

■ Defendant further argues that, even if sufficient evidence exists to support the kidnapping conviction, the state cannot prove beyond a reasonable doubt that he murdered the victim. The jury convicted defendant of felony murder pursuant to A.R.S. § 13–1105, which, in this case, requires proof that defendant kidnapped the victim and that, in the course of and in furtherance of the kidnapping, he caused the victim's death. Defendant contends, however, that the state failed to establish the corpus delicti of murder and that his murder conviction is therefore invalid.

■ Under the corpus delicti doctrine, the state must prove that (1) the victim died and (2) the death was caused by criminal agency rather than suicide or accident. *See* Perkins, *The Corpus Delicti of Murder*, 48 Va.L.Rev. 173, 181–82 (1962). The state has satisfied the first corpus delicti requirement—Mary's remains were discovered in April 1985. Dr. Walter Birkby, a forensic anthropologist who positively identified the remains, confirmed this tragic fact.

Because only a skull, mandible, and various other scattered bone fragments were recovered, Dr. Birkby and Dr. Richard Froede, the Pima County Medical Examiner, were unable to determine the cause of death. Defendant therefore argues that, even if he did kidnap Mary, no proof exists that he murdered her. He asserts that the state failed to establish that she did not die by accident or fall victim to foul play from an unknown superseding party.

Defendant cites passages from several cases stating, in essence, that the presence of a dead body does not necessarily equate with murder. We fully agree. History is replete with macabre cases in which human remains are discovered and no evidence exists to suggest how the victim met his or her demise. This, however, is not such a case. Although authorities were unable to determine exactly how the victim died, proving the cause of death is not a neces-

sary element of corpus delicti. *See People v. Bolinski*, 260 Cal.App.2d 705, 715, 67 Cal.Rptr. 347, 353 (1968). The record reveals extensive circumstantial evidence satisfying the corpus delicti requirement. *See State v. Lantz*, 72 Ariz. 115, 119, 231 P.2d 454, 456–57 (1951) (corpus delicti may be shown by circumstantial evidence); *McCormick on Evidence* § 145, at 368 (3d ed. 1984) (same).

A young girl disappears from her neighborhood and later is found dead in the desert. This fact alone suggests the presence of criminal activity, for, given the facts of this case, it is difficult, if not impossible, to imagine that the child left a residential area, crossed a freeway, traversed a river bed, and went voluntarily to a sparsely populated desert location several miles from her home. Although we cannot know from the facts presented at trial exactly what happened to the victim when she was taken to the desert, we do know that (1) defendant, a convicted pedophile, was seen within yards of the girl literally seconds before she vanished; (2) witnesses identified defendant as the man they saw driving with a young child in his car; (3) defendant was seen later that afternoon with blood on his hands and clothing; and (4) defendant was also seen with cactus needles in his arms and legs.

To demonstrate criminal agency, the state must establish that the victim's death was not caused by suicide or accident. In this case, of course, the latter possibility is the only legitimate alternative to murder. We conclude that the evidence presented, although circumstantial, plainly negated the possibility that the victim died as the result of an accident. We therefore hold that the state's evidence created a reasonable inference of the corpus delicti of murder. *Janise*, 116 Ariz. at 559, 570 P.2d at 501.

■ With this requirement satisfied, the jury properly could consider defendant's admissions. These statements further substantiated the state's theory in this case and, coupled with the evidence already discussed, satisfied the final element in establishing murder—proving beyond a reasonable doubt that defendant killed the victim. After defendant's friends at De Anza Park noticed the blood on his hands, he told them that he had stabbed a man in a drug transaction and that he had taken the victim's body to the desert. He repeated this story several times during the next few days as he and McDonald traveled to Texas. Defendant also told McDonald and Parisien that he had gotten cactus needles in his arms and legs when he returned to the location where he left the body to retrieve keys he had dropped. Defendant also discussed the idea of disposing of his blood-stained clothes and, during his trip to Texas, he repeatedly sandpapered the blade of his knife.

Viewing this evidence in the light most favorable to upholding the jury's finding, we conclude that the jury was presented with substantial evidence from which it could conclude beyond a reasonable doubt that defendant murdered the victim. We therefore find the evidence sufficient to support defendant's first degree felony murder conviction.

## 2. Alleged Ineffective Assistance of Counsel

Defendant claims that he was denied effective assistance of counsel because of inadequate pretrial representation by his first trial attorney, Lamar Couser. Couser served as defendant's court-appointed counsel for the first 7 months of his prosecution.

■ As a general rule, ineffective assistance of counsel claims should be raised in post-conviction relief proceedings pursuant to rule 32, Arizona Rules of Criminal Procedure. *State v. Valdez*, 160 Ariz. 9, 770 P.2d 313 (1989). If the record clearly indicates that the ineffective assistance of counsel claim is meritless, however, this court may consider the issue on direct appeal. *State v. Carver*, 160 Ariz. 167, 771 P.2d 1382 (1989). We address the merits of defendant's claim in this direct appeal because, viewing the record in its entirety, we conclude that defendant's claim is meritless.

■ This court applies a two-pronged test to determine whether a conviction should be reversed on grounds of ineffective assistance of counsel. Defendant must affirmatively show that (1) counsel's performance fell below an objective standard of reasonableness, as defined by prevailing professional norms, and (2) the deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Nash*, 143 Ariz. 392, 397, 694 P.2d 222, 227 (1985); *State v. Lee*, 142 Ariz. 210, 214, 689 P.2d 153, 157 (1984). If an ineffectiveness claim can be rejected for lack of prejudice, the court need not inquire into counsel's performance. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. We will find prejudice if defendant establishes a reasonable probability that the verdict in this case might have been affected by the alleged error of counsel. *See State v. Walton*, 159 Ariz. 571, 592, 769 P.2d 1017, 1038 (1989), *aff'd*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

■ As a preliminary matter, we note that a strong presumption exists that counsel's performance fell within the broad range of conduct considered reasonable. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Nash*, 143 Ariz. at 398, 694 P.2d at 228. That is, judicial scrutiny of such conduct is highly deferential, granting wide latitude to the tactical choices of counsel. *Nash*, 143 Ariz. at 398, 694 P.2d at 228. Within this framework, a detailed review of defendant's allegations is warranted.

■ Defendant contends that his counsel filed an insufficient number of pretrial motions. Counsel filed 9 motions during a 7–month period, 4 of which defendant alleges were routine. Not only does defendant fail to overcome the strong presumption that counsel's conduct was reasonable, but he also fails to show any resulting prejudice. Although this court will presume prejudice when defense counsel fails entirely to subject the state's case to meaningful adversarial testing, *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984); *Nash*, 143 Ariz. at

398–99, 694 P.2d at 228–29, we do not find that this case represents such an extreme failure on counsel's part. Consequently, defendant must show that the reliability of the guilt determination was undermined by counsel's alleged omissions. *Cronic*, 466 U.S. at 659 n. 26, 104 S.Ct. at 2047 n. 26. Defendant has not done so and, therefore, we reject this claim for lack of prejudice.

■ Similarly, defendant challenges his counsel's failure to file a notice of change of judge. *See* rule 10.2, Arizona Rules of Criminal Procedure. This court recognizes the strong presumption that such a choice is trial strategy. *State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989). Defendant fails to offer any evidence to counter this presumption. Furthermore, even assuming that counsel's choice was unreasonable, no prejudice resulted because the judge to whom defendant's case was originally assigned was removed when defendant's own motion was granted.

■ Defendant argues that his counsel failed properly to examine or investigate the paint smear because he neither (1) requested that the bicycle be made available for testing nor (2) investigated alternative sources of the paint smear. Both claims can be rejected for lack of prejudice. First, defendant admits that a defense expert later examined the paint smear. Although this examination took place approximately two years after the state's examination, defendant has not shown that the time lapse resulted in prejudice to the defense. Second, defendant offers no proof that investigations into possible alternative sources of the paint smear would have yielded anything valuable to the defense. Thus, the required showing of prejudice has not been met.

■ Defendant next argues that his counsel made two errors regarding the grand jury proceedings: (1) he did not present any evidence; and (2) he did not object to the Pima County Grand Jury hearing evidence when the venue of the kidnapping case had been moved. In both instances we find that counsel's choices can be regarded as tactical decisions rather

than error. Defendant's conclusory allegations that these tactical choices were detrimental are not sufficient to displace the wide latitude this court grants to such choices. Further, even assuming that counsel made an error, defendant does not demonstrate any resulting prejudice to him. An error—even one with the potential to affect a grand jury's charging decision—is rendered harmless by the trial jury's subsequent guilty verdict. *See United States v. Mechanik*, 475 U.S. 66, 73, 106 S.Ct. 938, 943, 89 L.Ed.2d 50 (1986) (petit jury's guilty verdict rendered harmless any conceivable error in the grand jury's charging decision caused by alleged violation of rule 6(d), Federal Rules of Criminal Procedure); *State v. Just*, 138 Ariz. 534, 541–42, 675 P.2d 1353, 1360–61 (App.1983). Therefore, we reject these claims both for lack of merit and lack of prejudice.

Defendant challenges two aspects of his counsel's conduct regarding examination of the victim's bones: (1) failure to obtain an additional medical expert after the appointed pathologist became a state's witness; and (2) failure to prevent burial of the bones. Given our decision today that defendant was not denied a fair trial when his motion for exhumation of the bones was denied, we conclude that the defense was not prejudiced by the inability further to examine the bones. *See infra* Part 4.

■ Defendant argues that his counsel failed properly to investigate the case and interview witnesses. He contends that this deficient performance was immediately prejudicial to his defense because many of the witnesses were transients, drifters, drug addicts, and alcoholics, whose memories faded with the passage of time. Counsel, however, did interview a number of witnesses, so he did not fail entirely to subject the prosecution's case to meaningful adversarial testing. Thus, defendant is not entitled to a presumption of prejudice. *See Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047. Defendant has not shown that any witness possessed any information helpful to his defense which, because undiscovered, undermined the reliability of the guilt de-

termination. Therefore, we reject this claim for lack of prejudice.

■ Defendant contends that his counsel failed to maintain a professional relationship with him because (1) counsel failed to communicate with him directly, but rather communicated through letters; and (2) counsel was burdened by an actual conflict of interest as evidenced by his concern over funds spent on the case. We reject the first claim for lack of prejudice. We have found only one instance in the record where Mr. Couser communicated to defendant by letter. This letter, which concerned Mr. Couser's disapproval of defendant's meeting with a newspaper reporter, reminded defendant that he had been counseled not to discuss his case with the media. We find that defendant was not prejudiced by this incident.

■ We reject defendant's second claim of unprofessional conduct on the merits. Defendant must show that his counsel actively represented conflicting interests, not merely that a possibility of such a conflict existed. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). Defendant's unsupported accusation that his counsel was inordinately concerned about the amount of money expended for his defense is insufficient to demonstrate a conflict of interest.

■ Finally, defendant argues that the Pima County appointment system results in deficient representation for defendants. He urges that we review this system as we did the Mohave County system in *State v. Smith*, 140 Ariz. 355, 681 P.2d 1374 (1984). However, we find no indication of such systemic ineffectiveness here. Moreover, in *Smith*, in 1984, we referred to the Pima County system as an illustration of a system not burdened by such ineffectiveness. *Smith*, 140 Ariz. at 363, 681 P.2d at 1382. Therefore, we decline to engage in an extensive review of the Pima County appointment system.

Considering all the circumstances of this case, we find that defendant was not denied effective assistance of counsel by Mr. Couser. Each of defendant's allegations

lacks the support necessary to sustain an ineffectiveness claim. Additionally, the brevity of defendant's representation by his appointed attorney, the length and extent of his trial, and the competence of his retained attorney all militate against a determination that his defense was prejudiced.

3. Eyewitness Identifications

Defendant claims that the trial court's refusal to suppress eyewitness identifications that were allegedly biased by "suggestive, improper, tainted and unreliable" pretrial identification procedures denied him due process of law. Defendant focuses primarily on the witnesses' exposure to extensive media coverage of the victim's disappearance and defendant's later arrest and prosecution, and he argues that this exposure so tainted the witnesses that any subsequent *identifications were inherently* unreliable. We address the question of media exposure separately from other possibly suggestive pretrial viewings of defendant.

A. *Media Exposure*

■ To consider fully defendant's claim that exposure to publicity tainted the subsequent witness identifications, we first examine the scope and nature of the media coverage of this case. The victim's abduction became an immediate media sensation in the Tucson area. In the hours following the kidnapping, the media disseminated information to the community concerning the search for the young girl and the nascent investigation into her disappearance. Perhaps fueled by the resulting atmosphere of intense community concern and outrage over the senselessness of the crime, the press continued to devote significant coverage to the case, with defendant's arrest and subsequent prosecution receiving particular attention. As the trial judge would later remark, "To live in Pima County and avoid exposure to this coverage would have required one to be a hermit living in a cave." Press coverage of defendant included:

—photographs of him being arrested and transported in handcuffs;

—close-up photographs of his face;

—videotapes of him being arrested and escorted from a police vehicle by law enforcement officials;

—videotapes of his return to Tucson;

—extensive videotaped coverage of his hearings;

—voice-overs and/or lead-ins accompanying the videotapes identifying Atwood as "the suspect" and "the defendant," with frequent references to his prior convictions and parole status; and

—newspaper articles, accompanied by photographs of defendant, providing information about his background, prior convictions, and parole status, and discussing evidence incriminating him in the victim's kidnapping and murder.

Approximately one year before his trial, defendant moved to suppress the identification testimony of 14 witnesses, claiming that some might have been subject to improperly suggestive identification procedures and that all had been tainted by pretrial publicity. In response to defendant's motion to suppress, the trial court held an 11–day *Dessureault* hearing, *see State v. Dessureault,* 104 Ariz. 380, 384, 453 P.2d 951, 955 (1969), to determine the admissibility of the various identifications. The trial court concluded that all 14 witnesses had been exposed to one or more pretrial viewings of defendant under circumstances that were inherently suggestive. The court stated:

As a result of all this exposure every eye-witness has had one or multiple pre-hearing and pretrial viewings of the Defendant. Whatever the witnesses' opportunity and ability to make their original observations and then to recall and testify about them, those observations cannot be free of influence from their subsequent viewings of the Defendant in the various suggestive circumstances.

The trial court, relying on *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and its predecessors, then applied a "totality of the circumstances" analysis to determine whether the

admission of the various identifications would violate defendant's constitutional right to due process. *See Manson*, 432 U.S. at 113–14, 97 S.Ct. at 2252–53; *see also Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Based on its analysis, the court suppressed the identification testimony of two witnesses, but refused to suppress the identification testimony of the remaining 12 witnesses.

■ We review a trial court's decision on a motion to suppress under a "clear abuse of discretion" standard. *See State v. Fisher*, 141 Ariz. 227, 236, 686 P.2d 750, 759 (1984) ("It is well established in this state that a trial court's ruling on a motion to suppress will not be disturbed absent a clear abuse of discretion."), *citing State v. Adamson*, 136 Ariz. 250, 665 P.2d 972 (1983); *State v. Ferreira*, 128 Ariz. 530, 627 P.2d 681 (1981). Based on our review of the relevant authority and the record in this case, we conclude that the trial court did not abuse its discretion in refusing to suppress the identification testimony of any of the 12 witnesses who testified.

■ Initially, we recognize that each of the cases relied on by the trial court in conducting its analysis concerned unnecessarily suggestive *government* identification procedures, and note that the record in this case reveals no such procedures. However, we do not believe that unnecessarily suggestive government identification procedures are a *sine qua non* of due process concerns. Rather, we believe that *"reliability* is the linchpin in determining the admissibility of identification testimony ...," *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253 (emphasis added), and the trial court properly read *Manson* and its predecessors as requiring it to make an initial determination as to the reliability of the identification

testimony of the 14 witnesses. Similarly, we believe that the trial court properly considered the totality of the circumstances in determining whether the identification testimony of the witnesses was reliable. *Manson*, 432 U.S. at 113–14, 97 S.Ct. at 2252–53.[1] Accordingly, we conclude that the trial court's analysis is supported by well-established Supreme Court precedent.

We also believe that the trial court's decision to admit the identification testimony of 12 of the 14 witnesses is supported by the record. After conducting the *Dessureault* hearing, and after considering the factors bearing on reliability under the totality of the circumstances, the trial court concluded that the identification testimony of 12 of the 14 witnesses was reliable. Indicative of the trial court's conscientiousness in conducting this hearing is its finding that the identification testimony of two witnesses was not reliable. In addition to conducting a conscientious hearing, we believe that the trial court properly concluded that the identification testimony of 12 of the 14 witnesses was reliable. Although the record indicates that each of the 14 witnesses was exposed to inherently suggestive viewings of the defendant, the record does not indicate that the identification testimony of any of the 12 witnesses who testified was thereby rendered so unreliable that its admission would violate due process. We therefore find no error.

## B. *Other Pretrial Viewings*

■ Our review of the record indicates that the only other potentially suggestive pretrial viewings of defendant were (1) a photo spread shown to a young witness; (2) the same photo spread as witnessed by the youth's mother as she looked over his shoulder; and (3) the showing of black and white photos of defendant to another witness, Michael Eggers, by an investigator hired by defendant's first attorney. The trial court considered each of these viewings in its ruling on defendant's motion to

---

**1.** Factors bearing on reliability include (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the confrontation. *Biggers*, 409 U.S. at 199, 93 S.Ct. at 382.

suppress. A trial court's decision concerning the reliability of an identification will not be overturned on appeal absent clear and manifest error. *State v. Myers*, 117 Ariz. 79, 84, 570 P.2d 1252, 1257 (1977). We find no such error in the trial court's determination; defendant's motion to suppress was properly denied.

■■ We also note that, even if these witnesses had been irreparably tainted by the pretrial viewings, no prejudice inhered to defendant. The young boy did not testify at trial, and his mother was called as a defense witness. Michael Eggers was called as a prosecution witness and he identified defendant as the man he had seen in a trailer park near the victim's school. However, assuming *arguendo* that his identification was tainted by the viewing of the photographs, that viewing was initiated by defense counsel's own investigator. Therefore, no basis existed for suppressing Eggers' identification.

### 4. Denial of Exhumation

■■ Defendant contends that his right to a fair trial was violated by the trial court's refusal to order exhumation of the victim's remains. The skeletal remains were discovered in April 1985 and were buried one month later. Prior to burial, the remains were examined by Drs. Froede and Birkby, at the prosecution's request, and by Drs. Keen (the Yavapai County Medical Examiner) and Chilton (a forensic odontologist), at defense counsel's request. Apparently, all of the examiners reached similar conclusions—that the remains belonged to the victim, but that the cause of death could not be determined.

At the time the victim's parents arranged for funeral services, Lamar Couser was defendant's attorney. Defendant had requested that Stanton Bloom represent him, but Bloom had not yet accepted the case. The prosecution therefore notified both Couser and Bloom of the pending burial. Couser, as attorney of record, chose not to seek a delay of the funeral to allow for further examination of the bones, despite Bloom's request that he do so. Funeral services took place on May 30, 1985.

On November 4, 1985, Bloom, who had since assumed defendant's representation, moved for the exhumation of the remains. The motion stated that,

[b]ecause the autopsies previously done on the bones of [the victim] were totally inconclusive, this Defendant moves that these bones be exhumed in order to administer justice. It is felt that evidence can be secured by disinterment which would create material valuable and highly relevant in establishing the accused's guilt or innocence.

Bloom supplemented this motion with his own affidavit, stating that he had spoken with an expert, whose identity he refused to disclose, who had assured him that he would be able to determine the cause of death. The affidavit also indicated that the unknown expert's examination might entail sending the remains out of the United States.

The motion to exhume was denied by the trial court without comment. The defense initiated special action proceedings seeking appellate review of this ruling, but both the court of appeals and this court declined to accept jurisdiction. *See* Arizona Court of Appeals, Division Two, 2 CA–SA 335 (jurisdiction declined Jan. 7, 1986), and Arizona Supreme Court, CV–86–0085–PR (petition for review denied March 25, 1986).

■■ The power to grant the exhumation of human remains lies within the sound discretion of the trial court, *see, e.g., Moss v. State*, 152 Ala. 30, 34, 44 So. 598, 599 (1907), and we will not overturn the court's decision on this matter absent an abuse of that discretion. We find no abuse in this case. The trial court was presented only with Mr. Bloom's cryptic promises that "valuable and highly relevant" evidence could be discovered by exhumation. However, he revealed neither the name of the expert nor the basis for the expert's conclusions. "Exhumation of the victim's body is to be allowed only under extraordinary circumstances. Where existence of the evidence sought was so speculative and uncertain, and its value in aiding defendant's defense so conjectural and remote, the trial court properly exercised its discre-

tion in refusing appellant's motion." *Commonwealth v. Kivlin*, 267 Pa.Super. 270, 281, 406 A.2d 799, 805 (1979); *see also* Annotation, *Disinterment in Criminal Cases*, 63 A.L.R.3d 1294, 1302 (1975) (exhumation is appropriate when "absolutely essential to the administration of justice"). We find no error in the denial of the motion to exhume the victim's remains.

## 5. Alleged Prosecutorial and Police Misconduct

Defendant claims that several instances of prosecutorial and police misconduct denied him a fair trial. We categorize these alleged instances of misconduct into 4 areas: (A) investigative misconduct by both the police and prosecution; (B) prosecutorial misconduct before the grand jury; (C) improper contact between the prosecution and the media; and (D) trial misconduct.[2] We examine each category separately.

### A. *Alleged Investigative Misconduct*
#### 1. Burial of Victim's Remains

■ Defendant argues that the prosecutor, John G. Davis, III, had agreed with Stanton Bloom (before Bloom became attorney of record) that the victim's remains would not be buried until mid-June 1985 to enable a defense expert to examine the bones. At the victim's parents' request, however, the remains were buried on May 30, 1985, before Bloom could have them examined. Defendant suggests that, in allowing the victim's parents to proceed with the funeral, the prosecution failed to preserve valuable evidence and thereby denied defendant a fair trial.

Contrary to defendant's argument, we believe that he was not denied a fair trial.

Two experts for the defense had already examined the victim's remains before funeral arrangements were made. The prosecutor notified both Couser and Bloom of the pending burial. Couser, who was still attorney of record, chose not to seek a delay of the funeral, despite Bloom's request to do so. Thus, the defense was offered access to the evidence before the remains were buried, and, in fact, two defense experts examined the remains.

Additionally, both Drs. Birkby and Keen were unable to determine the cause or exact date of death, and the record does not reflect that additional examination of the victim's remains would have yielded any evidence useful to the defense. In fact, in his motion to exhume, defendant did not present any evidence—other than Bloom's personal affidavit—indicating that further examination of the bones would have proven fruitful. We therefore conclude that defendant was not denied a fair trial by the burial of the victim's remains.

#### 2. Police Investigation

■ Defendant also claims that the police and prosecution failed adequately to investigate alternative theories of the case. He asserts that the prosecution did not fully investigate other supposed sightings of defendant or the possibility that some other person had kidnapped the victim. Although we will not address individually each of defendant's grievances with the investigatory process, the essence of the argument is that the "prosecution singled out [defendant] and proceeded to build their case to the exclusion of other leads."

As a preliminary matter, we note that our review of the record does not support

---

**2.** Defendant raises an additional claim of prosecutorial misconduct: that the state improperly attempted to have defendant's appellate counsel replaced.

Specifically, the state sought to have Ms. Carla Ryan, defendant's appointed appellate counsel, removed because she had indicated to a Tucson newspaper in August 1987 that she was suffering from "burn out" due to overwork. In the article, Ryan stated that she had left her job with the Pima County Public Defender's office because she "couldn't go on" and that she intended "to put in half-days in private practice

for several years, then scrutinize her career." In its attempt to have Ryan removed, the state argued that Ryan's condition and her reduced workload jeopardized the possibility of a speedy and effective appeal in defendant's case.

The state was unsuccessful in its attempt to have Ryan removed. Because the incident could not, on this appeal, have had any effect on the outcome of defendant's trial, however, we do not address defendant's claim that the attempt to remove Ryan constitutes prosecutorial misconduct.

defendant's claim that the prosecution "singled" him out. The police did in fact question, investigate, and evaluate the disparate sources of information concerning the case. Concededly, their investigation quickly narrowed its focus on defendant. This concentration, however, was engendered by the evidence pointing to him, not by an apparent desire of the police or prosecution to find a person upon whom to place the blame, regardless of that person's guilt or innocence.

■ Nevertheless, we will reverse defendant's conviction because of prosecutorial misconduct *if* two conditions are satisfied: (1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial. *See State v. Bracy,* 145 Ariz. 520, 526, 703 P.2d 464, 470 (1985). We decline to find that the police or prosecution acted improperly in failing exhaustively to investigate the hundreds of reports they received from Tucson citizens claiming to possess information concerning the case. This fact, coupled with our determination that the police did not improperly "single out" defendant to the exclusion of equally viable suspects, leads us to conclude that no misconduct occurred in the investigation of the victim's disappearance. We are therefore unpersuaded by defendant's argument.

Of course, integral to defendant's argument is the suggestion that further or more thorough investigation would have revealed defendant's innocence. However, we will not speculate on appeal about "what might have been" or "what could have happened." We again stress that we are not the jury. We have already concluded that ample evidence existed to support the convictions. Thus, even if we were to find that the police and/or prosecution acted improperly in failing to investigate alternative theories in this case, the record does not disclose a reasonable likelihood that their misconduct could have affected the jury's verdict. For this additional reason, we reject defendant's claim.

### 3. The "Cuckoo File"

■ Defendant takes issue with the prosecutor's reference to his file of telephone calls and letters from Tucson residents as his "cuckoo file."[3] He also complains about the timeliness with which the file was disclosed to the defense. We find no merit in either claim.

■ First, the jury did not hear the file referred to as a "cuckoo file;" therefore, defendant can claim no prejudice from the use of this name. Second, although criminal defendants have a due process right to disclosure, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), this right only extends to the disclosure of *material* evidence. Thus, although untimely disclosure may be as constitutionally reprehensible as complete nondisclosure, reversal is appropriate only when it is reasonably probable that the jury's verdict would have been different had the evidence been disclosed at a time when it would have been of value to the defense. *See, e.g., United States v. Juvenile Male,* 864 F.2d 641, 647 (9th Cir.1988). The United States Supreme Court has held that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392,

---

**3.** In highly publicized cases like this one, the prosecution, the police, and the judge commonly are deluged with letters and telephone calls from people claiming to possess information relevant to the investigation. As might be expected, many of these letters and calls that seem to be from emotionally disturbed persons eager to participate in a high profile criminal investigation are often kept in a separate file. The prosecutor in this case described his file of such contacts as follows:

I have one file that is very thick which is labeled merely the cuckoo file. And that consists of a torrent of letters from obviously disturbed people about this case. Mr. Couser and I used to get together on a somewhat regular basis and compare our cuckoo files to see if we were getting the same ones. Most of the time we were.

2400, 49 L.Ed.2d 342 (1976); *see also United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."). Under this standard, the file did not constitute "material" evidence. We therefore find no error.[4]

### B. *Alleged Misconduct Before the Grand Jury*

■ Defendant next complains that the prosecution presented misleading information to the Grand Jury that indicted him on the murder charge. We will not consider this issue on appeal; defendant raised the argument in a special action proceeding through which he sought review of the trial court's denial of his motion to dismiss the indictment. Both the court of appeals and this court declined to accept jurisdiction. *See* Arizona Court of Appeals, Division 2, 2 CA–SA 335 (jurisdiction declined Jan. 7, 1986); Arizona Supreme Court, CV–86–0085–PR (petition for review denied March 25, 1986). The issue is therefore moot. *See State v. Agnew*, 132 Ariz. 567, 573, 647 P.2d 1165, 1171 (App.1982); *see also United States v. Mechanik*, 475 U.S. 66, 72–73, 106 S.Ct. 938, 943, 89 L.Ed.2d 50 (1986) (petit jury's guilty verdict rendered harmless any conceivable error in the grand jury's charging decision caused by alleged

violation of rule 6(d), Federal Rules of Criminal Procedure); *State v. Verive*, 128 Ariz. 570, 574–75, 627 P.2d 721, 725–26 (1981) (defendant cannot, by appeal from conviction, obtain review of matters relevant only to grand jury proceedings that had no effect on the subsequent trial).

### C. *Alleged Prosecutorial Contact with the Media*

■ Defendant asserts that the prosecution acted improperly in releasing certain information to the press. Although we recognize the potential for serious infringement of a defendant's right to a fair trial when the prosecution engages in extrajudicial contact with the media, *see, e.g., United States v. Milanovich*, 303 F.2d 626, 629–30 (4th Cir.1962), our concern in addressing alleged prosecutorial misconduct is the actual effect of the conduct on defendant's trial. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982); *cf. State v. Hallman*, 137 Ariz. 31, 37, 668 P.2d 874, 880 (1983) ("Misconduct alone will not cause a reversal, but only where the defendant has been denied a fair trial as a result of the actions of counsel."). Because we hold that defendant was not denied a fair trial because of pretrial publicity, we do not address the various alleged incidents of improper contact with the media. *See infra* Part 15.[5]

---

**4.** We also note that the record does not indicate that the defense received the file at a time when it would have had no value to them. However, because we were unable to determine (1) precisely when the file was disclosed, and (2) the amount of time necessary for the defense adequately to investigate the information contained in the file, we have applied the *Brady* standard. Thus, although the record does not necessarily indicate a *Brady* violation, we conclude that, because the file was immaterial for constitutional purposes, defendant would not have been prejudiced even if one had occurred.

**5.** In concluding that no prejudice occurred, however, we do not suggest that defendant's concerns about the prosecution's attitude toward media interest in the case are unfounded. For example, defendant argues that the prosecu-

tor improperly disclosed the location of his trial to the press after the court had granted a change of venue because of the publicity already attendant to the case. Specifically, the prosecutor made the following statement during a hearing on defendant's motion to continue:

> MR. DAVIS: The only thing that I would like the Court to consider in setting a new date is that I would like it set as early in September as possible since that seems to be when Mr. Bloom has targeted. I appreciate Mr. Bloom's concern to perhaps let the Phoenix heat abate, but I grew up there and survived. So even if we start early in September, I think that will be plenty of time.

The prosecutor's statement, made before several members of the media who were present at the hearing, contravened the court's request that neither party divulge that the trial had been

### D. *Alleged Trial Misconduct*

Defendant raises several instances of alleged prosecutorial misconduct at the trial. We address each claim individually.

#### 1. Witness's Reference to Polygraph

■ Defendant asserts that the prosecutor engaged in misconduct by failing to warn a state's witness not to testify that he had taken a polygraph test. The prosecutor admitted failing to inform the witness, but he maintained that the omission was unintentional. In its brief, the state asserts that the witness's statement was made "only after the defense counsel pressed him very hard to state precisely when he had first recalled a particular piece of information during the various interviews he had with police investigators." The state contends that defense counsel "opened the door" for the improper statement through his questioning, and that defendant therefore cannot claim error. *See State v. Ikirt*, 160 Ariz. 113, 115, 770 P.2d 1159, 1161 (1987); *State v. Roberts*, 144 Ariz. 572, 575–76, 698 P.2d 1291, 1294–95 (App.1985).

The statement concerning the polygraph was made while defense counsel was cross-examining Jack McDonald about when he remembered defendant's telephone conversation with his mother in which McDonald testified that defendant stated, "Even if I did do it, you have to help me." Defense counsel was attempting to elicit from McDonald an explanation about why he did not mention the conversation to the police until several weeks after the Kerrville arrest:

MR. BLOOM: Where were you when the information came to you after you had given all the long statements to the Police?

Where was it this business of information came to your mind?

WITNESS: I think it was when I was taking the lie detector test.

Defendant argues that the issue is not that this statement was heard by the jury, but rather that the prosecutor failed to warn the witness not to mention the polygraph. Apparently, he asserts that, regardless of lack of prejudice to defendant, the prosecutor's failure to warn the witness was improper conduct rising to the level of constitutional error. We disagree. Our concern in examining any claim of prosecutorial conduct is with the fairness of the trial, not the culpability of the prosecutor. *See Phillips*, 455 U.S. at 219, 102 S.Ct. at 947. Thus, if prosecutorial misconduct were present in this case, that misconduct would not merit reversal of defendant's conviction unless it denied him a fair trial. *See, e.g., Milanovich*, 303 F.2d at 630; *State v. Marquez*, 113 Ariz. 540, 544, 558 P.2d 692, 696 (1976) ("where the reference to the [polygraph] examination does not prejudice the defendant, there is no reversible error").

We find that defendant was not denied a fair trial by the reference to the polygraph. Even without addressing the possibility that defense counsel opened the door to this testimony, the reference to the polygraph and the possible reflection it had on McDonald's veracity are insufficient, when viewed in relation to the totality of the

---

moved to Phoenix. By not revealing the location of the trial, the trial court hoped to prevent possible detrimental media coverage in the new venue.

In its brief, the state dismisses Mr. Davis's statement as "an inadvertent slip of the tongue." Accepting this as true, however, and also finding that the prosecutor did not realize that he was endangering defendant's right to a fair adjudication of his guilt or innocence, such inadvertence would not negate this argument if the result was indeed prejudicial. *See, e.g., United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979) (noting that even unintentional prosecutorial behavior can cause improper influence); *In re Balistrieri*, 503 F.Supp. 1112, 1115 (E.D. Wis.

1980) ("Even if the documents were inadvertently released as stated by the government's counsel, their disclosure is inexcusable."); B. Gershman, *Prosecutorial Misconduct* § 6.1, at 6–2 (1990). (prosecutors may engage in improper conduct with the media either deliberately or inadvertently).

In hindsight, we are able to determine that pretrial publicity did not deprive defendant of a fair trial, and we therefore conclude that defendant was not prejudiced by Mr. Davis's regrettable disclosure of the trial location. Thus, for due process purposes, no error occurred. Nevertheless, given the scope of media attention to this case, we find inadvertency concerning such an important matter disconcerting.

evidence presented by the state, to suggest that defendant's right to a fair trial was abrogated by the incident. Finally, any possible error was rendered harmless by the court's immediate instruction to the jury to disregard the witness's answer. *See State v. Bowen*, 104 Ariz. 138, 141, 449 P.2d 603, 606 (1969).

### 2. Emotional Witness

■ Defendant next argues that the prosecution engaged in misconduct in connection with the testimony of Sam Hall, the teacher who saw defendant's car in an alley near the Homer Davis Elementary School. Hall became emotionally upset during direct examination and the prosecutor attempted to calm him. Defense counsel moved for a mistrial, arguing that the testimony was a "staged performance" and that the witness had been "prompted" by the prosecution. According to the defense, this prompting was illustrated by the witness's charged responses to the prosecutor's questions and his contrastingly calm testimony during cross-examination.

The trial court denied the motion for mistrial. We will not reverse the trial court's ruling on this issue absent an abuse of discretion. *See Hallman*, 137 Ariz. at 37, 668 P.2d at 880; *State v. Williams*, 121 Ariz. 213, 215, 589 P.2d 456, 458 (App. 1978); *see also State v. Carr*, 91 Or.App. 673, 675, 756 P.2d 1263, 1264 (1988). We find no abuse. Although the record reflects that Hall became agitated during his testimony and that he perhaps was overcome with emotion, the trial judge was in the best position to evaluate the effect of Hall's demeanor on the jury. *See State v. Wayman*, 104 Ariz. 125, 127, 449 P.2d 296, 298 (1969); *State v. Chears*, 231 Kan. 161, 166, 643 P.2d 154, 158 (1982). With the jury present, the trial judge discussed with Hall his emotional state and requested that he answer questions with "yes or no" whenever possible. In addition, the jury was instructed that it "must not be influenced by sympathy or prejudice." The court's comments at the time of the incident, together with its instruction to the jury, sufficiently countered any negative impact Hall's loss of composure might have

had on the jury. Further, we do not believe, given the length of the trial and the magnitude of evidence presented, that the jury was impermissibly tainted by the emotional display of one witness on the second day of trial. We therefore need not address defendant's underlying contention that the testimony was "prompted" or "staged."

### 3. Testimony of Victim's Mother

■ Defendant next argues that, by calling the victim's mother to testify in both its case-in-chief and as a rebuttal witness, the prosecution engaged in prejudicial misconduct designed to arouse sympathy from the jury. We do not believe, however, that allowing the victim's mother to testify constituted reversible error. Mary's mother was uniquely aware of her daughter's activities leading up to the kidnapping and, concerning her testimony in rebuttal, she was able to describe certain of her daughter's characteristics that conflicted with the testimony of persons who claimed to have seen the child at a local mall. Despite the potentially prejudicial effects of permitting a victim's mother to testify, we do not believe that the trial court in this case erred in allowing this probative testimony. *See Corn v. Zant*, 708 F.2d 549, 568 (11th Cir.1983) ("The trial court has broad discretion in passing on the admissibility of evidence, including testimony that may be calculated to create prejudice against or sympathy for the accused. It is for the trial court to determine whether the probative value of the evidence is outweighed by possible prejudicial impact."); *see also United States v. Donley*, 878 F.2d 735, 738–39 (3d Cir.1989) (trial court has discretion to determine whether testimony of victim's mother is sufficiently probative to outweigh prejudicial effects); *State v. Purcell*, 117 Ariz. 305, 309, 572 P.2d 439, 443 (1977) (upholding trial court's decision to allow murder victim's son to testify).

### 4. Testimony Concerning Underpants Found Near Victim's Remains

■ Defendant next argues that the prosecutor engaged in misconduct during

direct examination when he questioned a detective from the Pima County Sheriff's Department concerning items found in the vicinity of the victim's remains. The detective responded that one item recovered was a pair of little girl's underpants. The prosecutor asked no further questions about the underpants. Defendant asserts that the prosecutor was attempting to mislead the jury by failing to elicit from the detective that the victim's mother had been unable positively to identify the underpants as her daughter's, and that he thereby engaged in prosecutorial misconduct. *See infra* Part 17(G).

Regardless of the prosecutor's motive in questioning the detective, the jury was informed through defense counsel's thorough cross-examination that the victim's mother had not positively identified the underpants. We therefore find that defendant was not prejudiced by the incident.

### 5. Comments Made by Prosecutor

■ Defendant contends that the prosecutor made improper comments in both the trial and closing argument that prejudiced his right to a fair trial. Particularly, defendant takes issue with what he describes as the prosecutor's repeated gratuitous comments attempting to ingratiate himself with the jury.[6] For example, at the close of defense counsel's direct examination of a witness, the prosecutor engaged in the following colloquy with the witness:

---

**6.** Defendant also .addresses other comments made by the prosecutor during the course of the trial. Because these statements were made outside the jury's presence, however, they could not have prejudiced the jury's determination. We limit our discussion to those statements made before the jury.

**7.** The prosecutor made the following comments:.
MR. DAVIS: Now Mr. Bloom in his closing argument does several things [that] are kind of indicative of this whole trial.
Remember that question to Mike Young? Objection sustained. Came back in closing argument, didn't it? Objection sustained.
. . . .
Why do you do that? Why do you break the rules?
MR. BLOOM: Objection, Your Honor.

---

MR. DAVIS: If I don't ask you any questions, will you promise not to knock me down the next time we play soccer?
WITNESS: No.
MR. DAVIS: Well, no questions anyway.

Of course, the record cannot reveal the nuances of the prosecutor's courtroom demeanor. Nevertheless, although we do not find an excess of such statements in the record, this exchange was not an isolated event. Indeed, the trial judge found it necessary more than once to admonish the prosecutor—outside the jury's hearing—to refrain from the extraneous comments.

Defendant also argues that he was prejudiced by the prosecutor's statements during closing argument. Specifically, the record reveals that the prosecutor questioned defense counsel's motives for making certain improper statements in closing argument,[7] and repeatedly joked about the defense counsel's lengthy presentation style.[8]

The state responds that the prosecutor's gratuitous remarks were "utterly innocuous attempts to leaven the grinding seriousness of week after week of murder trial with a few minor pleasantries." We agree with the state's conclusion that the prosecutor's comments and asides throughout the trial were "innocuous," although we express no opinion on the prosecutor's reasons for making them. We are more reluctant, however, to dismiss as innocuous Mr. Davis's jocular remarks about defense counsel's closing argument and especially his comments concerning defense counsel's

---

MR. DAVIS: Why do you express your personal opinion in closing argument?
THE COURT: Mr. Davis, I think it's gone far enough. Let's get back to discussing the evidence and the law and its application.

**8.** For example, in characterizing the defense's closing argument, he suggested that only in Cuba would people otherwise be forced to listen to someone speak for 4 or 5 hours. Further, in alluding to defense counsel's analogy to the story of Susanna and the Elders, the prosecutor suggested that, if Mr. Bloom had represented Susanna, he "could have just talked until [the elders] died, and that would have completed the story." *See Book of Daniel*, Ch. 13, New Jerusalem Bible.

motives. Although we recognize that an adversarial setting may encourage some good humored—and even ill-humored—repartee between attorneys, we believe that, regardless of its effect on defendant's trial, the prosecutor's attempts to discredit the defense attorney before the jury evidenced a lack of discretion and a disregard for the high standards expected of attorneys who represent the public interest, and as such they were not "innocuous." Regardless of whether Mr. Davis's glibness and his personal comments about the defense counsel were precipitated by the culmination of a long, emotional trial, or whether they were encouraged by the gavel-to-gavel televised coverage of the case, we find his statements unnecessary and inappropriate.

Nevertheless, we do not believe that the comments deprived defendant of a fair trial. As this court has held:

> In determining whether remarks made by counsel in a criminal case are so objectionable as to warrant a new trial, the trial court should consider (1) whether the remarks call to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) the probability that the jurors, under the circumstances of the particular case, were influenced by the remarks. Misconduct alone will not mandate that the defendant be awarded a new trial; such an award is only required when the defendant has been denied a fair trial as a result of the actions of counsel.

*State v. Hansen*, 156 Ariz. 291, 296–97, 751 P.2d 951, 956–57 (1988) (citation omitted). We further noted in *Hansen* that "the trial court is in a better position to judge whether the prosecutor is unduly sarcastic, his tone of voice, facial expressions, and their effect on the jury, if any. Accordingly, we defer to the trial court's judgment in the absence of patent error." *Hansen*, 156 Ariz. at 297, 751 P.2d at 957. Concerning the gratuitous remarks, the trial court reprimanded Mr. Davis outside the jury's hearing and threatened further sanctions if he continued making them. Apparently, the court did not find further sanctions necessary. Concerning the "why do you break

the rules" statement, the court told the prosecutor that he had gone "far enough," in effect instructing him not to break the rules himself.

Although "in capital cases appellate courts are prone to scrutinize [improper statements] more carefully," *Burrows v. State*, 38 Ariz. 99, 117, 297 P. 1029, 1036 (1931), *overruled on other grounds, State v. Hernandez*, 83 Ariz. 279, 320 P.2d 467 (1958), we do not believe that the prosecutor's behavior, albeit unnecessary and inappropriate, rose to the level of reversible error. *See, e.g., United States v. Weinstein*, 762 F.2d 1522, 1542 (11th Cir.1985) ("Reversal on the basis of prosecutorial misconduct requires that the conduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.' "), *quoting United States v. Blevins*, 555 F.2d 1236, 1240 (5th Cir.1977). The statements conceivably were attempts to call to the jurors' attention matters irrelevant to the determination of defendant's guilt or innocence. The probability that the statements actually influenced the jury's verdict, however, is remote. We find no patent error.

### 6. Consolidation and Severance

Defendant claims that the lower court's refusal to sever the kidnapping and murder offenses at trial constitutes reversible error. He alleges that consolidation of the two charges (1) caused prejudice to his defense; (2) resulted in a "rub-off" effect whereby neither offense was proven beyond a reasonable doubt; and (3) prevented him from testifying on one charge and not the other, thereby violating his fifth amendment rights. The state initially responds to these allegations by arguing that defendant did not file a proper motion to sever, resulting in a procedural waiver under rule 13.4, Arizona Rules of Criminal Procedure. We will address the procedural issue first, before considering the merits of defendant's allegations.

█ The state notes that, prior to arguing its motion for consolidation, defendant filed both an opposition to the state's mo-

tion for consolidation *and* a motion to sever. After argument, the trial court granted the state's motion to consolidate; immediately, defendant renewed his motion to sever. The state contends that, technically, defendant's conduct does not comport with rule 13.4, which speaks of filing a motion to sever only *after* a motion to consolidate has already been granted. Thus, the state argues, this technically incorrect motion to sever, coupled with the Arizona courts' prior strict application of the waiver provisions of rule 13.4, requires this court to reject defendant's claim on procedural grounds.

Although the state is correct in asserting that the waiver provisions of rule 13.4 have been strictly applied, the cases it cites are not on point. *See State v. Haas*, 138 Ariz. 413, 675 P.2d 673 (1983); *State v. Bruni*, 129 Ariz. 312, 630 P.2d 1044 (App.1981). In each of those cases, the court found that a defendant's motion to sever was waived when it was not properly renewed during trial or at the close of evidence. *Haas*, 138 Ariz. at 425, 675 P.2d at 685; *Bruni*, 129 Ariz. at 316, 630 P.2d at 1048. Failure to do so violated the explicit requirements dictated by rule 13.4(c). In this case, however, defendant's conduct does not violate any specific provision of the rule. Although the state argues that the rule prohibits such conduct by implication, we are unconvinced.

Moreover, rule 1.2, Arizona Rules of Criminal Procedure, provides that the criminal rules "shall be construed to secure simplicity in procedure, fairness in administration, [and] the elimination of unnecessary delay and expense...." For this court to conclude that a procedural waiver resulted from defendant's conduct—*i.e.*, conduct that is not proscribed by any rule—would be to contradict the principles of construction provided by rule 1.2. Accordingly, we do not find that defendant's motion to sever was waived.

■ When reviewing the trial court's denial of defendant's motion to sever, this court will not find reversible error absent a clear abuse of discretion. *State v. Comer*, 165 Ariz. 413, 418, 799 P.2d 333, 338 (1990);

*State v. Day*, 148 Ariz. 490, 493, 715 P.2d 743, 746 (1986). Given this standard, we will review each of defendant's allegations separately.

■ First, defendant contends that the trial court's refusal to sever the kidnapping and murder charges prejudiced his defense. A clear abuse of discretion is established only when a defendant shows that, at the time he made his motion to sever, he had proven that his defense would be prejudiced absent severance. *State v. Via*, 146 Ariz. 108, 115, 704 P.2d 238, 245 (1985); *State v. Lucas*, 146 Ariz. 597, 601, 708 P.2d 81, 85 (1985). This burden of proof is not met, however, when "evidence as to one set of charges would have been admissible at the trial on the other set 'as part of the complete picture.'" *Via*, 146 Ariz. at 115, 704 P.2d at 245, *quoting State v. Mincey*, 115 Ariz. 472, 483, 566 P.2d 273, 284 (1977), *rev'd on other grounds*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

In this case, the kidnapping charge was the underlying offense supporting the felony murder charge. Consequently, a substantial portion of the evidence regarding the kidnapping charge would have been admissible at trial for the felony murder charge to provide the jury with a "complete picture" of the events preceding defendant's arrest. In fact, another court has affirmed the propriety of consolidating a kidnapping offense with a felony murder offense in two cases with strikingly similar factual backgrounds to that of this case. *See People v. Cunningham*, 194 Colo. 198, 201, 570 P.2d 1086, 1088 (1977) (a defendant charged with kidnapping a child, who was later found dead, was also charged with felony murder); *People v. McCrary*, 190 Colo. 538, 551–52, 549 P.2d 1320, 1330–31 (1976) (a defendant charged with kidnapping a child, whose body was found some time later, was subsequently charged with felony murder). Therefore, because defendant did not meet his required burden of proof, we find that the trial court did not abuse its discretion.

■ Second, defendant claims that the trial court's refusal to sever the two

charges resulted in a "rub-off" effect whereby neither charge was proven beyond a reasonable doubt. He cites a line of cases espousing the rub-off doctrine, which provides that cases with multiple defendants and a great disparity in the weight of evidence against each defendant pose a danger that the guilt of one defendant will rub-off on the other defendant. *See United States v. Mardian*, 546 F.2d 973, 977 (D.C.Cir.1976); *United States v. Donaway*, 447 F.2d 940, 943 (9th Cir.1971). Thus, a trial court's refusal to sever defendants' trials under such circumstances constitutes an abuse of discretion. *Donaway*, 447 F.2d at 943.

Although conceding that these cases are not directly on point, defendant argues that the rub-off doctrine should apply by analogy to the trial court's refusal to sever the kidnapping and murder offenses in this case. We disagree.

In *Comer*, we rejected a similar argument when the defendant in that case claimed that a guilt determination on one charge may have influenced the jury's guilt determination on the other charge. *Comer*, 165 Ariz. at 419, 799 P.2d at 339. We ruled that a defendant is not prejudiced if the jury is (1) instructed to consider each offense separately, and (2) is advised that each offense must be proven beyond a reasonable doubt. *Comer*, 165 Ariz. at 419, 799 P.2d at 339. In this case, the trial court's instructions fulfilled both requirements. Accordingly, we find no prejudice to defendant and, therefore, no abuse of discretion by the trial court.

■ Finally, defendant maintains that the trial court's refusal to sever the two offenses prevented him from testifying on one charge and not the other. Severance, however, is not automatic whenever a defendant decides to testify on some charges, but not others. *Comer*, 165 Ariz. at 419, 799 P.2d at 339. He must show "that he has both important testimony to give on some counts and strong reasons for not testifying on others." *Comer*, 165 Ariz. at 419, 799 P.2d at 339; *accord United States v. Nolan*, 700 F.2d 479, 483 (9th Cir.1983). Defendant's general explanation did not reach the level of specificity necessary to meet this requirement. *See Baker v. United States*, 401 F.2d 958, 977 (D.C.Cir.1968). Consequently, we find no abuse of discretion by the trial court.

7. Defendant's Arrest, Detention and Interrogation, and the Searches of Defendant's Car

A. *The Arrest*

■ Defendant contends that he was improperly arrested and detained by federal authorities in Texas and that the trial court therefore should have suppressed any evidence obtained as a result of the arrest. FBI agents arrested defendant in Kerrville, Texas on September 20, 1984 (three days after the victim's disappearance), pursuant to an arrest warrant issued by a United States magistrate in Tucson. The warrant charged defendant with kidnapping in violation of 18 U.S.C. § 1201.

Except for a limited number of circumstances not relevant in this case, kidnapping becomes a federal offense only when the victim is "willfully transported in interstate or foreign commerce." 18 U.S.C. § 1201(a)(1). Defendant argues that, because no evidence of interstate transportation existed, federal authorities improperly relied on the presumption of interstate transportation found in 18 U.S.C. § 1201(b) to establish the required nexus. Section 1201(b) provides that "the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce." Relying on *United States v. Moore*, 571 F.2d 76 (2d Cir.1978), defendant asserts that § 1201(b)'s presumption of interstate transportation is unconstitutional and that, because the FBI had no probable cause to believe a federal crime had been committed absent that presumption, his arrest deprived him of due process.

The state attacks defendant's argument on several grounds, noting first that the record does not indicate that the magis-

trate actually relied upon the presumption. Because the affidavit did not mention the § 1201(b) presumption, argues the state, the magistrate conceivably could have drawn his own reasonable inference that the victim had been transported interstate from the facts that the victim had not been seen in 3 days and that the suspect had been located in Texas. The state further argues that *Moore,* which "stands completely alone in its condemnation of the § 1201(b) presumption," is inapposite to this case because it concerned the use of the presumption at trial, not in an arrest warrant affidavit.

We are persuaded by the state's argument, for even if the magistrate did rely on the presumption, we do not find *Moore* persuasive authority for the argument that the presumption is unconstitutional when used to establish probable cause to arrest. In *Moore,* the court reversed the kidnapping convictions of two defendants because § 1201(b)'s presumption of interstate transportation formed the only substantial basis to establish an interstate nexus. After examining a string of United States Supreme Court cases concerning "the constitutionality of statutory presumptions *in the trial of criminal cases,*" *Moore,* 571 F.2d at 85–86 (emphasis added), *citing Tot v. United States,* 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); *United States v. Gainey,* 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965); *Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the court concluded:

> We simply cannot say with substantial assurance that *for purposes of proving the transportation of a kidnapping victim in interstate or foreign commerce* such transportation is more likely than not to have occurred whenever the victim is not released within 24 hours of his disappearance.

*Moore,* 571 F.2d at 86–87 (emphasis added). The court, therefore, held that "the presumption of interstate transportation embodied in 18 U.S.C. § 1201(b) is unconstitutional *when used to prove an element of the federal crime of kidnapping.*" *Moore,* 571 F.2d at 86 (emphasis added).

██ However, assuming *arguendo* that the federal magistrate in this case relied upon the presumption, we see no similar constitutional infirmity when the presumption is considered in the determination of probable cause to arrest, as opposed to the determination of guilt or innocence. An arrest warrant issues upon a showing of probable cause to believe a suspect is committing or has committed an offense. *Steagald v. United States,* 451 U.S. 204, 213, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981). Only a probability and not a prima facie showing of criminal activity is required. *State v. Dixon,* 153 Ariz. 151, 153, 735 P.2d 761, 763 (1987), *citing Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The United States Supreme Court noted in *Brinegar v. United States,* 338 U.S. 160, 173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879 (1949), that "[t]here is a large difference between the two things to be proved [*i.e.,* guilt beyond a reasonable doubt versus probable cause], as well as between the tribunals which determine them, and therefore a like difference in the quanta and modes of proof required to establish them." The Court stressed:

> Guilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property.
>
> However, if those standards were to be made applicable in determining probable cause for an arrest or for search and seizure, ... few indeed would be the situations in which an officer, charged with protecting the public interest by enforcing the law, could take effective action toward that end.

*Brinegar,* 338 U.S. at 174, 69 S.Ct. at 1310.

As the court in *Moore* itself noted, "[in creating the interstate transportation presumption,] Congress clearly was primarily interested in expediting FBI investigation

in kidnapping cases *in order to apprehend the criminal and save the victim's life."* *Moore,* 571 F.2d at 84 (emphasis added). We believe that the use of the presumption in determining probable cause to arrest is consistent with, rather than violative of, this objective, and we do not believe defendant was denied due process merely because the presumption may have been relied upon to invoke federal authority to arrest.

■ The trial court found sufficient probable cause to support the magistrate's issuance of the arrest warrant. On review, we will defer to the trial court's decision on this matter in the absence of a clear abuse of discretion. *State v. Boyer,* 106 Ariz. 32, 34, 470 P.2d 439, 441 (1970). Our review of the record indicates that the trial court did not abuse its discretion in denying defendant's motion to quash the arrest warrant.

### B. *The Detention and Interrogation*

■ Defendant next argues that "immediately after" the arrest, the presumption of interstate transportation was rebutted by Jack McDonald's statements to the FBI that the victim had not been in defendant's car when the two men left Arizona. According to defendant, those statements were confirmed when the search of the car failed to reveal evidence indicating that the victim had been inside it. He reasons that, because the presumption was rebutted, the FBI violated his right to due process and a speedy trial when it detained him in federal custody for 10 days.

Although McDonald told the FBI agents that, to his knowledge, no child had been in the car as it traveled interstate, the agents were not required to accept the statement as either truthful or informed. To suggest that probable cause evaporated "immediately after" the arrest simply because McDonald told FBI agents that no child had been in the car is tantamount to arguing that an arresting authority is obligated to release a criminal suspect if he or she makes any exculpatory statement, regardless of its veracity. At the time of the arrest, the agents had no reason to accept McDonald's statement as true. It is ludicrous to suggest that they were required to release a suspected kidnapper because his companion denied any interstate transportation.

Further, even if we were to conclude that the federal authorities were obligated to release defendant after the veracity of McDonald's statement had been confirmed, the record indicates that they did not receive that verification until after additional federal charges justifying defendant's continued incarceration had been filed against him. McDonald's statement that no child had been in the car was not "verified" until September 27, when McDonald was given a polygraph test. By September 25, however, a parole violation warrant was forwarded from California to the FBI in San Antonio. This complaint would have justified defendant's detention in federal custody, even if the United States could not have properly detained defendant on the kidnapping charge.

■ Defendant nevertheless suggests that his federal detention was the product of a collusive agreement between Arizona and federal authorities to keep him in custody until Arizona investigators could obtain a warrant to arrest him on state kidnapping charges. Initially, we note that the United States Supreme Court has commented that "[f]ree and open cooperation between state and federal law enforcement officers is to be commended and encouraged." *Elkins v. United States,* 364 U.S. 206, 221, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960). Naturally, such cooperation is improper when it is used to facilitate a deprivation of a defendant's rights. However, we find nothing offensive in the joint efforts of the state and federal agencies in this case.

Defendant was arrested in Kerrville on September 20 pursuant to a federal warrant. The next day he was transported to San Antonio for his initial appearance. In accordance with rule 5(c) of the Federal Rules of Criminal Procedure, the federal magistrate at the initial appearance set defendant's preliminary hearing for October 1—10 days after the initial appearance. At the preliminary hearing, the federal author-

ities would have been required to establish probable cause that a federal offense had been committed and that defendant had been the perpetrator. *See* rule 5.1(a); 2 W. LaFave & J. Israel, *Criminal Procedure* § 14.1, at 237 (1984). Thus, the FBI was given until October 1 to determine whether the necessary interstate nexus existed, and accordingly it was under no obligation prior to the preliminary hearing to release defendant for lack of probable cause.

Although we now know that the victim was not taken out of Arizona, her body was not located until several months after defendant's arrest, and the information provided by McDonald did not conclusively negate the possibility of a federal offense. Both state and federal investigations were on-going while defendant was in federal custody. The fact that these investigations subsequently revealed insufficient evidence of a federal offense does not invalidate the detention. The federal charge against defendant was dismissed and defendant was released from federal custody before the government was required to show probable cause at the preliminary hearing. We find no error in the federal government's decision to detain defendant until October 1, 1984.

### C. *The Searches*

Defendant further argues that the FBI improperly searched his automobile. Before trial, defendant moved to suppress all items found in the two FBI searches. The first search occurred at the automobile dealership in Kerrville, Texas where defendant had taken his car for repair and where he was arrested. The second search was performed two days later at the FBI storage facility in San Antonio pursuant to a federal search warrant. The trial court denied defendant's motion to suppress, concluding that the original search in Kerrville

could be supported on two separate bases: (1) the FBI was entitled to perform a search of the vehicle incident to a valid arrest, and (2) defendant had consented to the search. The court further concluded that the search warrant was supported by probable cause and that the subsequent search was therefore valid.

### 1. The First Search

■ Regarding the initial search of defendant's vehicle, we agree with the trial court that defendant validly consented to the search.[9] Shortly after being brought to the Kerrville Police Station, defendant was given a "Consent to Search Form." The form, which was normally used to obtain consent to search a suspect's "premises," had been altered to describe defendant's automobile. Specifically, the form used the word "premises" three times. The form given to defendant still mentioned "premises" twice, but the word had been crossed out once and had been replaced with the word "vehicle" and a description of defendant's car. The location of the vehicle was listed as "Ken Stoepel Ford, 400 Sidney Baker, Kerrville, TX."[10] An FBI agent read the form to defendant and advised him that he need not consent to the search. Defendant read the form himself, indicated that he understood it, and then signed it.

Our review of the record indicates that the trial court properly concluded that this consent was voluntarily given and was not the product of duress or coercion. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973); *see also United States v. Lindsey*, 877 F.2d 777, 783 (9th Cir.1989) (trial court's determination of voluntariness upheld by appellate court unless clearly erroneous); *United States v. Sealey*, 830 F.2d

---

**9.** Because we conclude that defendant's consent justified the first search, we need not resolve the question of whether, once defendant had been arrested and no longer had access to his vehicle, the arresting officers could justify the warrantless search as "incident to arrest." *See, e.g., United States v. Cotton*, 751 F.2d 1146 (10th Cir.1985); *State v. Berkwit*, 689 S.W.2d 763, 766 (Mo.App.1985).

**10.** For a remarkably similar example of the FBI's use of an identical FBI "consent to search premises" form to gain consent for an automobile search, see *United States v. Covello*, 657 F.2d 151, 153 (7th Cir.1981).

1028, 1032 (9th Cir.1987) (same). Of course, we recognize that the potential for coerced consent is greater when, as in this case, a suspect is in custody when the consent is given. However, "the fact of custody alone has never been enough in itself to demonstrate a coerced ... consent to search." *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Rather, courts must consider the totality of the circumstances. *See Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2048. Even considering the cumulative effect of the factors at play in this case, however, we find no indication that defendant's consent was involuntary.

In examining the implications of defendant's arrest on his ability to give truly voluntary consent, defendant urges this court to "be aware of the 'vulnerable subjective state' of ... defendant as well as the possibility of 'subtly coercive police questions,' and the inherently coercive nature of custodial interrogation." *United States v. Rothman*, 492 F.2d 1260, 1265 (9th Cir.1973), *quoting Schneckloth*, 412 U.S. at 229, 247, 93 S.Ct. at 2049, 2058. In giving due consideration to these factors, however, we also consider the sophistication of the accused and whether *Miranda* warnings were tendered. *See United States v. Heimforth*, 493 F.2d 970, 972 (9th Cir.1974).

Given the facts of this case, we do not believe that defendant's will was overcome by any coercive atmosphere attendant to the arrest and detention. Indeed, as the trial court found, rather than exhibiting trepidation and concern, defendant was "calm and inquisitive" during his arrest and in his conversations with the FBI. Defendant also was read his *Miranda* warning prior to giving consent, and he was specifically told by the FBI agents that he need not consent to the search of his vehicle. Defendant nevertheless contends that he signed the consent form because the FBI agents "threatened" to obtain a search warrant if he did not cooperate. Our review of the record does not reveal such an ultimatum. Even if one had been made, however, we would not find that event sufficient to render defendant's consent involuntary in this case. *See, e.g., United States v. Talkington*, 843 F.2d 1041, 1049 (7th Cir.1988) (when considered in the totality of the circumstances, a defendant's consent may be free and voluntary despite fact that agents threaten to obtain warrant if defendant does not consent); *United States v. Compton*, 704 F.2d 739, 742 (5th Cir.1983) (threat made by federal law enforcement officers to obtain search warrant if suspect did not cooperate did not invalidate written consent to search).

Further, defendant's argument that his "physical and mental state" prevented him from making a knowing and intelligent waiver of his rights is not borne out by the record. Although defendant may have smoked marijuana 3 days prior to his arrest, McDonald testified that he did not see defendant consume any alcohol or drugs after they left Tucson. In addition, the FBI agents observed no indication that defendant was under the influence of drugs or alcohol. We concur with the trial court that alcohol and drug use did not leave defendant incapable of voluntarily consenting to the search. *See United States v. Rambo*, 789 F.2d 1289, 1297 (8th Cir.1986) ("[T]he mere fact that one has taken drugs, or is intoxicated, or mentally agitated, does not render consent involuntary.... In each case, '[t]he question is one of mental awareness so that the act of consent was the consensual act of one who knew what he was doing and had a reasonable appreciation of the nature and significance of his actions.' "), *quoting United States v. Elrod*, 441 F.2d 353, 355 (5th Cir.1971); *see also United States v. Gay*, 774 F.2d 368, 376–77 (10th Cir.1985) (suspect who "staggered and swayed" under intoxication was still capable of giving consent to search glove box).

█ We also are unconvinced that defendant was misled by the FBI's use of the altered consent form. Although the standard form was intended for consent to search premises, it had been altered to apply to defendant's vehicle. We recognize that the alteration contained an error (the form referred to defendant's car as a 260Z

rather than a 280Z), but we do not believe that the error prevented defendant from understanding that he was consenting to the search of his automobile. Despite the word change and the inaccuracy in the description of the vehicle, the form clearly referred to the search of a black 1975 Datsun with defendant's California license plate number.

■ Defendant further argues, however, that even if he did consent to the search, the actual search conducted by the FBI exceeded the scope of the consent given. We disagree. Defendant consented to a "complete search" and authorized the agents to take "any letters, papers, materials or other property which they may desire." He asserts on appeal that he "did not authorize the opening of bags, suitcases, picnic baskets, or looking underneath these items." We find no merit in this argument. In *United States v. Covello,* 657 F.2d 151 (7th Cir.1981), the court addressed a defendant's claim that FBI agents had exceeded the scope of the consent given in a form identical to the consent form at issue in this case. In reversing the trial court's suppression of evidence, the court noted:

> The form authorized the agents "to conduct a *complete* search" of the car. (Emphasis supplied.) The district court would read "complete" to mean "incomplete." Furthermore, those agents were authorized "to take from [the] premises any letters, papers, materials, or other property which they may desire." In the absence of the word "complete," one possibly might construe the consent in a limited fashion, however, the addition of the word "complete" indicates that consent was extended to everything within the automobile. Such a construction is further supported by the permission given to the agents to remove items from the automobile. "Letters" and "papers" would not be expected to be lying around loose. They would be contained in something.

*Covello,* 657 F.2d at 154; *see also United States v. Anderson,* 859 F.2d 1171, 1176 (3d Cir.1988).

We find defendant's assertion that he somehow intended to limit the manner in which the search was executed disingenuous at best. Accordingly, we find no error.

Thus, we conclude that defendant knowingly and voluntarily consented to the search of his vehicle, and that the search was conducted within the bounds of the consent given. We therefore find no error in the trial court's refusal to suppress evidence obtained from the search.

## 2. The Second Search

■ We likewise concur in the trial court's conclusion that probable cause existed to justify the second search performed pursuant to the federal search warrant. *See State v. DeBoucher,* 135 Ariz. 220, 227, 660 P.2d 471, 478 (App.1982) (reviewing courts give great deference to magistrate's probable cause determination). Defendant argues, however, that the trial court should have suppressed evidence obtained in the second search because the FBI lacked authority to tow his car from Kerrville to San Antonio before obtaining the search warrant. We disagree. Defendant was arrested at the Ken Stoepel Ford dealership in Kerrville on September 20. Once defendant was in custody, the FBI became responsible for the car's safekeeping and the vehicle was properly seized incident to the arrest. The car remained at the dealership overnight, where it was guarded by FBI agents. This situation, however, would not have been feasible on an extended basis. Being responsible for the vehicle, the FBI had the authority to move it to the Bureau's San Antonio facility, where it could be more conveniently secured.

## D. *Defendant's Statements to the FBI*

■ Defendant next argues that he was improperly advised of his constitutional rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that the trial court therefore should have suppressed statements elicited

from him after his arrest.[11] We find no merit in this argument. Although we may conclude that defendant waived his *Miranda* rights only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension, *see Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986), *citing Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979), our review of the record does not indicate, as defendant suggests, that the "statements, admissions, or tests elicited from him were a direct result of either physical or mental coercion." Nor does it reflect any discrepancy in defendant's ability to comprehend his waiver.

Specifically, we are unable to discern any improper, coercive activity by FBI agents who repeatedly administered defendant's *Miranda* warnings, both orally and on printed forms. Further, defendant stated that he understood his rights and, contrary to his present assertion, he read part of his waiver of rights form aloud before signing it, thereby indicating to those present that he could read and understand. Although defendant mentioned that he was tired, he continued to talk with the agents and made no request or suggestion that he wished to end the discussion. Also, as we have noted, defendant's ability to comprehend was not impaired by drug or alcohol use at the time of his arrest, and his demeanor was both calm and inquisitive. In short, defendant's sweeping allegations of physical and mental coercion are not substantiated by the record. We find no irregularity in defendant's custodial interrogation and we conclude that the trial court properly denied defendant's motion to suppress the statements he made to the FBI concerning his activities on and around September 17, 1984.

■ Perhaps realizing the ethereal nature of his coercion claims, defendant argues that, even if no *Miranda* violation occurred, his statements were nevertheless inadmissible at trial because they were irrelevant, immaterial, and highly prejudicial. The statements were admitted, in redacted form, through the testimony of FBI special agent Patrick C. McCormick, who interviewed defendant in Kerrville. Although defendant's argument is not entirely clear, he also apparently asserts that because his statements were neither decidedly exculpatory nor decidedly inculpatory, they were not "admissions" within the meaning of rule 801(d)(2)(A), Arizona Rules of Evidence. The statements therefore were hearsay and, because they did not fall within any recognized hearsay exception, they were inadmissible.[12]

Rule 801(d)(2)(A) provides that a statement is not hearsay if it is offered against a party and is his own statement, made in his individual capacity. Defendant's statements to the FBI easily satisfy the facial requirements of the rule. We find no support for defendant's argument that the statements were not admissions because they were neither exculpatory nor inculpatory. For a defendant's statement to be an admission, "it is not necessary to show that the statement was against the interest of the party at the time it was made." 1 M. Udall, J. Livermore, P. Escher, & G. McIlvain, *Arizona Practice: Law of Evidence* § 125, at 255 (3d ed. 1991). Rather, "[t]he only limitation, in short, to the use of an opposing party's words is the rule of relevance." Udall at 257. Certainly, a criminal suspect's statements about his activities on the day of an alleged crime are relevant.

■ The only remaining limitation on the admissibility of defendant's statements was the possibility that the probative value

---

**11.** The statements defendant sought to suppress were made to FBI agents on September 20 and 21 and concerned his activities in Tucson on the day of the victim's disappearance.

**12.** We believe we have correctly interpreted defendant's argument. Appellate counsel presented the argument in the following manner:

The agent improperly testified to these statements. The statements were not exculpatory nor incriminatory. They did not fall within an exception to the hearsay rule. If the Appellant wanted to introduce the statements in support of an alibi, they would have been held inadmissible.

of the statements was substantially outweighed by the danger of unfair prejudice. *See* rule 403. This determination was within the trial court's discretion and we will reverse the trial court's decision only in the event of an abuse of that discretion. *State v. Neal*, 143 Ariz. 93, 101, 692 P.2d 272, 280 (1984); *State v. Clabourne*, 142 Ariz. 335, 343, 690 P.2d 54, 62 (1984). We find no abuse in this case. Although Agent McCormick was permitted to testify that defendant told the FBI he was in the victim's neighborhood the day she disappeared because he was looking for a person from whom he eventually purchased marijuana, we do not conclude that the trial court erred in determining that the probative value of this information outweighed its potentially inflammatory effects on the jury. Given the gravity of the crime for which defendant was on trial and the fact that the jury had been voir dired concerning their attitude toward drugs, we are unconvinced that the reference to marijuana was impermissibly prejudicial. We find no error in the admission of defendant's statements.

8. Defendant's Motion for Continuance

■ Defendant argues that the trial court violated his right to a fair trial when it denied his request for a continuance so his attorney could interview the prosecution's paint expert and other witnesses. The prosecution's first paint expert, an FBI agent assigned to examine defendant's car and the victim's bicycle, died prior to trial. James Corby, the agent who assumed responsibility for the case, conducted his own tests, choosing not to rely on the first expert's findings and conclusions. Defense counsel apparently did not receive all of Corby's findings until the day before he was scheduled to interview Corby—approximately one month before trial. Counsel claimed that, as a result of the late disclosure, he was unable adequately to prepare for the agent's testimony. On appeal, defendant also argues that denying the continuance prevented his trial counsel from interviewing several other witnesses. As the state notes, however, only three of the witnesses mentioned by defendant were called at trial.

■ Rule 8.5(b), Arizona Rules of Criminal Procedure, provides that "[a] continuance shall be granted only upon a showing that extraordinary circumstances exist and that delay is indispensable to the interests of justice." The grant of a continuance is an exercise of the sound discretion of the trial court. *State v. Amarillas*, 141 Ariz. 620, 622, 688 P.2d 628, 630 (1984), *citing State v. Sullivan*, 130 Ariz. 213, 635 P.2d 501 (1981). Further, the trial court's denial of a motion for continuance will not be disturbed unless (1) the trial court clearly abused its discretion in denying the motion, and (2) prejudice resulted. *Amarillas*, 141 Ariz. at 622, 688 P.2d at 630.

We do not believe that the trial court abused its discretion in this case. Although the court denied defendant's motion, it held that the defense would be permitted to interview any witness before he or she testified, even if recesses were necessary to accommodate the interviews. Of course, interviewing witnesses in the course of trial certainly is not the most desirable procedure. However, we will not second guess the trial court's decision in this matter. Defense counsel had been involved in the case for well over one year, and more than two years had elapsed since defendant's arrest. We do not believe that the trial court exceeded its discretion in determining that the defense's failure to interview various witnesses, most of whom had not been selected by the prosecution to testify at trial, did not constitute "extraordinary circumstances" necessitating a delay "indispensable to the interests of justice."

Further, regarding evidence concerning the paint sample, the record indicates that the defense was not entirely blameless in creating the delays in preparation. For example, the defense was aware that the first paint expert was desperately ill with cancer long before his death, yet, despite attempts by the prosecution to facilitate the expert's deposition, the defense did not attempt to preserve the testimony for trial. Most importantly, defendant is unable to

demonstrate that any prejudice actually inhered from the trial court's ruling. The record does not indicate that defendant's trial counsel was ineffective or impaired in any way during opening statements or in his examination of witnesses.

Concerning the state's paint expert, the defense's pretrial interview with Agent Corby lasted an entire day, and, although he was unable to interview Corby about certain graphs and charts supplied the day before the interview, defense counsel's cross-examination of the agent at trial was extensive and reflected no lack of preparation. Thus, even if a continuance to permit interviews would have been advisable in this case, defendant was not prejudiced by the trial court's determination that the case should proceed to trial.

### 9. Jury Selection

Defendant next argues that Maricopa County's juror selection procedure denied him a trial before an impartial jury drawn from a representative cross-section of the community. Specifically, defendant posits that the county's practice of selecting jury pools from voter registration and Department of Motor Vehicles lists results in the exclusion of cognizable groups from the jury venire because those groups are generally underrepresented on the voter and DMV lists. For example, according to defendant, of the approximately 130 prospective jurors in the pool for his trial, two were Black and approximately 6 were Hispanic.

Defendant also addresses other perceived shortcomings in the jury selection process, both in general and with specific reference to his case. He contends that the length of his trial resulted in the exclusion of persons who were not employed by businesses having a policy of compensating their employees during jury duty. He argues that the $12.00 per diem granted jurors, *see* A.R.S. § 21–221, was insufficient to compensate adequately those jurors whose incomes were not supplemented by their employers. As a result, he claims that this "cognizable group" of persons not compensated by their employers during jury duty was underrepresented in the jury panel.

Further, he asserts that employees in the Jury Commissioner's Office were improperly allowed to exclude prospective jurors "without standards, guidelines, or court review." That is, members of the Jury Commissioner's staff were permitted to excuse jurors who contacted the Commissioner's office after receiving their summonses and who claimed some form of hardship. According to defendant, as a result of these undocumented, unsupervised excusals, many prospective jurors were removed from the pool before the merits of their "hardships" could be evaluated.

Concerning defendant's claim that Blacks and Hispanics were underrepresented in the jury pool, we note initially that the mere observation that a particular group is underrepresented is insufficient to support a constitutional challenge. *State v. Lee*, 114 Ariz. 101, 103, 559 P.2d 657, 659 (1976). To succeed on a claim that underrepresentation in a particular case violated the sixth amendment fair cross-section requirement, defendant must make a prima facie showing that (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

Although we recognize that Blacks and Hispanics qualify as distinctive groups under the *Duren* analysis, *see Castaneda v. Partida*, 430 U.S. 482, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (Hispanics are distinct group); *United States v. Sanchez–Lopez*, 879 F.2d 541, 547 (9th Cir.1989) (same); *Peters v. Kiff*, 407 U.S. 493, 498, 92 S.Ct. 2163, 2166, 33 L.Ed.2d 83 (1972) (Blacks are distinct group); *People v. Harris*, 36 Cal.3d 36, 51, 201 Cal.Rptr. 782, 790, 679 P.2d 433, 441 (1984) (Blacks and Hispanics are cognizable groups for purposes of fair cross-section analysis), and even as-

suming that a venire of 130 individuals which includes two Blacks and approximately 6 Hispanics indicates an underrepresentation of those groups, defendant has failed to satisfy the third requirement of *Duren.* At no time has defendant provided or analyzed information indicating that either of these groups is *systematically* excluded in the jury selection process in a way that results in its underrepresentation. Of course, without such information and analysis, this court cannot determine whether an identifiable underrepresentation is the result of systematic exclusion in the jury selection process. Thus, we express no opinion on whether exclusive use of voter registration and DMV lists could result in the systematic exclusion of certain minorities in the community. We hold only that defendant's reliance on isolated, subjective observations of alleged underrepresentation is insufficient to support his sixth amendment claim.

■ Similarly, defendant's argument that the length of his trial resulted in the exclusion of persons who were not employed by businesses having a policy of compensating their employees during jury duty also fails to survive *Duren.* The sixth amendment fair cross-section guarantee concerns the representation of "distinctive" groups in the community. *See Duren,* 439 U.S. at 364, 99 S.Ct. at 668. That is, to succeed in a fair cross-section claim, a defendant must demonstrate that the persons he asserts were excluded from the venire were members of a group that is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280.

In asserting simply that "individuals who are not employed by larger corporations" were excluded from the jury pool, defendant has failed to demonstrate that such individuals constitute a distinct group. Indeed, defendant has made no credible effort—either before the trial court or in his briefs to this court—to prove that the persons he claims were targeted for exclusion are a constitutionally significant group under *Duren.* Further, even if defendant

had attempted to fulfill his obligation under *Duren,* we express serious doubts about whether "individuals not employed by large corporations" constitute a distinctive group. The hurdle a defendant must overcome to establish the existence of a group for sixth amendment purposes is set forth clearly in *United States v. Abell,* 552 F.Supp. 316 (D.Me.1982), and we borrow substantially from that opinion to illustrate defendant's burden in this case:

> In order for a class to be legally cognizable, it must be characterized by "a common thread ... a basic similarity in attitudes or ideas or experiences which ... cannot be adequately represented if the group is excluded from the jury selection process." *United States v. Potter,* 552 F.2d 901, 904 (9th Cir.1977). There must be a definite and ascertainable membership:
>
>> A cognizable group is not one whose membership shifts from day to day or whose membership can be arbitrarily selected.
>
> *United States v. Guzman,* 337 F.Supp. 140, 143 (S.D.N.Y.1972), *affirmed,* 468 F.2d 1245 (2d Cir.), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973).
>
> In addition to internal cohesion, the group must be perceived as distinct by the community at large. Evidence of community discrimination tends to indicate that "a group [is] sufficiently distinct from the community to be a credible target for the exercise of community prejudices." *Ciudadanos Unidos de San Juan v. Hidalgo Cty.,* 622 F.2d 807, 818 n. 21 (5th Cir.1980).
>
> In all but the clearest cases, such as classes based on race or gender, the presence of a cognizable class within the community must be established with respect to the particular community as a matter of fact:
>
>> Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may

define other groups which need the same protection. *Whether such a group exists within a community is a question of fact.* (Emphasis added). *Hernandez v. Texas,* 347 U.S. 475, 478–79, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954). *Abell,* 552 F.Supp. at 322.

We do not believe that those people whose employers do not compensate them while they serve jury duty share such an "internal cohesion" or "a basic similarity in attitudes or experiences" to characterize them as a distinct group. *Accord People v. Harris,* 47 Cal.3d 1047, 1076–78, 767 P.2d 619, 637–38, 255 Cal.Rptr. 352, 370–71 (1989) (persons whose employers were unwilling to continue payment of salaries for the protracted period of a capital case did not constitute a "cognizable class"). And, more importantly, defendant has offered no evidence to refute our impressions of his position. *See Harris,* 47 Cal.3d at 1078 n. 12, 767 P.2d at 638 n. 12, 255 Cal.Rptr. at 371 n. 12 ("Defendant asserts that self-employed persons 'surely share a common perspective,' but neither supports that assumption with anything in the record or of which judicial notice might be taken, nor demonstrates that none of the other jurors could have shared that perspective."). We therefore conclude that defendant's argument falls short of the constitutional mark established in *Duren,* and we accordingly find no constitutional infirmity in the juror selection process in this case.

■ We note that defendant also asserts that the juror selection process in this case violated equal protection principles. Even though we believe that defendant has standing to raise this claim, *see, e.g., Powers v. Ohio,* —— U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), we hold that defendant has failed to establish the degree of underrepresentation "by comparing the proportion of the group in the total population to the proportion called to serve as ... jurors, over a significant period of time." *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280.

Concerning his claim that "persons not employed by large corporations" were systematically excluded from the jury pool, we

hold that, as with his sixth amendment claim, defendant has failed to demonstrate that those persons constitute a distinct group for purposes of equal protection analysis. *See Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280. We therefore find no merit in defendant's equal protection arguments.

■ We likewise find no merit in defendant's argument that members of the Jury Commissioner's staff improperly excused prospective jurors who contacted the Commissioner's office claiming undue hardship. "The office of 'jury commissioner' was established to assist the courts with the jury selection process and to insulate judges from having to consider every request for excusal." *State v. Fendler,* 127 Ariz. 464, 470, 622 P.2d 23, 29 (App.1980). According to defendant, court personnel excused prospective jurors because they were not citizens, they no longer lived in Maricopa County, they had a felony record, they did not speak English, they were responsible for young children or elderly people in their home, and for various other hardships. He asserts that these dismissals were improper because the trial judge did not automatically dismiss other prospective jurors who suffered similar hardships.

Given, however, that 136 prospective jurors were qualified for defendant's trial, we fail to see how defendant was prejudiced by the excusals granted by court personnel, who were acting within the broad discretion afforded the Jury Commissioner's Office. *See Fendler,* 127 Ariz. at 470, 622 P.2d at 29 (jury commissioners are given broad measure of unilateral discretion in determining whether a prospective juror should be excused from service). As the trial judge himself noted, "I am satisfied, from those 137 or so [prospective jurors] that we did see here in this courtroom, that we got a fairly good cross section of people as far as ages and economic backgrounds, and every other way that I can think of." Although some prospective jurors were excused by the Commissioner's office due to hardship, defendant was still afforded an ample pool from which to select a fair and impartial jury. As we have

previously held, "A defendant in a criminal case is entitled to a fair and impartial jury for the trial of his case, but he is not entitled to be tried by any particular jury; therefore, unless the record affirmatively shows that such a fair and impartial jury was not secured, the conviction must be confirmed." *State v. Arnett*, 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978). Given that a pool of over 130 prospective jurors was provided and nothing in the record indicates that the jury selected from those candidates fell short of the requisite standards of fairness and impartiality, we reject defendant's claim that he was prejudiced by court personnel's excusal of prospective jurors.

### 10. "Death Qualification" of Jury

■ Defendant next argues that, because juries in Arizona do not determine sentencing, the trial court should not have "death qualified" the jury during voir dire. He asserts that, by engaging in a death qualification of the prospective jurors, the trial court "biased and prejudiced the jury." We disagree.

We have expressly held that jury questioning regarding capital punishment is permissible where the questioning determines bias of a nature which would prevent a juror from performing his duty. Under the procedure used in Arizona in death penalty cases, the jurors' duty is to determine guilt or innocence, while the sentence of death is solely the responsibility of the trial judge. Nevertheless, voir dire questioning related to a juror's views on capital punishment is permitted to determine whether those views would prevent or substantially impair the performance of the juror's duties to decide the case in accordance with the court's instructions and the juror's oath.

*State v. Martinez–Villareal*, 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985) (citations omitted); *see also State v. White*, 168 Ariz. 500, 509–10, 815 P.2d 869, 878–79 (1991); *State v. Wiley*, 144 Ariz. 525, 533–35, 698 P.2d 1244, 1252–54 (1985), *overruled on other grounds, State v. Superior Court*, 157 Ariz. 541, 760 P.2d 541 (1988).

The United States Supreme Court has indicated that "an impartial jury consists of nothing more than 'jurors who will conscientiously apply the law and find the facts.'" *Lockhart v. McCree*, 476 U.S. 162, 178, 106 S.Ct. 1758, 1767, 90 L.Ed.2d 137 (1986), *quoting Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (emphasis omitted). Defendant neither asserts nor demonstrates that any participant on his jury failed to fulfill this obligation. *See Evans v. Lewis*, 855 F.2d 631, 635 (9th Cir.1988). We therefore find no error.

### 11. Jury Instructions

Defendant raises numerous alleged errors in the instructions given to the jury and in the trial court's failure to instruct on certain issues. We address each challenged instruction separately.

#### A. *Kidnapping Instruction*

■ Over defendant's objection, the trial court gave the following instruction regarding the kidnapping charge:

The crime of kidnapping requires proof of the following three things.

1. The defendant knowingly restrained another person's movements, and
2. The restraint was accomplished:

 A. By physical force, intimidation or deception, and

 B. In a manner which interfered substantially with the person's movements, and
3. The restraint was with the intent to inflict death, physical injury or a sexual offense on a person.

Defendant claims that this instruction was given in error because the state failed to present sufficient evidence to prove kidnapping or the occurrence of a sexual offense and because the term "sexual offense" is vague and ambiguous. We find no merit in these arguments. As we have already concluded, ample evidence existed to substantiate the kidnapping charge. *See supra* Part 1(A). Further, the state was required to prove only that defendant kidnapped the victim with the *intent* to commit a sexual offense. *See* A.R.S. § 13–

1304(A). Thus, although the state did not establish that defendant actually committed a sexual offense, it presented evidence to the jury from which it could conclude that defendant had the *intent* to commit such an offense when he abducted her. That was all the state was required to do. *See, e.g., State v. Adrian,* 111 Ariz. 14, 18, 522 P.2d 1091, 1095 (1974) ("It should be emphasized that the offense of kidnapping with intent to commit rape can be established without proof of a subsequent rape where the circumstances indicate an intention to rape."). We therefore find no error in instructing the jury on the kidnapping charge.

■ In addition, we find no ambiguity or vagueness in the instruction itself. Despite defendant's argument to the contrary, we conclude that the term "sexual offense" was sufficiently specific to guide the jury in determining whether defendant's actions fell within the scope of the kidnapping statute. As one court has noted, "People of average intelligence will understand the term 'sexual offense' to mean illegal sexual conduct. In light of this common, ordinary meaning, no definitional instruction was required. Ordinary words and phrases in statutes require no definition because they are presumed to be understood by the jurors." *People v. Dasher,* 198 Cal.App.3d 28, 36, 243 Cal.Rptr. 486, 490 (1988). Further, as the state correctly observed, no reason exists for requiring specific instructions to be given about the various forms of sexual activity envisioned by the statute because *any* sexual activity with an 8–year–old child would be a crime, and thus would be a "sexual offense" that would support the kidnapping charge.

### B. *Felony Murder Instruction*

■ At trial, defendant objected to instructions given to the jury concerning felony murder. Defendant continues to argue that insufficient evidence existed to support the felony murder charge and that the state abused its discretion in seeking only a felony murder instruction rather than a premeditated murder instruction. We have already concluded that sufficient evidence existed to support the jury's verdict on the felony murder charge. *See supra* Part 1(B). Defendant's first argument therefore fails. Defendant's claim that the prosecution abused its discretion in seeking a felony murder conviction is likewise unsupportable. The essence of this claim is that the prosecution somehow gained an unfair advantage by charging felony murder because it did not have to prove specific intent on the part of defendant. This analysis is clearly wrong.

First, the prosecution was required to prove the specific intent to commit the predicate felony, and "the *mens rea* necessary to satisfy the premeditation element of first-degree murder is supplied by the specific intent required for the felony." *State v. McLoughlin,* 139 Ariz. 481, 485–86, 679 P.2d 504, 508–09 (1984), *citing State v. Arias,* 131 Ariz. 441, 641 P.2d 1285 (1982). We have upheld the constitutionality of this procedure, *McLoughlin,* 139 Ariz. at 486, 679 P.2d at 509, and defendant's argument fails to persuade us that our prior holding was incorrect. Therefore, defendant's assertion that the prosecution was not required to prove specific intent is inaccurate.

■ Second, the prosecutor has broad discretion—even in capital cases—to charge defendant with the crimes he or she thinks appropriate, and we will not interfere with that discretion unless the prosecutor acts illegally or in excess of his or her powers. *State v. Murphy,* 113 Ariz. 416, 418, 555 P.2d 1110, 1112 (1976). Aside from his assertion that the state gained an "unfair advantage" by pursuing the felony murder charge, defendant has not demonstrated how the prosecutor's decision to seek the felony murder conviction in this case constituted an abuse of discretion or an illegal action, and our review of the record fails to reveal any impropriety in the prosecutor's charging decision. We therefore find no error.

### C. *Unanimous Verdict Instruction*

■ Before the jury retired to deliberate, the trial court, over defendant's objec-

tion, gave the following instruction concerning the unanimity of their verdict:

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each of you agree thereto. In other words, ladies and gentlemen, your verdict in this case, when you return a verdict, must be unanimous.

It is your duty as jurors to consult with one another and deliberate with a view toward reaching that agreement if you can do so without violence to your individual judgment. Each of you must decide this case for yourself. You must do so only after an impartial consideration of the evidence with the other jurors.

In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you are convinced it was erroneous, but do not surrender your honest convictions as to the weight or the effect of the evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict.

Defendant argues that this instruction was "coercive rather than instructive," and he takes particular issue with the court's instruction that the jurors should deliberate with a view toward reaching an agreement if they could do so "without violence" to their individual judgment. Although defendant does not elaborate on why this statement is especially coercive,[13] we presume his argument is that the "without violence" language suggested to the jurors that they could refuse to agree on a verdict only under the most extraordinary or extreme circumstances and that the statement therefore coerced the jury into reaching a verdict. We disagree.

■ Initially, we note that coercion by the trial court most commonly occurs *during* jury deliberations when the court tries to move a deadlocked jury toward a verdict.

*State v. McCutcheon,* 162 Ariz. 54, 59, 781 P.2d 31, 36 (1989). In this case, the challenged statements were made before the jury began deliberating, suggesting that the dynamics between the judge and jury lacked the coercive atmosphere present when a judge impresses upon a deadlocked or struggling jury the court's desire for a verdict. Nevertheless, the timing of the instruction, although highly relevant, is not dispositive of the issue. Rather, we will find coerciveness if, under the totality of the circumstances, the trial court's actions or remarks displaced the independent judgment of the jurors. *State v. McCutcheon,* 150 Ariz. 317, 320, 723 P.2d 666, 669 (1986).

We find that the trial court's remarks did not have an improper effect upon a reasonable juror. The jury had not yet retired, and thus the jurors were not suffering from the fatigue or frustration that may accompany difficult hours of divisive deliberation which may, in turn, cause jurors to be susceptible to undue pressure from the bench. Further, the trial court expressly informed the jurors not to surrender their honest convictions concerning the weight of the evidence solely because of other jurors' opinions or "for the mere purpose of returning a verdict." We cannot conclude from these remarks that the jury received an improper message from the court encouraging them to compromise their individual impressions of the case so that a verdict could be reached. We therefore find no error in the unanimous verdict instruction.

### D. *Denial of Willits Instructions*

■ Defendant requested, and the trial court refused, the following instruction concerning the state's alleged failure to preserve evidence with potentially exculpatory value:

You are instructed if the State did not conduct tests or did tests without disclosing the results, then you may infer that

---

**13.** Indeed, defendant's discussion of this issue, in its entirety, consists of the following:
(4) *No. 22: Unanimous Verdict*
(a) coercive rather than informative: "It is your duty as jurors to consult with one anoth-

er and to deliberate with a view to reach [sic] an agreement if you can do so *without violence* to your individual judgment."

the evidence would have been against the State.

■ This type of instruction is known as a *Willits* instruction, *see State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964), and it permits a jury to draw an inference against the prosecution if the state allows evidence within its control to be destroyed. *State v. Broughton*, 156 Ariz. 394, 399, 752 P.2d 483, 488 (1988). This form of instruction is appropriate when a defendant proves that (1) the state failed to preserve "material and reasonably accessible evidence that had a tendency to exonerate the accused," and (2) prejudice resulted. *State v. Reffitt*, 145 Ariz. 452, 461, 702 P.2d 681, 690 (1985); *see Broughton*, 156 Ariz. at 399, 752 P.2d at 488. A *Willits* instruction, however, is not appropriate if defendant fails to establish that the lost evidence would have had a tendency to exonerate him. *Broughton*, 156 Ariz. at 399, 752 P.2d at 488.

■ Defendant focuses on two pieces of evidence that he argues justified his proposed *Willits* instruction: the victim's bones, which were interred before defendant's second trial counsel had the remains examined by additional defense experts, and "certain FBI and DPS test results," which defendant claims the state did not disclose. Over defense counsel's objection, the trial court refused the proposed *Willits* instruction based on this evidence. That decision was within the trial court's discretion and we will not reverse it absent a clear abuse of that discretion. *See State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984). We find no such abuse.

Concerning the victim's bones, we have already concluded that the state did not act improperly in allowing the burial. *See supra* Part 5(A)(1). Thus, defendant was not entitled to a *Willits* instruction for that evidence. Further, we find defendant's allegation that the state failed to disclose "certain FBI and DPS test results" unsupported by the record. Defendant does not attempt to specify which information was withheld by the prosecution, let alone how he was prejudiced by its withholding. We also view defendant's assertion in light of

the state's statement to the trial court that "[a]ll the scientific examinations or testing of the evidence was disclosed under Rule 15." Therefore, given that defendant raises nothing more than a vague accusation of prosecutorial improprieties concerning unnamed test results, and any such impropriety is not apparent by our review of the record, we conclude that the trial court did not abuse its discretion in denying the *Willits* instruction.

■ Defendant also requested a *Willits* instruction concerning portions of a 1½ to 2 hour interview he gave Lupita Murrillo, a Tucson television reporter on March 4, 1985. The edited and televised version was reduced to 3 or 4 minutes. Apparently, the prosecution attempted to have the outtakes of the original interview preserved, but was unsuccessful.

During its case-in-chief, the state presented the testimony of John Bowron, a Pima County Sheriff's Department corrections officer who was present during the interview. Officer Bowron testified that, during the meeting with Ms. Murrillo, defendant recanted his original story that he had stabbed a man in a drug transaction on the day the victim disappeared. According to Bowron, defendant informed Murrillo that he told this story to his companions at De Anza Park so that they "would think he was a tough guy."

At trial, defendant complained that because the entire, unedited interview was unavailable for the jury's viewing, he was prejudiced by Bowron's testimony and that he was therefore entitled to a *Willits* instruction concerning the outtakes of that interview. He requested, and the court refused, the following instruction:

> If the defendant made statements to KVOA–TV Television in Tucson for one hour to one and a half hours, but a very small portion of that statement was recalled by the witness and preserved by KVOA–TV, you can infer that additional statements were made by the defendant indicating that he is not guilty of the charges.

To succeed in obtaining a *Willits* instruction, defendant must convince the trial court that he was actually prejudiced by the prosecution's failure to preserve the "obviously material, and reasonably accessible" evidence. *Perez*, 141 Ariz. at 464, 687 P.2d at 1219. Assuming *arguendo* that the interview tapes were both obviously material and reasonably accessible, we nevertheless conclude that the trial court did not abuse its discretion in denying the requested *Willits* instruction because defendant failed to demonstrate actual prejudice.

Defendant argues on appeal that he was prejudiced because the "complete story was not presented to the jury." With the actual tapes no longer available, however, Lupita Murrillo was the only other source from which the "complete story"—or a reasonable reconstruction—could be obtained. As the state informed the trial court, however, Ms. Murrillo's own interview with counsel not only substantiated Officer Bowron's testimony, but provided even more damaging recollections of her discussion with defendant, apparently including an admission by defendant that he in fact had had blood on his hands when he returned to De Anza Park. Our review of the record has revealed nothing to contradict this account of Ms. Murrillo's recollection of the interview. Thus, defendant failed to demonstrate that the absent evidence would have tended to exonerate him. *See Broughton*, 156 Ariz. at 399, 752 P.2d at 488.

Given these facts from which to rule on the requested *Willits* instruction, we conclude that the trial court did not abuse its discretion. Defendant failed to establish any prejudice caused by the unavailable evidence. Accordingly, he was not entitled to his proposed *Willits* instruction.

### E. *Denial of Unlawful Imprisonment Instruction*

■ Defendant next argues that the trial court's refusal of defendant's request to instruct the jury that unlawful imprisonment is a lesser included offense of the crime of kidnapping amounted to reversible error. *See State v. Caudillo*, 124 Ariz. 410, 604 P.2d 1121 (1979); *State v. Celaya*, 135 Ariz. 248, 660 P.2d 849 (1983); A.R.S. § 13-1303 ("A person commits unlawful imprisonment by knowingly restraining another person."). Defendant's argument, however, disregards a crucial aspect of our analysis in both *Caudillo* and *Celaya:* that the evidence presented at trial must support the giving of a lesser included offense instruction. *See, e.g., Celaya*, 135 Ariz. at 253, 660 P.2d at 854 ("*Where a defense theory is reasonably supported by the evidence*, it is reversible error not to give [the lesser included offense instruction]....") (emphasis added); *State v. Schroeder*, 95 Ariz. 255, 259, 389 P.2d 255, 257 (1964) (lesser included offense instructions are justified only when evidence exists upon which the jury could convict defendant of a lesser offense).

Although defendant suggests that, upon reviewing the evidence, the jury could have concluded that he accidentally struck the victim's bike and then picked her up to return her to her home unharmed, this suggestion runs counter to the entire thrust of the defense presented at trial. Defense counsel offered an alibi defense, claiming not that defendant might have taken the girl and released her unharmed, but that defendant had absolutely no contact with the child at all.[14]

---

14. Six months before trial, defense counsel asserted:

This is not a case of showing the intent of FRANK JARVIS ATWOOD. The defendant will present a defense based solely on identification and alibi. The defendant will submit an "all or nothing" case, and will not, in any way, challenge the legal intent requirements. If, and when, the prosecution establishes that the bones found in April of 1985, are identified as those of [the victim], and that her death was caused by a criminal agency, the defense will not present affirmative evidence that FRANK JARVIS ATWOOD committed the offense in a lesser manner than that required by first degree murder. The defendant will say that he did not commit the offense. Further, if he did commit the offense, he will not say he did not possess the certain requisite culpable mental state required for first degree murder and lesser included charges.

As we held in *State v. Caldera,* 141 Ariz. 634, 637, 688 P.2d 642, 645 (1984), when a defendant proffers an alibi defense, the record usually contains little evidence to support an instruction on a lesser included offense. Because defendant argued solely that he did not commit the offense charged and the state argued solely that he did commit the offense, no theory is advanced to support the theory of a lesser included offense. *Caldera,* 141 Ariz. at 637, 688 P.2d at 645. Thus, in this case, the defense did not attempt to argue that defendant came into contact with the victim and released her unharmed. Concerning the possibility that, despite defendant's alibi defense, the jury nevertheless could have been convinced by the evidence presented that he had taken the child and then released her, we find our discussion in *Schroeder* persuasive:

> There remains the possibility, of course, that the jury might simply disbelieve the state's evidence on one element of the crime. If so, it is argued, conviction of a lesser offense is still possible. This reasoning, however, would require instructions on all offenses theoretically included in every criminal information [or indictment]. The law does not require or even permit such a procedure.

*Schroeder,* 95 Ariz. at 259, 389 P.2d at 258. We therefore find no error in the trial court's failure to instruct on the lesser included offense of unlawful imprisonment. We also find no error, fundamental or otherwise, in the trial court's failure to instruct the jury on kidnapping as a class 4 felony, in which the victim is released voluntarily by defendant without physical injury in a safe place. *See* A.R.S. § 13–1304(B). As with unlawful imprisonment, the evidence presented at trial did not support such an instruction.[15]

### F. Denial of Instructions on Lesser Included Offenses of First Degree Murder

▮ In the same vein, defendant attacks the trial court's failure to instruct the jury *sua sponte* on the lesser included offenses of first degree felony murder, claiming that this refusal amounted to fundamental error. Indeed, because defendant's trial counsel explained to the trial court that he did not believe instructions on the lesser included offenses of murder were appropriate in this case,[16] the failure to instruct the jury on these matters would have to be fundamental error to merit reversal.

Our prior rulings, however, clearly demonstrate that a court does not err in refusing to instruct a jury on lesser included offenses in a felony murder case. *See State v. LaGrand,* 153 Ariz. 21, 30, 734 P.2d 563, 572 (1987). As we emphasized in *LaGrand,* "no lesser included offense to felony murder exists because the *mens rea* necessary to satisfy the premeditation element of first degree murder is supplied by

---

15. In his Opening Brief, defendant stated that he "objected to the Court's failure to instruct the jury about kidnapping as a class 4 felony." In support of his statement, defendant cited R.T. 3–14–87, pp. 23–24, 28–29. In its Answering Brief, the state said, "[t]hat simply is not true." In reply, defendant stated that he "stands corrected. There was no objection or request to the trial court to instruct on the lesser included offense of unlawful imprisonment." The truth of the matter, deciphered in spite of defendant's opening and reply briefs, is that defendant *did* request a lesser included offense of kidnapping instruction, which the trial court properly rejected, but did *not* object to the court's failure to instruct the jury about kidnapping as a class 4 felony.

16. Counsel argued:

> I will state to the Court that I thought long and hard about submitting instructions on first degree murder and other charges from second degree murder to manslaughter to negligent homicide to accident in this case, and I have decided that it would not be proper for me to submit those to your honor as part of my case.
>
> I don't intend to argue those matters to the jury, and I don't feel it would be appropriate to submit instructions along those lines.
>
> I realize what that means. It is a move, I'm sure some appellate court may want to ask me about it, but I would certainly tell them I don't feel it was appropriate in this case, and I suppose that they may be asked whether it was a move, also, of strategy or not. I hear that question coming up at times on cases like this here, and if someone wants to ask me about it, I suppose it is, you know, I think it's more than strategy, but it's certainly that, too.

the specific intent required for the felony." *LaGrand,* 153 Ariz. at 30, 734 P.2d at 572, *citing State v. Arias,* 131 Ariz. 441, 443–44, 641 P.2d 1285, 1287–88 (1982); *Celaya,* 135 Ariz. at 255, 660 P.2d at 856. Thus, we find defendant's argument wholly without merit and hold that the trial court did not err in failing to instruct the jury *sua sponte* about lesser included offenses of felony murder.

**12, 13 and 14. Publicity and the Jury**

Issues 12, 13 and 14 are discussed below in part 15.

**15. Publicity and Fair Trial**

Defendant raises four issues concerning the impact of pretrial and trial publicity on his right to a fair trial. Those issues are (12) whether the jury was biased by the publicity attendant to his case; (13) whether the trial court should have sequestered the jury during voir dire and trial; (14) whether the trial court improperly denied defendant's motion to change venue; and (15) whether defendant was otherwise denied a fair trial because of the publicity surrounding his prosecution. Because these challenges all focus on the extent and effect of publicity in this case, and because they overlap significantly in the issues they raise, we address them together.

■ As we have noted, this case generated significant media attention. Indeed, publicity in Tucson and Pima County was so extensive that the trial court granted a change of venue to Maricopa County. The court had expressed to both the prosecution and the defense its desire to keep the new trial location confidential, but as we discussed in our analysis of defendant's prosecutorial misconduct claims, the prosecutor revealed the new venue in court while the media was present. *See supra* Part 5(C), n. 5. As a result, argues defendant, the media attention did not subside, but rather relocated to Phoenix, where it pervaded television and newspaper coverage. Defendant asserts that this media coverage impeded the selection of a fair and impartial jury, and he asserts that the problem was exacerbated by the trial court's refusal to grant a subsequent change of venue and its failure to sequester the jury throughout voir dire and trial. Defendant further argues that the publicity during his trial, which included gavel-to-gavel television coverage of the proceedings broadcast daily in the Tucson area (but *not* in Phoenix, where the trial was held), prevented him from receiving a fair trial.

■ Ideally, juries should be selected from citizens who enter the venire free from prior exposure to the matter they are called to adjudicate. In reality, however, because we now must accept publicity—both legitimate and sensational—as an expected concomitant to crime, courts are more frequently presented with prospective jurors who have had varying degrees of previous contact, via the media, with criminal cases upon which they are called to serve. Yet, although this situation is troublesome, it does not necessarily equate with an inability to protect a defendant's right to a fair trial. Even in cases with substantial publicity like this one, "the mere quantity of ... publicity does not alone deny a criminal defendant of a fair trial." *Dunn v. Roberts,* 768 F.Supp. 1442, 1446 (D.Kan.1991), *citing Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). Rather, we must determine whether, under the totality of the circumstances, the publicity attendant to defendant's trial was so pervasive that it caused the proceedings to be fundamentally unfair. *See Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). As the court in *Dunn* emphasized:

The right to jury trial guarantees the criminal defendant "a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The Constitution does not, however, guarantee a criminal defendant trial by a panel of jurors with no previous knowledge of the issues involved or even jurors with no previous opinions regarding the matter. Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the

evidence presented in court." *Id.* at 723, 81 S.Ct. at 1643.

*Dunn,* 768 F.Supp. at 1446. Viewed in this light, we reject defendant's publicity arguments, for, as we will explain, although we recognize that the horrific nature of the crime in this case engendered intense and prolonged media attention, we do not believe that defendant was ultimately denied the right to have his guilt or innocence determined by a fair and impartial jury.

If defendant could demonstrate that media coverage was so extensive or outrageous that it permeated the proceedings or created a "carnival-like" atmosphere, we would presume prejudice without a particularized examination of the publicity's effect on the jury. *LaGrand,* 153 Ariz. at 34, 734 P.2d at 576. In determining whether the publicity in this case was in fact "carnival-like," we look to the United States Supreme Court's rulings in *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), and *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

Prejudice was presumed in the circumstances under which the trials in *Rideau, Estes,* and *Sheppard* were held. In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings. In *Rideau* the defendant had "confessed" under police interrogation to the murder of which he stood convicted. A 20–minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place. In reversing, the Court did not examine the *voir dire* for evidence of actual prejudice because it considered the trial under review "but a hollow formality"—the real trial had occurred when tens of thousands of people, in a community of 150,-000, had seen and heard the defendant admit his guilt before the cameras.

The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equip-

ment. Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob.

*Murphy v. Florida,* 421 U.S. at 798–99, 95 S.Ct. at 2035–36.

Our review of the record in this case does not reflect anything comparable to the mockery of justice that occurred in *Rideau, Estes,* and *Sheppard.* Although the trial was televised in Tucson, the process of video broadcasting the proceedings did not diminish the "solemnity and sobriety" of the courtroom. Nor, in our opinion, did the presence of members of the press distract the jurors, witnesses, or parties from their responsibilities. If the media was a felt presence in the courtroom, it certainly was not a disruptive or overtly manipulative presence. Further, although the publicity surrounding the case may have at one point reached a fever pitch perhaps comparable to the media frenzies condemned in *Rideau, Estes,* and *Sheppard,* Pima County, rather than Maricopa County, received the brunt of that publicity and, at the time of trial, almost two years had elapsed since the height of the media coverage. Thus, we easily conclude that the publicity surrounding defendant's trial did not erupt into a "circus," and we therefore do not presume that defendant was prejudiced by the media attention.

This determination, however, does not dispose of the issue, for defendant is still entitled "to demonstrate that the media's coverage of his case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly." *Chandler v. Florida,* 449 U.S. 560, 575, 101 S.Ct. 802, 810, 66 L.Ed.2d 740 (1981); *see also LaGrand,* 153 Ariz. at 34, 734 P.2d at 576 (absent carnival-like atmosphere, defendant seeking a change of venue must prove that "the pretrial publici-

ty was prejudicial and will have the likely result of depriving him of a fair trial"). In this regard, defendant argues first that, because of the pretrial publicity, "it was not possible to find an impartial jury." He further asserts that several of the jurors actually selected for his case admitted to prior media exposure to his case.

■■■ Concerning defendant's claim that "an impartial jury" could not possibly have been found in Phoenix, the state responds that, of the 136 persons in the venire, approximately only 10% were removed because of extensive media exposure to the case. The state admits that, because some excusals were made without comment, this number might actually have been greater than 10%. Nevertheless, we agree that the record does not portray a venire tainted by publicity. Our review of the record indicates that as much as 25% of the venire had no prior exposure to the case at all, and that most other venire members had only minimal exposure to the case and had not developed any bias from the media coverage. Thus, we conclude that publicity in the Phoenix area did not preclude the possibility of selecting an impartial jury and we accordingly hold that the trial court did not err in refusing defendant's request for an additional change of venue. *See* *State v. Chaney*, 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (1984) (we will not reverse a trial court's denial of a motion for change of venue absent an abuse of discretion).

■■■ Concerning defendant's charge that some of the jurors actually selected for his jury had been exposed to prejudicial pretrial publicity, our analysis of the voir dire reveals that approximately one half of the jurors in fact had some prior media exposure to the case. That exposure, however, as well as the jurors' memory regarding the publicity, was minimal. Further, none of the jurors gave even the slightest indication during voir dire that prior knowledge of the case would impede their ability to serve as objective jurors. We believe these facts sufficiently rebut defendant's claim that his jury was biased against him. As the United States Supreme Court has recognized, even those persons whose exposure to pretrial publicity has led them to form opinions regarding a defendant are not necessarily incapable of serving as dispassionate jurors:

> It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961). Our review of the record does not reveal, and defendant has not even attempted to demonstrate, that any of the 12 persons ultimately selected as jurors were unable to lay aside their prior impressions or opinions, if indeed they actually had any, and render a verdict based solely on the evidence presented in court.

■■■ We are also not persuaded by defendant's argument that the jury, even if impartial when impaneled, was tainted by publicity *during* defendant's trial. Defendant asserts that rather than sequestering the jury only during deliberations, the trial court should have sequestered the jury throughout the entire trial to guard against the invasive effects of publicity. However, the decision to sequester a jury lies within the discretion of the trial court, and we will not disturb the court's decision on the matter absent an abuse of discretion. *State v. Watkins*, 126 Ariz. 293, 300, 614 P.2d 835, 842 (1980). Again, defendant has failed to demonstrate that the jury was exposed to publicity during the trial. The trial court gave the jury repeated admonitions, both

oral and written, to avoid media coverage of the case. Defendant does not allege "juror misconduct or disobedience to the court's admonitions," *State v. Greenawalt,* 128 Ariz. 150, 162, 624 P.2d 828, 840 (1981), and we have found none in our review of the record. Accordingly, we find no error.

16. Courtroom Decorum

▉ Defendant next claims that he was denied a fair trial by the disruptive actions of members of "We The People," a citizen's action group organized, in part, because of community reaction to the kidnapping and murder in this case. Specifically, he alleges that on at least two occasions group members reacted audibly to the presentation of evidence. Consequently, he contends that the trial judge's failure to bar "We The People" members from the proceedings constitutes reversible error.

Rule 9.3(b), Arizona Rules of Criminal Procedure, provides that "[a]ll proceedings shall be open to the public ... unless the court finds, upon application of the defendant, that an open proceeding presents a clear and present danger to the defendant's right to a fair trial by an impartial jury." More than one year before trial, defendant moved unsuccessfully to have "We The People" members barred from the courtroom.

▉ Initially, we note that this court has stated that, in the fair trial context, "[c]lear and present danger means that the substantive evil must be extremely serious and the degree of imminence extremely high...." *Phoenix Newspapers, Inc. v. Jennings,* 107 Ariz. 557, 560, 490 P.2d 563, 566 (1971). Thus, exclusion of spectators is an extraordinary measure and "should be done with caution." *State v. Bush,* 148 Ariz. 325, 330, 714 P.2d 818, 823 (1986). As the Ninth Circuit Court of Appeals has noted, "the better course [is] for the judge first to issue appropriate admonitions as to improper courtroom behavior and then to exclude spectators who fail[ ] to observe his request after holding an evidentiary hearing." *United States v. Sherlock,* 865 F.2d 1069, 1078 (9th Cir.1989).

In this case, after defense counsel complained about "a little laughter, titter, and some noise" in response to his cross-examination of a witness, the trial judge chose promptly to admonish, outside the jury's presence, the entire group of spectators. He noted that he was unable to determine who was responsible, and he informed the spectators that he would ask them to leave if they made any further audible comments. This incident occurred on the second day of trial. The record reflects no further occurrences of inappropriate behavior by spectators, and no additional admonitions were made throughout the course of the trial. Defendant now argues that the trial court's warning was inadequate and that the continued presence of "We The People" members deprived him of a fair trial because the group members acted as a passive influence upon the jury.

Defendant has not satisfied us that actual prejudice resulted from the group's actions at the trial, so we will find error only if the attendance of the group members was "so *inherently* prejudicial as to pose an unacceptable threat to [defendant's] right to a fair trial...." *Holbrook v. Flynn,* 475 U.S. 560, 572, 106 S.Ct. 1340, 1347, 89 L.Ed.2d 525 (1986) (emphasis added); *see Norris v. Risley,* 918 F.2d 828, 830 (9th Cir.1990). Inherent prejudice exists when " 'an unacceptable risk is presented of impermissible factors coming into play.' " *Holbrook,* 475 U.S. at 570, 106 S.Ct. at 1346–47, *quoting Estelle v. Williams,* 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976).

We find that the presence of "We The People" members at the trial was not inherently prejudicial. The record suggests that the group members were neither identifiable nor distinct from other courtroom spectators. Thus, this case is distinguishable from those in which the reviewing court found error due to spectator influence upon the jury. *See Norris,* 918 F.2d at 829–30; *Woods v. Dugger,* 923 F.2d 1454, 1459 (11th Cir.1991).

In *Norris,* several spectators at the trial wore "Women Against Rape" buttons. *Norris,* 918 F.2d at 830. The buttons not

only made these individuals identifiable and distinct, but the reviewing court also found that they posed an unacceptable threat to the defendant's right to a fair trial because they successfully conveyed an implied message to the jury encouraging a determination of guilt. *Norris*, 918 F.2d at 830. Similarly, the *Woods* court found that the presence of uniformed officers at the defendant's trial for the murder of a correctional officer was prejudicial because it was intended to send a message to the jury that the officers wanted the defendant convicted and the death penalty imposed. *Woods*, 923 F.2d at 1459–60. Under the circumstances of that case, the court concluded that "[t]he jury could not help but receive the message." *Woods*, 923 F.2d at 1460.

In contrast, because the group members at defendant's trial were indistinguishable from the other spectators, it is difficult to imagine how they could have "passively" communicated an influential message to the jury. In other words, although we assume that the intentions of the "We The People" members were similar to those of the spectators in *Norris* and *Woods*—to demonstrate their desire to have a man whom they believed guilty punished for his crime—we do not believe that the members could have been successful in expressing that message to the jury simply by their presence among the spectators in the courtroom.

In so concluding, we do not suggest that organizations of this nature cannot pose a serious threat to a criminal defendant's right to a fair trial, even when those organizations act only as a passive influence upon the jury. *See, e.g., State v. Franklin*, 174 W.Va. 469, 327 S.E.2d 449, 454–55 (1985) (Mothers Against Drunk Drivers members remained in court throughout the trial, sat directly in front of the jury, some cradled sleeping infants in their laps, and all prominently displayed their MADD buttons). We hold that the "We The People" members were not sufficiently noticeable, persuasive, or influential—passively or otherwise—to deprive defendant of a fair trial. We therefore find no error.

### 17. Evidentiary Rulings

Defendant challenges approximately two dozen evidentiary rulings made by the trial court. In reviewing each claim, we recognize that the trial court has considerable discretion in determining the relevance and admissibility of evidence. Therefore, we will not disturb the trial court's ruling on any evidentiary issue absent a clear abuse of discretion. *See State v. Amaya–Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990).

We have reviewed each claim. Because our review has revealed no reversible error, however, we do not believe that each of the challenges merits individual discussion. Therefore, we address only the more colorable of defendant's arguments.[17]

---

17. We find no error in the following evidentiary rulings, and we conclude that the issues raised by these challenges do not warrant separate discussion:

(1) permitting the victim's mother to testify (*see supra* Part 5(D)(3) );

(2) permitting Officer John Bowron to testify concerning defendant's interview with television reporter Lupita Murrillo despite defendant's claim that Bowron had a "poor recollection;"

(3) permitting Paul Larmour, the state's accident reconstruction expert, to testify in a somewhat narrative manner;

(4) admitting into evidence photographs corresponding to the slides shown by Larmour during his testimony;

(5) allowing the testimony of FBI agent Carl Gosting concerning his interview with two boys who had seen Sam Hall leave Homer Davis Elementary School and who, approximately ½ hour later, saw a pink bicycle lying in the street on Pocito;

(6) limiting the in-court experiments defense counsel was permitted to conduct with Dr. Walter Birkby, the physical anthropologist who examined the teeth attached to the mandible recovered in the desert and identified them as belonging to the victim, *see State v. Prince*, 160 Ariz. 268, 274, 772 P.2d 1121, 1127 (1989); *State v. Mincey*, 130 Ariz. 389, 408, 636 P.2d 637, 656 (1981);

(7) ruling that James Thorton, who was disclosed as a surrebuttal witness after trial began, could testify during the defense's case-in-chief, but only on the limited issue of nickel transference;

(8) prohibiting defense counsel from cross-examining an identification witness about the molestation of the witness's daughter, who was 5 years old when the molestation oc-

### A. *Defendant's Statements*

#### 1. Defendant's Story

Defendant returned to De Anza Park late in the afternoon on the day the victim disappeared. James McDonald and Brian Hall, another of defendant's acquaintances, walked over to defendant's car and engaged him in conversation. Hall questioned defendant about what appeared to be blood on his hands, and defendant responded that he had stabbed a man in a drug dispute. Defendant repeated this story, with varying degrees of elaboration, to Thomas Parisien that evening and again to McDonald as defendant and McDonald traveled to Texas. Defendant later recanted his story in his television interview with Lupita Murrillo, claiming that he had fabricated it to appear "tough" to his friends.

 On appeal, defendant argues that the trial court improperly allowed the jury to hear testimony concerning his story, claiming, among other things, that the evidence was hearsay and irrelevant. We disagree. Rule 801(d)(2)(A), Arizona Rules of Evidence, provides that "[a] statement is not hearsay if [it] is offered against a party and is ... his own statement, in either his individual or a representative capacity...." Thus, defendant's statements were nonhearsay and, as such, were admissible against him if relevant. *See* 1 M. Udall, J. Livermore, P. Escher & G. McIlvain, *Arizona Practice: Law of Evidence* § 125, at 257 (3d ed.1991).

 Defendant's claim that the story "is unrelated to this crime," and therefore irrelevant, is equally unsupportable. Relevant evidence need only have *"any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Arizona Rules of Evidence (emphasis added). Defendant's account of his activities on the afternoon the victim disappeared is highly relevant, especially when that account involves the stabbing of another person. That defendant would fabricate a story involving a stabbing to explain away the presence of blood on his hands certainly has the tendency to make more probable the fact that defendant committed the victim's murder.

 Defendant next challenges the manner in which evidence concerning his story was presented to the jury. Particularly, he argues that McDonald was improperly permitted to testify concerning Brian Hall's discussion with defendant on the afternoon of the kidnapping. Although both Hall and McDonald were present dur-

curred and who was an adult at the time of the trial in this case;

(9) precluding Kevin Gilmartin, a psychologist with the Pima County Sheriff's Department, from testifying for the defense about the "Conversion V Factor," a psychological test measuring suggestibility (the record reflects neither that Gilmartin was an expert in this subject nor that the witnesses about whom the defense wanted the testimony introduced had been tested for the Conversion V Factor);

(10) prohibiting John Cohen, Ernest Bernsienne's former attorney from Los Angeles, from testifying for the defense concerning Bernsienne's character (Cohen and Bernsienne had had no contact for 9 years and Bernsienne no longer resided in Los Angeles);

(11) precluding, on relevancy grounds, testimony concerning the availability of drugs in the trailer park adjacent to Homer Davis School;

(12) allowing the prosecutor, during his opening statements, to refer to an enlarged photograph of the victim taken before her death;

(13) admitting "mug shot" of defendant showing his hair in a ponytail (with sheriff's identification removed);

(14) denying defendant's offer into evidence of an enlarged photograph of the bumper of defendant's car;

(15) refusing to admit, for lack of proper identification, a photograph of a woman the defense argued had been seen with the victim on the evening of September 17, 1984, the day she disappeared;

(16) precluding the defense from cross-examining Ernest Bernsienne about his religious beliefs, despite the defense's argument that Bernsienne had been a member of a religious cult;

(17) prohibiting the defense from mentioning that defendant had volunteered to take a polygraph test;

(18) ruling that, if defendant testified, the state could introduce evidence that defendant had prior convictions, but could not reveal the nature of those convictions; and

(19) denying the jury's request to view certain areas of Tucson that were discussed in the trial testimony.

ing the conversation at De Anza Park, apparently only Hall spoke with defendant. It was during this conversation that defendant first claimed to have stabbed someone. Hall was struck by lightning and killed 4 days after the meeting with defendant, and McDonald therefore related the incident to the jury at trial. The following exchange occurred during McDonald's testimony:

McDONALD: When Brian [Hall] came around to the car, he mentioned that [defendant] had blood on his hands.

DAVIS: What did [defendant] say?

McDONALD: He said, he had a fight or hassle with some guy trying to rip him off, and that's how the blood got on his hands.

McDonald was not asked whether he observed the blood on defendant's hands. We find no error in the admission of McDonald's testimony. "'An incriminating statement of a third person which is admitted to be true by the accused, is admissible in evidence against him as his own statement by adoption.'" *State v. Thomas*, 104 Ariz. 408, 411, 454 P.2d 153, 156 (1969), *quoting People v. Henderson*, 37 Ill.2d 489, 493, 229 N.E.2d 519, 521 (1967). Thus, when defendant failed to deny Hall's statement that he had blood on his hands, he adopted that statement as his own. As we have noted, admissions are non-hearsay. The Arizona Rules of Evidence therefore did not prohibit McDonald from testifying about Hall's question to defendant.

■ Defendant nevertheless argues that the evidence was improperly admitted because James McDonald was an unreliable witness. He asserts that McDonald was a chronic alcohol and drug user and that his memory concerning the events of September 17, 1984, and the days leading up to defendant's arrest, were clouded by his substance abuse. At best, the record contains conflicting evidence concerning the degree of McDonald's impairment during this period. In addition, McDonald himself testified that he was not above lying if he believed it would benefit him. These facts, however, concern the weight to be given McDonald's testimony, not the admissibility

of that testimony. *See United States v. Haili*, 443 F.2d 1295, 1299 (9th Cir.1971). Therefore, McDonald's ability accurately to recall the statements made by defendant was a question for the jury in this case. Accordingly, we find no error in the trial court's refusal to prohibit the testimony because of McDonald's alcohol and drug use.

■ Defendant nevertheless complains that allowing McDonald to testify about the conversation between Brian Hall and defendant violated the confrontation clause of the sixth amendment. The limited reference to the conversation between Hall and defendant, however, concerned only defendant's adoptive admission that he indeed had blood on his hands. As such, Hall's question to defendant was non-hearsay, and it is well settled that the admission of non-hearsay "raises no Confrontation Clause concerns." *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425 (1985); *see State v. Spinks*, 156 Ariz. 355, 359, 752 P.2d 8, 12 (App. 1988). Further, even if sixth amendment confrontation principles were implicated by the testimony in this case, we would be hard pressed to conclude that defendant had been unfairly prejudiced by McDonald's testimony. Brian Hall's question to defendant concerning the blood contained no unique information, because Thomas Parisien, who was called as a defense witness, also testified that he had seen blood on defendant's hands and shirt. Thus, we find no error in the admission of testimony concerning defendant's story.

### 2. Defendant's Statement on the Telephone

■ Defendant and McDonald experienced car trouble while traveling through Texas. McDonald testified that defendant, who was financially dependent on his parents, telephoned his mother in Los Angeles "to get help to get it fixed." McDonald gave the following testimony concerning the incident:

McDONALD: Frank called his mother in California. She called back and told

him a place to get it fixed on a credit card with the telephone.

DAVIS: Do you know what day of the week this was?

McDONALD: No, I can't remember.

DAVIS: Do you recall hearing any of the conversation that [defendant] had on the phone?

McDONALD: Just the words he said when I was walking by the phone while he was talking.

He said, "Even if I did do it, you have to help me."

That's all I heard of the conversation.

DAVIS: Did you talk with [defendant] about that comment, later?

McDONALD: Well, he talked to me. I didn't ask him about it.

He said that they hadn't found the guy he stabbed there in Tucson. You know, that's about the only comment he made about it.

He did—He said, also, they were trying to stick something on him about a little girl—something like that. That's all he said about it.

Defendant argues that McDonald should have been prohibited from testifying about the conversation because it was "irrelevant, immaterial and hearsay." He also asserts that, because McDonald only heard a portion of defendant's comments on the telephone and because he could not hear the other half of the conversation, the probative value of the evidence was far outweighed by its prejudicial effects. In support of his argument, defendant cites *Benton Grain Co. v. Reger*, 131 Kan. 735, 293 P. 955 (1930), in which the plaintiff in a civil case concerning the sale of wheat sought to admit the testimony of a witness who had overheard the plaintiff in a telephone conversation with the defendant. The witness was called to corroborate the plaintiff's version of the telephone conversation that "he finally succeeded in buying the wheat." *Benton*, 131 Kan. at 737, 293 P. at 957. The Kansas Supreme Court held that the trial court had properly prohibited the witness from testifying because, among other things, her testimony would have been a conclusion by a witness on the

very question the jury was called to determine. *Benton*, 131 Kan. at 737, 293 P. at 957.

Defendant's reliance on *Benton*, and indeed his entire hearsay argument, is misplaced. The statement made by defendant during his telephone conversation with his mother was an admission and was therefore non-hearsay. The statement differs from the evidence at issue in *Benton* in the fundamental aspect that it was offered *against* the defendant, rather than as a corroborative effort to support his interpretation of the incident. *See* rule 801(d)(2), Arizona Rules of Evidence ("[a] statement is not hearsay if [it] is offered against a party"). This non-hearsay statement— "Even if I did do it, you have to help me"— was clearly relevant evidence. Further, although the prejudicial effects of the statement were substantial, the trial court did not abuse its discretion in determining that the statement was nevertheless admissible. Defendant was afforded ample opportunity to impeach McDonald's testimony about the conversation, and the weight to be given the evidence was properly left to the jury. We find no error.

### B. *Defendant's Letter and Statements to Ernest Bernsienne*

Defendant next objects to the admission of portions of a letter he wrote to Ernest Bernsienne, a man with whom he had corresponded while in prison and with whom he continued to communicate during his parole. He also objects to the admission of oral statements he made to Bernsienne concerning his sexual interest in children.

The letter at issue was written in April 1982, more than two years before the kidnapping in this case. The jury was permitted to view the following redacted portions of the letter:

Dearest Ernie:

Do what thou wilt shall be the whole of the law. Wow, I'm scared! Ya see, it's time for "true confessions." What I mean is, there is a fact about me that I am ashamed of. I believe it is considered so wrong that I have kept this part of me hidden from you. That is, until now!

Rather than saying I am attracted to people between the ages of 7 and 12, I feel a more complete explanation is necessary.

Another fear is that I am still attracted to kids but can't handle another arrest.

Similarly, the trial court permitted Bernsienne to testify that 3 or 4 months before the kidnapping in this case, defendant stated in a telephone conversation with him that he had considered "picking up" another child and that "this time he would make sure the child wouldn't talk."

Defendant argues that the trial court erred in admitting the redacted version of the letter and Bernsienne's testimony because the evidence improperly alluded to defendant's prior bad acts and because the references to defendant's sexual interest in young children constituted impermissible character evidence. He further argues that both the oral and written statements were made too long before the kidnapping in this case to have sufficient probative value. In contrast, the trial court ruled that the redacted sections of the letter and the oral statements were admissible as evidence of motive and intent and that, although the evidence indirectly mentioned defendant's prior arrest record, its probative value outweighed any prejudicial effects. *See* rule 404(b), Arizona Rules of Evidence.

The trial court did not abuse its discretion in admitting the redacted letter or defendant's statement to Bernsienne. We question, however, whether defendant was afforded all the protection due a criminal defendant against whom evidence of prior bad acts is admitted. The United States Supreme Court, in interpreting the Federal Rules of Evidence, has commented that 4 provisions protect a defendant from unfair prejudice resulting from evidence of prior bad acts: (1) rule 404(b)'s requirement that the evidence be admitted for a proper purpose; (2) the relevancy requirement of rule 402; (3) the trial court's assessment that the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice, *see* rule 403; and (4) rule 105's provision for an appropri-

ate limiting instruction, if the party requests one. *See Huddleston v. United States*, 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988). These same 4 factors, as embodied in the Arizona Rules of Evidence, were available to defendant to provide assurance against unfair prejudice. Unfortunately, the record indicates that one of these safeguards was not employed.

■ We concur with the trial court that both the letter and the oral statements, although reflective of defendant's prior bad acts, constitute appropriate evidence of his motive and intent to commit the crimes in this case. Together, defendant's statements about his sexual attraction to young children and his counterbalancing fears of further incarceration indicate the presence of motive to kidnap and murder the victim, thereby fulfilling his pedophilic desires while eliminating the victim who might report his actions. *See State v. Bowen*, 48 Wash.App. 187, 191, 738 P.2d 316, 319 (1987) (motive defined as an inducement, or that which leads or tempts the mind to indulge a criminal act). Thus, the evidence was admissible for a proper purpose under rule 404(b).

■ In addition, defendant's statements were unquestionably relevant to the issues at trial, and we are not persuaded that the trial court abused its considerable discretion in determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Although the oral and written statements were made a significant amount of time before the crime in this case (3 to 4 months and 2 years, respectively), we have consistently held that the remoteness of such statements is a factor going to the weight of the evidence, not its admissibility. *See State v. Jeffers*, 135 Ariz. 404, 418, 661 P.2d 1105, 1119 (1983); *State v. Moore*, 111 Ariz. 355, 356, 529 P.2d 1172, 1173 (1974). We therefore conclude that the second and third *Huddleston* factors were satisfied.

■ We do find error, however, in the trial court's failure to give the jury a limiting instruction concerning the evidence.

Rule 105, Arizona Rules of Evidence, provides that when evidence is admissible for one purpose but not for another, "the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." The evidence of defendant's sexual interest in children, and particularly the references to his prior bad acts involving children, were admitted for the limited purpose of demonstrating motive and intent. The statements were inadmissible "to prove the character of [defendant] in order to show that he acted in conformity therewith." Rule 404(b). The evidence, however, clearly had the potential of improperly suggesting to the jury that "because the defendant is a person of criminal character, it is more probable that he committed the crime for which he is on trial." *McCormick on Evidence* § 190, at 557–58 (3d ed.1984). A limiting instruction therefore would have been appropriate.

The state concedes that no limiting instruction was given concerning the written and oral statements, but it asserts that the failure to give the instruction was not error because the defense did not request it. Indeed, the defense did not request a limiting instruction when the evidence was presented to the jury. Defendant does not challenge the state's assertion in his brief, but responds only that a limiting instruction was nevertheless necessary in this case.

■ Initially, we note that the state is correct that failure to give a limiting instruction is not error if trial counsel does not make a proper request for the instruction. *See, e.g., United States v. Record,* 873 F.2d 1363, 1376 (10th Cir.1989), *construing Huddleston,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) (discussing identical provisions of Federal Rules of Evidence). Our independent review of the record, however, reveals that trial defense counsel *did* in fact request a limiting instruction concerning the evidence and that the proposed instruction, which was submitted with defendant's other proposed jury instructions at the end of all of the evidence, was denied by the trial court. The requested instruction read:

The simple fact itself that the defendant was previously arrested one time prior to April 1982 should not be considered by you in arriving at your verdict.

Admittedly, this is a poor example of a limiting instruction and should not have been given to the jury without modification. Given, however, that the April 1982 letter to Ernest Bernsienne presented to the jury contained the reference to defendant's previous arrest, we believe that the thrust of the proposed instruction was evident. Further, any doubt should have been dismissed when defense counsel orally informed the court of his purpose in submitting the instruction:

I tried to draft, and I guess inartfully, language that would suggest that the jurors should not consider the arrest itself as evidence in the case to find the defendant guilty. They may use the fact that he was arrested, but not that he just was arrested and he's a bad person. That's the reason I have that one in there.

■ We conclude, therefore, that the trial court erred in refusing the proposed limiting instruction (after modification). This error, however, does not warrant reversal. "The test for determining harmless error is 'whether there was reasonable probability ... that a verdict might have been different had the error not been committed.'" *State v. Williams,* 133 Ariz. 220, 225, 650 P.2d 1202, 1207 (1982), *quoting State v. McVay,* 127 Ariz. 450, 453, 622 P.2d 9, 12 (1980). Had the error not been committed in this case, the jury still would have been permitted to consider defendant's statements as evidence of motive and intent "in arriving at [its] verdict." As such, the statements were tremendously incriminating. For that reason, we do not believe that a reasonable probability exists that the verdict would have been different had the jury been properly instructed. Accordingly, we hold that the error was harmless.

### C. *Testimony of Paul Larmour*

■ Defendant argues that Paul Larmour, the state's accident reconstruc-

tion expert, was improperly allowed to testify that, to his eye, the color of the victim's bicycle and the pink smear on the bumper of defendant's car were a "perfect paint match." According to defendant, this testimony violated the trial court's earlier ruling that, because the jury could view both the bike and the bumper, the question of whether the two paints matched was to be left for the jurors to determine. The trial court allowed the testimony, however, because it concluded that determining whether the paint smear visually matched the bicycle was a necessary aspect of Larmour's tests to determine if and where defendant's vehicle struck the bike. We believe that the trial court did not abuse its discretion in allowing this testimony. In addition, defense counsel's cross-examination sufficiently brought to the jury's attention the fact that Larmour was not a paint expert. We find no error.

### D. *Testimony of Sam Hall*

 We have already held that the trial court did not err in refusing to grant a mistrial because of Sam Hall's emotional demeanor during his testimony. *See supra* Part 5(D)(2). Defendant further contends, however, that he was prejudiced by Hall's statements during direct examination that the defendant looked as if he was "living out of his car," that as Hall viewed defendant "something was telling [him] that something's not right here," and that defendant "caused the hair on the back of [Hall's] head to rise up and [his] arm to get goose bumps and [his] adrenaline to start pumping just by sitting there, observing the gentleman in his car."

The trial court allowed these statements, concluding that they were not improper opinion testimony, but rather were relevant comments illustrating the degree of Hall's attention when he saw defendant in the school parking lot. We concur in the trial court's interpretation of the statements and we accordingly find no error.

### E. *Limitation on Cross–Examination of James Corby*

 Defendant next asserts that he was prejudiced by the trial court's refusal to allow his trial counsel fully to cross-examine James Corby, the FBI agent who analyzed the paint transfers between defendant's car and the victim's bike. Particularly, he argues that his attorney was unfairly precluded from questioning Corby about areas in which Corby's test results varied from the results obtained in similar tests run by Tim Carlson, the state's first paint expert who died prior to trial. As noted, Carlson's testimony was not preserved before his death. *See supra* Part 8.

Our review of the record, however, does not reveal that defense counsel ever actually objected to the court's prohibition against the use of Carlson's conclusions and opinions as an impeachment tool. A lengthy discussion ensued after the prosecution objected to the defense's attempt to use the Carlson material. The prosecution argued that the defense was improperly attempting to bring in Carlson's inadmissible opinions via Corby's cross-examination. The transcript of the discussion reveals considerable confusion among the trial judge, prosecutor, and defense counsel concerning which aspects of the Carlson materials the defense was attempting to use (*i.e.*, the charts, graphs, and other findings generated by the Carlson experiments as opposed to the actual *conclusions* Carlson reached from those materials). The trial court eventually concluded, based on its understanding of defense counsel's argument, that the defense was seeking only to introduce Carlson's graphs and charts to impeach Corby's testimony. Because the court believed that the materials were "charts and items upon which Mr. Corby and Mr. Carlson and other of their colleagues would normally rely in the preparing of their conclusions and opinions," it determined that the items could be employed by the defense pursuant to rule 703 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."). In response to this ruling, defense counsel stated:

> I have nothing to add. That's what I was trying to argue yesterday, and I

guess I misunderstood Your Honor's ruling.

Thus, our reading of the record indicates that the defense received exactly what it requested.

Assuming, however, that the defense in fact desired to use Carlson's opinions for impeachment purposes, the record does not reflect that, once the trial court's ruling was clear, defense counsel objected to the limitation placed upon his cross-examination of Corby, nor does it reflect that he made an offer of proof demonstrating the admissibility of Carlson's opinions. *See* rule 103(a)(2), Arizona Rules of Evidence; *see also State v. Kaiser*, 109 Ariz. 244, 246, 508 P.2d 74, 76 (1973) ("As a general rule evidence cannot be reviewed on appeal in the absence of an offer of proof showing that the excluded evidence would be admissible and relevant."). We recognize that an offer of proof may not be necessary if "the purpose and purport of the testimony expected to be elicited is obvious." *Kaiser*, 109 Ariz. at 246, 508 P.2d at 76, *quoting Peterson v. Sundt*, 67 Ariz. 312, 318, 195 P.2d 158, 162 (1948). We do not believe, however, that the "purpose and purport" of using the Carlson materials was "obvious" to the trial court in this case. Indeed, the only obvious aspects of the defense's attempt to use Carlson's material were defense counsel's miscommunication and the trial court's confusion as to the defense's intent. Accordingly, we find no basis for considering on appeal whether the defense was unfairly limited in cross-examining Corby.

Finally, regardless of whether this issue was properly preserved at the trial level, we conclude that the ruling prohibiting the use of Carlson's opinions did not constitute an abuse of the trial court's discretion.[18] We therefore find no error, fundamental or otherwise.

### F. *Admission of Defendant's Knives*

Defendant claims that the trial court improperly admitted two knives and some sandpaper found in his possession. He argues that because the state was unable to establish how the victim died and because he recanted his story about stabbing a man in a drug transaction, the knives were irrelevant and prejudicial. The state responds that the defense failed to make a timely objection to the admission of this evidence at trial and that defendant therefore is precluded from raising this issue on appeal. It also argues that, even if the issue is properly before this court, the trial court's ruling was correct because defendant's possession of the knives and his attempt to clean one of them with the sandpaper demonstrated both the availability of a murder weapon and a consciousness of guilt, which rendered defendant's culpability for the victim's death more probable and thereby provided a sufficient basis for admitting the items.

We agree with the state that defendant's failure to make a timely objection to the admission of the knives and the sandpaper precludes defendant from raising this issue on appeal. "Error may not be predicated upon a ruling which admits ... evidence unless ... a timely objection or motion to strike appears of record...." Rule 103(a)(1), Arizona Rules of Evidence. The record reveals that the defense did not object to the evidence when it was offered and admitted, but rather moved for a mistrial two days later based on its admission. We conclude that the defense's motion was not timely as required by rule 103, and that defendant therefore waived his right to claim that the trial court erred in admitting the knives and the sandpaper. *See also State v. McDaniel*, 136 Ariz. 188, 196, 665 P.2d 70, 78 (1983) ("It has long been the law in Arizona that failure to object to an offer of evidence is a waiver of any ground of complaint against its admission.").

Similarly, we conclude that the trial court did not abuse its discretion in admitting the knives and sandpaper, for although defendant's argument is not totally without merit, we believe that the record

---

**18.** As we cautioned in *State v. Lundstrom*, 161 Ariz. 141, 148, 776 P.2d 1067, 1074 (1989), "if the testifying expert merely acts as a conduit for another non-testifying expert's opinion, the 'expert opinion' is hearsay and is inadmissible, Rule 703 notwithstanding."

substantiates the relevance of these items. Certainly, if the state had attempted to introduce the knives without presenting any other evidence linking them to the crime, they would have been inadmissible to prove that defendant murdered the victim, because, as defendant emphasizes, the state was unable to establish the cause of death.

Defendant's argument, however, ignores significant evidence bearing on the relevance of these items. Specifically, the jury was informed that defendant returned to De Anza Park on the afternoon Mary disappeared, that Brian Hall questioned him about blood on his hands, and that defendant responded that he had stabbed someone during a drug transaction. Further, the jury learned that in addition to seeing blood on defendant's clothing that evening, Thomas Parisien claimed to have seen blood on a knife in defendant's possession and that the two men had discussed whether defendant should dispose of the knife. Finally, McDonald testified that defendant sandpapered the blade of a knife during the trip to Texas.

In determining whether sufficient evidence connects an alleged weapon with the offense charged, the trial court must consider the totality of the evidence, "and no one single factor is completely determinative." *People v. Owens*, 109 Ill.App.3d 1150, 1155, 65 Ill.Dec. 593, 596–97, 441 N.E.2d 908, 911–12 (App.1982).

Although the general rule is that items must be properly identified and shown to be connected with the crime, this is not an absolute rule. Where there is sufficient evidence to justify a reasonable inference that items were used by the accused in the commission of the crime charged, those items are admissible.

*Hayes v. State*, 443 So.2d 1323, 1325 (Ala. Cr.App.1983), *citing* 22A C.J.S. *Criminal Law* § 712 (1961); *see also Commonwealth v. Phong*, 19 Mass.App. 901, 901, 471 N.E.2d 383, 384 (1984) (although prosecution could not prove that defendant wore rubber gloves during the commission of crime, gloves were properly admitted because they were probative of an attempt to conceal fingerprints, which was probative of an intent to commit robbery, which, in turn, was probative of the defendant's actual robbery attempt).

Under the totality of the circumstances surrounding the knives and sandpaper in this case, the trial court did not err in admitting these items. Given the testimony of McDonald and Parisien, the knives and sandpaper had obvious relevance that was not substantially outweighed by the danger of unfair prejudice to defendant.

### G. Admission of Underpants

 Defendant next argues that the trial court incorrectly determined that the prejudicial effect of admitting a pair of girl's underpants found near the victim's remains did not outweigh the probative value of that evidence. *See* rule 403, Arizona Rules of Evidence. Our review of the record, however, indicates that defense counsel failed to object to the admission of the underpants at trial.[19] "Absent fundamental error, error is usually considered to be waived on appeal unless it was objected to at trial." *State v. Holder*, 155 Ariz. 83, 85, 745 P.2d 141, 143 (1987), *citing State v. Henley*, 141 Ariz. 465, 687 P.2d 1220 (1984).

As we have noted, the trial court has broad discretion to determine evidentiary matters, and we will not disturb the trial court's ruling absent an abuse of discretion. *See, e.g., State v. Clabourne*, 142 Ariz. 335, 343, 690 P.2d 54, 62 (1984). Given this deferential standard,[20] we are un-

---

**19.** The following colloquy occurred concerning the underpants:

> MR. DAVIS: And I plan to offer [the pair of children's panties] and I do offer that at this time.
> So, if Mr. Bloom opposes that, we do have this opportunity for him to make his record on that.

THE COURT: Okay. The State has offered Exhibit 79, the panties, Mr. Bloom.
MR. BLOOM: I don't oppose it.
THE COURT: Exhibit 79 is admitted in without objection.

**20.** "An abuse of discretion occurs when the decision is characterized by capriciousness or arbitrariness or by failure to conduct an adequate investigation into the facts necessary for an

persuaded that admission of the underpants constituted error, much less fundamental error.

Defendant emphasizes that Mary's mother was unable to identify positively the underpants as those she thought Mary had been wearing the day she disappeared. The lack of a positive identification, however, goes to the weight of the evidence, not its admissibility. *State v. Amaya–Ruiz,* 166 Ariz. 152, 169, 800 P.2d 1260, 1277 (1990), *citing State v. Blazak,* 114 Ariz. 199, 560 P.2d 54 (1977). In addition, Mary's mother did identify the underpants as being similar to a pair that Mary owned; she therefore was unable to rule out the possibility that the child had been wearing that pair the day she disappeared. Thus, the evidence had obvious potential probative value. Further, the state contends that the evidence also was admissible to demonstrate the thoroughness of the search of the area where the victim's remains were found and thereby to counter defense claims of inadequate or selective investigation by the Pima County Sheriff's Department. We agree.

When balanced against the clear probative value of the evidence and the defense's ability to lessen its prejudicial impact by focusing on the lack of a positive identification, the possible prejudicial aspects of admitting the underpants do not appear overriding. Therefore, we believe that the trial court did not abuse its considerable discretion in allowing the evidence to reach the jury, and we accordingly find no error.

### H. *Videotapes of Defendant in Custody*

■ Defendant next argues that he was denied a fair trial because the jury was permitted to view videotapes of television broadcasts showing him in police custody, handcuffed, and wearing jail attire. These videotapes were displayed to the jury, both during trial and during deliberations, as part of the out-of-court identifications made by several witnesses (*see supra*

FACTS, Part VI(A)) who recognized defendant when they saw him on television after his arrest. Defendant contends that allowing the jury to view the videotapes was tantamount to requiring him to attend his trial in jail garb and handcuffs.

■ Defendant is correct that, except in rare circumstances, the constitution protects criminal defendants from being compelled to attend trial in jail clothing or handcuffs. *See Estelle v. Williams,* 425 U.S. 501, 504–05, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976). His argument, however, adds a new, and somewhat disturbing, dimension to this principle: in determining whether a defendant has been afforded a fair trial, what is the impact of permitting the jury to view the defendant in videotaped portions of pretrial publicity clad in jail attire or handcuffs?

The state responds to defendant's argument by emphasizing that the jury was aware that defendant had been arrested, so he could not have been prejudiced simply because the jurors saw him handcuffed and in a jail uniform. Relying on *United States ex rel. Stahl v. Henderson,* 472 F.2d 556, 557 (5th Cir.1973), the state argues that "[n]o prejudice can result from seeing that which is already known." *Henderson,* however, concerned a defendant who was compelled to wear prison attire while on trial for murdering another inmate in prison. Extending *Henderson* to apply to all defendants who had been *arrested* would make a mockery of the right to a fair trial and would, in effect, swallow the rule prohibiting a defendant from being tried in prison clothing. Moreover, we believe the state's response misses the point, for the danger inherent in this type of situation is not that the jury will be made aware of some previously undisclosed fact, but that "the visual impact of the improper picture of a restrained defendant" might prejudice the jury against the defendant by portraying him as a bad or dangerous person. *Lucas v. State,* 791 S.W.2d 35, 56 (Tex.Cr.

intelligent exercise thereof." *State v. Patton,* 120 Ariz. 386, 388, 586 P.2d 635, 637 (1978), *citing State v. Douglas,* 87 Ariz. 182, 349 P.2d 622 (1960); *see also Waldrop v. Weaver,* 702

P.2d 1291, 1293 (Wyo.1985) ("An abuse of discretion is that which shocks the conscience of the court and appears so unfair and inequitable that a reasonable person could not abide it.").

App.1989); *see Gates v. Zant,* 863 F.2d 1492, 1501–02 (11th Cir.1989).

In *Lucas,* the defendant argued that he was denied his right to a presumption of innocence, to a fair trial and to due process when the jury was allowed to view his videotaped confession, in which he appeared in handcuffs. *Lucas,* 791 S.W.2d at 54. In concluding that the jury should not have been permitted to view the videotape, the court discussed the ramifications of the trial judge's evidentiary ruling:

> [W]here the State chooses to introduce into evidence before the jury a video-taped statement made by an accused, and the statement is used during the first stage of trial, before a verdict as to guilt or innocence is reached by the jury, the State must observe the rule guarding the presumption [of innocence] as in other cases where the physical presence of the accused in view of the jury must be unfettered and unrestrained. To find otherwise would be to discount the constitutional presumption of innocence in favor of strictly evidentiary concerns. The courts have recognized that the presence of physical restraints on an accused may tend to prejudice the jury against the accused and suggest that the trial judge, by permitting the use of such restraints, has thereby expressed the opinion that the accused is a dangerous person and is not to be trusted. While it is true appellant was not brought in before the jury during trial in restraints, the jury was allowed to see by video-taped means that which would not otherwise have been permitted. Although there is a distinction, it is one without difference if the broad presumption is to be supported. Therefore, unless the record reflects "good and sufficient reason for such extraordinary measures," we must find error in the admission of the videotape.

*Lucas,* 791 S.W.2d at 55 (citations omitted).

The *Lucas* court determined, however, that the error was harmless because (1) the defendant had willingly participated in making the videotaped confession; (2) the focus of the videotape was on defendant's words, rather than on the fact that he was handcuffed; and (3) the prejudice resulting from the videotape was diminished by the admission of defendant's prior confession. The court concluded:

> Given the contextual atmosphere in which the jury was allowed to view the handcuffed appellant, one in which by wholly voluntary admission the facts and circumstances of the crime were discussed and re-enacted by the accused, the fact the jury was instructed as to the presumption of innocence, and the fact that irregardless [sic] of his repeated confessions, the presumption was underscored by his unfettered appearance in the courtroom, we can say beyond a reasonable doubt the "encounter" made no contribution to appellant's conviction.

*Lucas,* 791 S.W.2d at 56.

The *Gates* case addressed a similar incident in which the jury was permitted to view the defendant in handcuffs during his videotaped confession. *Gates,* 863 F.2d at 1501–02. In addressing the defendant's claim that he was unduly prejudiced by the viewing, the court reasoned that playing the videotape for the jury was more analogous to cases involving "a brief or incidental viewing ... of the defendant in handcuffs" than to cases in which the defendant was required to attend his trial or sentencing in handcuffs. *Gates,* 863 F.2d at 1501–02. The court therefore concluded that, as in cases involving incidental courthouse viewings of a defendant in handcuffs, the defendant in *Gates* was required to demonstrate that he was actually prejudiced by the jury's viewing of him on the videotape.

Relying on the following factors, the *Gates* court found no actual prejudice: (1) although defense counsel had objected to the videotape, he did not expressly object to the presence of the handcuffs; (2) defense counsel did not ask for a limiting instruction or for a poll of the jury on the issue; (3) the videotape was made outside, rather than in the police station, so jurors "likely would infer that handcuffing was simply standard procedure when a defendant is taken outside the jail"; (4) viewing the defendant in handcuffs on a videotape

presented less potential for prejudice than seeing him handcuffed in the courtroom; and (5) the defendant sat in the courtroom for several days without handcuffs. *Gates*, 863 F.2d at 1502.

Applying the analyses of *Lucas* and *Gates*, we conclude that the videotape viewing in this case was not so prejudicial that it abrogated the probative value of the evidence. Several witnesses described for the jury the out-of-court identifications they made of defendant when they saw him on television. For the most part, these identifications occurred when the witnesses saw the brief television clips of defendant in police custody. The videotapes shown to the jury contained those television clips and demonstrated how and when the prior identifications had occurred. As such, the tapes were admissible. Further, although we are aware of the danger of "discount[ing] the constitutional presumption of innocence in favor of strictly evidentiary concerns," *Lucas*, 791 S.W.2d at 55, we do not believe that the use of the videotapes emasculated the presumption of innocence in this case.

We have reviewed the exhibits and concur with defendant that the television footage does portray him in a prejudicial light. We question, however, the exact source of that prejudice. Defendant is seen in the videos in handcuffs and, in some of the footage, in identifiable jail attire. Primarily, the clips show defendant outside, apparently being transported from police vehicles to various jail facilities. As in *Gates*, we believe this fact mitigates the prejudicial impact of the video because the jury easily could conclude that common practice requires criminal defendants in custody to be handcuffed when they are outside the jail setting. In addition, the viewings of defendant are very brief and were balanced

by the presence of the well-groomed, unfettered defendant throughout the lengthy trial. Indeed, perhaps the most damaging aspect of the videotape clips is the disparity they illustrate between the physical appearance of defendant at the time of his arrest and his appearance in the courtroom during trial. The jury easily could have been more influenced by the appearance of defendant than by the incidental facts that he was handcuffed and in jail garb. This aspect of the videotapes, however, did not warrant their exclusion, for the out-of-court identifications centered on how defendant appeared in September 1984—not on his considerably altered appearance at trial. Therefore, we believe that defendant was not impermissibly prejudiced by allowing the jury to see how he appeared at the time of the prior identifications.

Finally, given the length of defendant's trial and the quantum and variety of the evidence presented by the state, we are unpersuaded that the brief viewings of defendant on the videotapes could have had any measurable impact on the jury or its verdict. We therefore hold that the display of the videotapes did not deprive defendant of a fair trial.

## 18. The Death Sentence

Defendant argues that the trial court erred in sentencing him to death for Mary's murder. In support of his argument, defendant asserts that (1) Arizona's death penalty statute is unconstitutional; (2) the trial court erred in using defendant's 1975 conviction for lewd and lascivious conduct as an aggravating circumstance; (3) the trial court erred in finding no mitigating circumstances; (4) the trial court improperly received victim impact evidence; and (5) the death sentence under the circumstances of this case is disproportionately harsh.[21]

---

**21.** In addition to these 5 assertions, defendant also makes the following 11 assertions which, after review, we reject without further discussion:

(1) Arizona's death penalty statute is unconstitutional because it places the burden of establishing mitigating circumstances on the defendant, *see State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988), *aff'd, ——*

U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (identical assertion rejected);

(2) Arizona's death penalty statute is unconstitutional because it excludes jury involvement in sentencing, *see Fulminante*, 161 Ariz. at 258, 778 P.2d at 623 (identical assertion rejected);

(3) The death sentence was improperly imposed because defendant was precluded from

## A. Constitutionality of Arizona's Death Penalty Statute

▮ Defendant argues that Arizona's death penalty statute, A.R.S. § 13–703, is unconstitutional because it (1) denies defendant the right to a jury trial on the crime of capital murder (mitigating circumstances); (2) improperly places the burden of proof on defendant to prove mitigating circumstances; and (3) presumes the death penalty to be the appropriate sentence. We recently rejected these very arguments. *See State v. Brewer,* 170 Ariz. 486, 497, 826 P.2d 783, 794 (1991), *citing Walton v. Arizona,* 497 U.S. 639, ——, 110 S.Ct. 3047, 3054–56, 111 L.Ed.2d 511 (1990) (United States Supreme Court rejected arguments identical to defendant's and upheld Arizona's death penalty statute as constitutional), *aff'g State v. Walton,* 159 Ariz. 571, 769 P.2d 1017 (1989). Consistent with *Brewer,* we reject defendant's arguments and reaffirm Arizona's death penalty statute as constitutional.

death-qualifying the trial judge, *see State v. Rossi,* 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987) (identical assertion rejected); *State v. Beaty,* 158 Ariz. 232, 244, 762 P.2d 519, 531 (1988) ("Absent proof to the contrary, the trial judge in a capital case must be presumed to be able to focus on the relevant sentencing factors and to set aside the irrelevant, the inflammatory, and the emotional factors."), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989);
(4) Arizona's death penalty statute is unconstitutional because it fails to provide guidance to the trial judge, *see Beaty,* 158 Ariz. at 246–47, 762 P.2d at 533–34 (identical assertion rejected);
(5) Imposition of the death penalty for murder and life imprisonment for kidnapping violated defendant's constitutional right against double punishment, *see State v. Wiley,* 144 Ariz. 525, 540–41, 698 P.2d 1244, 1259–60 (1985) (identical assertion rejected), *overruled on other grounds, State v. Superior Court,* 157 Ariz. 541, 760 P.2d 541 (1988); *State v. Gerlaugh,* 134 Ariz. 164, 170, 654 P.2d 800, 806 (1982) (identical assertion rejected);
(6) The trial court improperly considered a presentence report, *see Beaty,* 158 Ariz. at 244, 762 P.2d at 531 ("Absent proof to the contrary, the trial judge in a capital case must be presumed to be able to focus on the relevant sentencing factors and to set aside the irrelevant, the inflammatory, and the emotional factors."); *State v. Fierro,* 166 Ariz. 539, 548, 804 P.2d 72, 81 (1990) ("It is presumed that a

## B. Defendant's 1975 Conviction for Lewd and Lascivious Conduct as an Aggravating Circumstance

▮ Defendant claims that his 1975 conviction for engaging in lewd and lascivious conduct in June 1974 cannot be used as an aggravating circumstance for imposing the death penalty. Section 13–703(E) precludes the imposition of the death penalty unless the first degree murder is accompanied by at least one of 10 aggravating circumstances enumerated in A.R.S. § 13–703(F). *See* A.R.S. § 13–703(E); *State v. Rockwell,* 161 Ariz. 5, 14, 775 P.2d 1069, 1078 (1989). The trial court found that Mary's murder was accompanied by the following aggravating circumstance enumerated in A.R.S. § 13–703(F)(1):

The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

After the jury found defendant guilty of first degree murder, the court conducted

trial judge, aware of the rules of evidence, will not consider inadmissible evidence in making his ruling.");
(7) Arizona's death penalty statute is unconstitutional because it is applied in a manner that discriminates against poor, young, and male defendants, *see State v. Blazak,* 131 Ariz. 598, 602, 643 P.2d 694, 698 (1982) (similar assertion rejected);
(8) Arizona's death penalty statute is unconstitutional because it is imposed arbitrarily and irrationally in Arizona, *see Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (Arizona's death penalty statute upheld as constitutional because it is not imposed arbitrarily or irrationally), *aff'g State v. Walton,* 159 Ariz. 571, 769 P.2d 1017 (1989);
(9) Arizona's death penalty statute is unconstitutional because it imposes cruel and unusual punishment, *see State v. Harding,* 137 Ariz. 278, 292, 670 P.2d 383, 397 (1983) (identical assertion rejected);
(10) Arizona's death penalty statute is unconstitutional because a prosecutor's discretion to seek the death penalty is without standards, *see Harding,* 137 Ariz. at 292, 670 P.2d at 397 (identical assertion rejected); and
(11) Arizona's death penalty statute is unconstitutional because it requires defendants to prove their lives should be spared, *see Brewer,* 170 Ariz. 486, 497, 826 P.2d 783, 794 (1991) (identical assertion rejected).

an aggravation/mitigation hearing pursuant to A.R.S. § 13–703(B). Following the hearing, the trial judge found beyond a reasonable doubt that defendant had been convicted on February 3, 1975, under California Penal Code § 288, of engaging in lewd and lascivious conduct on or about June 18, 1974. Arizona's 1974 equivalent to § 288, A.R.S. § 13–652, provided for a sentence of "not less than five years nor more than life...." A.R.S. § 13–652, amended by Laws 1965, Ch. 20, § 2, eff. March 25, 1965, renumbered § 13–1412 and amended by Laws 1977, Ch. 142, § 68, eff. Oct. 1, 1978. The state thus argues that defendant's 1975 conviction for engaging in lewd and lascivious conduct in 1974 establishes a § 13–703(F)(1) aggravating circumstance.

Defendant, on the other hand, argues that his 1975 conviction cannot be used to establish a § 13–703(F)(1) aggravating circumstance because in 1987, when defendant *was sentenced* for Mary's murder, neither a sentence of life imprisonment nor death was imposable under § 13–652's successor statute, § 13–1412.[22] In other words, defendant invites this court to look not at the sentence that *was imposable* at the time defendant *violated § 288*, but rather at the sentence that *would have been imposable* at the time defendant *was sentenced* for Mary's murder.

This court declined an identical invitation in *State v. Tittle*, 147 Ariz. 339, 710 P.2d 449 (1985). In *Tittle*, the defendant argued that his 1965 robbery conviction could not be used as a § 13–703(F)(1) aggravating circumstance because, although a sentence of life imprisonment was imposable under Arizona's 1965 robbery statute, at the time the defendant was sentenced for murder, a sentence of only 2 to 5 years' imprisonment was imposable. In rejecting the defendant's argument, we stated:

[Section 13–703(F)(1)] does not read that the offense must be punishable by life imprisonment or death under current Arizona law. The words "was imposable" clearly require the sentencing court to look at the [sentence] imposable at the time a defendant was sentenced for the original conviction and not at the time of sentencing for the subsequent murder. This interpretation is consistent with the rule of construction that statutes will be construed according to the fair meaning of their terms and to effect the objects of the penal code.

*Tittle*, 147 Ariz. at 343, 710 P.2d at 453; A.R.S. § 1–211(C). As in *Tittle*, we decline defendant's invitation.

In addition, we take this opportunity to clarify *Tittle*'s rather imprecise language. The language used by this court— "The words 'was imposable' clearly require the sentencing court to look at the [sentence] imposable *at the time a defendant was sentenced for the original conviction*"—does not, we believe, reflect what the *Tittle* court actually looked at. In *Tittle*, the trial court had the choice of looking at the sentence imposable at the time the defendant *committed the robbery*, or the sentence imposable at the time the defendant *was being sentenced for murder*. The sentence imposable at the time the defendant *was sentenced for the robbery* was neither discussed nor relevant to the *Tittle* court's decision. Likewise, we consider irrelevant the sentence imposable at the time defendant *was sentenced for lewd and lascivious conduct* (whether that date be 1975 or 1978), and hold that, in determining whether a prior conviction establishes an aggravating circumstance under A.R.S. § 13–703(F)(1), the trial court should look at the sentence that was imposable at the time the prior offense *was committed*. *See* A.R.S. § 1–246 ("[O]ffender[s] shall be punished under the law in force when the

---

**22.** We note that for his 1975 conviction, defendant was initially sent to the Atascadero Mental Hospital for an indefinite period of time. In November 1978, however, defendant was resentenced for a definite period of time.

Because of a 1977 amendment to § 13–1412, which became effective on October 1, 1978, nei-

ther a sentence of life imprisonment nor death was imposable at the time defendant was resentenced. Although defendant did not expressly argue that the trial court should have looked at the sentence that was imposable or imposed at the time he was resentenced in 1978, we consider and reject this argument below.

offense *was committed.*") (emphasis added). Accordingly, because a sentence of life imprisonment *was imposable* at the time defendant *engaged in lewd and lascivious conduct* (June 1974), we affirm the trial court's finding that the aggravating circumstance of § 13–703(F)(1) is established by defendant's 1975 conviction for lewd and lascivious conduct.

C. *The Trial Court's Finding of No Mitigating Circumstances Under A.R.S. § 13–703(G)*

Defendant contends that the trial court erred in finding no mitigating circumstances sufficiently substantial to call for leniency. Section 13–703(E) states that,

[i]n determining whether to impose a sentence of death ..., the court shall take into account the aggravating and mitigating circumstances included in subsections F and G ... and shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in subsection F ... and that there are no mitigating circumstances sufficiently substantial to call for leniency.

■■■■ In "taking into account" the mitigating circumstances, the sentencing court must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether a sentence less than death might be appropriate," *State v. McCall,* 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983), but "it is within the discretion of the trial judge how much weight should be given to the proffered mitigating factors." *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990), *citing Jeffers v. Ricketts,* 627 F.Supp. 1334, 1357 (D.Ariz.1986), *aff'd in part, rev'd in part,* 832 F.2d 476 (9th Cir. 1987), *rev'd,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). In addition, the burden is on the defendant to prove the existence of mitigating circumstances by a preponderance of the evidence. *Fierro,* 166 Ariz. at 551, 804 P.2d at 84.

Here, the trial court found no mitigating circumstances sufficiently substantial to call for leniency. Defendant maintains that the trial court erred in failing to find as mitigating circumstances any of the following: (1) the trial court's felony murder instruction and the trial judge's failure to make specific *Enmund/McDaniel* findings in his special verdict; (2) defendant's heavy drug use; (3) defendant's demeanor during trial; (4) defendant's parents' support; (5) the cause of Mary's death was not established; (6) defendant's age; (7) lingering doubt of guilt; (8) defendant's cooperation at the time of his arrest; (9) defendant's sympathy for Mary's family; (10) defendant's intelligence quotient (I.Q.); (11) defendant's concern for his parents; (12) defendant's lack of a violent prior record; (13) defendant's not causing his prior felonies; and (14) defendant's adjustment to incarceration and adoption of new goals.

On appeal, "we must independently review the record to determine the absence or existence of both aggravating and mitigating circumstances...." *State v. Gillies (Gillies I),* 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983). We address each of defendant's proffered mitigating circumstances in turn.

### 1. The Trial Court's Felony Murder Instruction

Defendant argues that the trial court erred in failing to find its felony murder instruction as a mitigating circumstance. Similarly, defendant argues that his death sentence must be reversed because he was convicted under a felony murder theory and the trial judge failed to make specific findings as purportedly required by *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983). Neither of these arguments, however, is persuasive.

### a. The Felony Murder Instruction

■■■■ Defendant argues that the trial court erred in refusing to find the giving of the felony murder instruction as a mitigating circumstance. We reject this argument. We have held that "[t]he giving of a felony-murder instruction is a mitigating circumstance *only where there is some*

*doubt as to defendant's specific intent to kill the victim."* Gillies I, 135 Ariz. at 513, 662 P.2d at 1020 (emphasis added), *citing State v. Schad,* 129 Ariz. 557, 573–74, 633 P.2d 366, 382–83 (1981). Likewise, we have held that the giving of a felony murder instruction is not a relevant circumstance when the defendant is not being held accountable for the acts of an accomplice, and no facts in the record indicate that the defendant had any intent other than to kill the victim. *State v. Roscoe,* 145 Ariz. 212, 227, 700 P.2d 1312, 1327 (1984); *see also State v. Zaragoza,* 135 Ariz. 63, 70, 659 P.2d 22, 29 (1983) (affirming death sentence of defendant who was convicted of first degree felony murder and who intended to kill or knew with substantial certainty that his conduct would cause death); *Schad,* 129 Ariz. at 573–74, 633 P.2d at 382–83 (same).

Applying *Gillies I, Roscoe, Zaragoza,* and *Schad* to the facts of this case, we affirm the trial court's finding that "[w]hile the giving of the felony murder instruction might under some circumstance be a mitigating factor, the Court finds it no mitigation here where the Defendant was the only participant in this offense," and no facts in the record indicate that defendant had any intent other than to kill the victim.

### b. The Trial Judge's Failure to Make Specific Enmund/McDaniel Findings

The United States Supreme Court in *Enmund* held that the eighth amendment precludes the imposition of the death penalty unless the defendant killed, attempted to kill, intended that a killing take place, or contemplated the use of lethal force. *Enmund,* 458 U.S. at 801, 102 S.Ct. at 3378–79. The Supreme Court itself, however, later noted that *Enmund* does *not* extend to protect a defendant who is convicted under a felony murder theory and who, *acting alone,* killed:

In *Enmund v. Florida,* ... we ruled that the Eighth Amendment forbids the imposition of the death penalty on "one ... who *aids and abets* a felony in the course of which a *murder is committed by others* but who *does not himself kill,*

attempt to kill, or intend that a killing take place or that lethal force will be employed."

*Cabana v. Bullock,* 474 U.S. 376, 378, 106 S.Ct. 689, 693, 88 L.Ed.2d 704 (1986) (emphasis added) (citation omitted). Thus, no constitutional barrier exists to imposing the death penalty on a defendant who is convicted under a felony murder theory and who, *acting alone,* actually killed.

Although no constitutional barrier exists to imposing the death penalty on defendant, he argues that his death sentence must be reversed because *McDaniel* requires the *trial judge* to make the *Enmund* finding, and the state concedes that the trial judge made no such finding in this case. We disagree.

In *McDaniel,* McDaniel, acting with others, beat, robbed, hog-tied, and then poured liquor down the throat of a man who had come to McDaniel's apartment looking for a prostitute. After being rendered helpless, the man was wrapped in a blanket and locked in the trunk of his car. He was found two days later; he had died of heat exhaustion or suffocation in the extreme August heat.

At McDaniel's trial, the court instructed the jury on both premeditated murder and felony murder. The jury returned a general verdict of guilty, and McDaniel was sentenced to death. McDaniel appealed.

On appeal, McDaniel argued that under *Enmund* his death sentence must be reversed because it was uncertain whether the jury's guilty verdict was based on premeditated murder or on felony murder, and, if it was based on felony murder, the jury did not make a finding that McDaniel killed, attempted to kill or intended to kill. After acknowledging that the basis of the jury's verdict was uncertain, we stated,

[I]n first degree murder cases where the jury is instructed on felony murder *as well as premeditated murder,* a general verdict finding the defendant guilty of first degree murder does not establish whether the defendant had in fact killed, attempted to kill, or intended to kill. A finding of felony murder, unlike premedi-

tated murder, does not require that the defendant have the culpability required by *Enmund....* In order to comply with *Enmund,* therefore, we believe that in future cases where the jury might have found the defendant guilty of first degree murder based on a felony-murder theory, *the trial judge* must determine beyond a reasonable doubt prior to imposing a sentence of death that the defendant killed, attempted to kill or intended to kill.

*McDaniel,* 136 Ariz. at 199, 665 P.2d at 81 (emphasis added).

Defendant would have us disregard the emphasized language in the phrase "in first degree murder cases where the jury is instructed on felony murder *as well as premeditated murder,"* and focus exclusively on the emphasized language in the phrase "the *trial judge* must determine beyond a reasonable doubt prior to imposing a sentence of death that the defendant killed, attempted to kill or intended to kill." We decline to do so.

The jury in *McDaniel* was "instructed on felony murder *as well as premeditated murder,"* and did not make a finding that McDaniel killed, attempted to kill or intended to kill. In this case, on the other hand, the jury was instructed on felony murder exclusively. Thus, the rule announced in *McDaniel, by its own language,* does not apply in this case. More importantly, the majority believes that the jury in this case *did make* a finding that defendant killed. The trial court instructed the jury as follows:

The State must prove beyond a reasonable doubt every material element of the charge of murder. The material elements include: 1. The fact of *death,* and 2. The fact that *the death was caused by the criminal agency of the defendant.*

A person commits first degree murder under the felony murder rule if such person commits kidnapping, and in the course of and in furtherance of such

offense or immediate flight from such offense, *such person causes the death of any person.*

With respect to the felony murder rule, insofar as it provides a basis for a charge of first degree murder, it is not necessary that the state prove that the defendant intended to kill; it is only necessary that the State prove that the death occurred in a course of and in furtherance of such offense.

*The burden is on the State to prove* beyond a reasonable doubt not only that the offense was committed as alleged, but *that* also *the defendant is the person who committed it.*

(Emphasis added.) Based on these instructions, the jury found defendant guilty of first degree felony murder. The majority believes that implicit in the jury's verdict is the finding that defendant in fact killed Mary, and, of course, the jury may make the *Enmund* finding. *Cabana,* 474 U.S. at 386, 106 S.Ct. at 697 ("If a person sentenced to death in fact killed, ... the Eighth Amendment itself is not violated by his or her execution *regardless of who makes the determination of the requisite culpability....")* (emphasis added). Accordingly, we hold that the trial judge's failure to make an *Enmund* finding is not error.[23]

**2. Defendant's Heavy Drug Use**

■■■ Defendant contends that the trial court should have found his heavy drug use to be a mitigating circumstance. We reject this contention. While we recognize that "[v]oluntary intoxication is a mitigating circumstance if [a] defendant's capacity to appreciate the wrongfulness of his conduct was significantly impaired ..." at the time of the crime, *State v. Gillies (Gillies I),* 135 Ariz. 500, 515, 662 P.2d 1007, 1022 (1983); *see also* A.R.S. § 13–703(G)(1), the burden of proving mitigating circumstances by a preponderance of the evidence is on the defendant, *see State v. Fulminante,* 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988), *aff'd,* —— U.S. ——, 111 S.Ct. 1246,

---

**23.** The author of this opinion questions whether the instructions to the jury, coupled with the jury's guilty verdict, comply with *Enmund,* and

would have this court make the *Enmund* finding. *See* Part I of the Special Concurrence.

113 L.Ed.2d 302 (1991), and we agree with the trial court "that the Defendant has failed to prove th[is] contention."

At the aggravation/mitigation hearing, defense counsel called two witnesses, John W. Atwood, defendant's father, and defendant. Mr. Atwood testified that when defendant, then age 13, attended a privately-owned school, another student introduced drugs to him. Mr. Atwood further testified that, to his knowledge, defendant's "drug scene" continued from that time until defendant's September 20, 1984 arrest in connection with Mary's disappearance, some 15 years later. Because defendant was in Tucson and Mr. Atwood was in California on September 17, 1984, Mr. Atwood could not, of course, testify as to whether defendant had taken, or was suffering from the effect of, any drugs on the date defendant kidnapped and killed the victim.

Similarly, defendant testified that he started taking drugs at age 13 and continued to take drugs until his September 20, 1984 arrest. In addition, defendant testified that on or about September 17, 1984, he was using marijuana, cocaine, codeine, and demerol. Defendant testified that these drugs "would change [his] attitude," and would "distort and impair [his] ability to think clearly in reality." Not being able to "think clearly in reality," however, is not coextensive with not having the capacity to appreciate the wrongfulness of one's conduct. Thus, defendant appears to have provided the trial court with no evidence that his capacity to appreciate the wrongfulness of kidnapping and killing Mary was significantly impaired on September 17, 1984.

Moreover, stacked against the testimony offered in mitigation by defendant is the evidence that defendant *did know* that his September 17, 1984 conduct was wrongful. At trial, three witnesses, James McDonald, Gary Cisco, and Thomas Parisien, all testified that defendant claimed to have stabbed a man in a drug transaction on September 17, 1984. McDonald and Parisien further testified that defendant discussed with them whether he should dis-

pose of his bloody clothes. They also testified that defendant said that, after killing the man, he took the body to the desert near the mountains. McDonald also testified that he saw defendant sandpapering his knife. This evidence indicates that defendant was trying to hide evidence of his conduct on September 17, 1984, which, in turn, indicates that defendant knew that his conduct was wrongful.

We agree with the trial court that defendant failed to prove by a preponderance of the evidence that his capacity to appreciate the wrongfulness of his conduct was significantly impaired on September 17, 1984.

### 3. Defendant's Demeanor During Trial

 Defendant would have this court believe that the trial court erred in refusing to find his "respectful, proper, and controlled" trial demeanor to be a mitigating circumstance. We are unpersuaded. We concede that nothing in the record indicates that defendant was anything but respectful, proper, and controlled *in the presence of the jury* that was to determine his guilt or innocence, and *in the presence of the judge*, who was to determine whether he would die or live out his life in prison. We recognize this not as a mitigating circumstance, however, but as an appropriately self-serving attitude directed toward obtaining either an acquittal or a less harsh sentence.

In addition, there is evidence that *outside the presence of the jury and the judge*, defendant was, to say the least, not respectful, proper, or controlled. For example, at the aggravation/mitigation hearing, defendant admitted that he had been "written up" for breaking jail rules and that some of those write-ups concerned violent activity. Obviously, breaking jail rules while engaging in violent activity is not respectful, proper, or controlled. In addition to breaking jail rules, defendant threatened to kill a deputy sheriff for trying to remove some extra clothes hanging in the holding area to which defendant was assigned during trial. On direct examination of the deputy, the following dialogue took place:

Q. [By the Prosecutor] [D]uring March was there a particular incident with [defendant] involving a threat of violence upon yourself?

A. [By Deputy Sheriff Nelson] Yes, sir, on March 10th.

Q. Would you repeat what happened on that day concerning yourself, [defendant] and one of your fellow deputies?

A. ... In the holding area I advised [defendant] that we would have to reduce the suits, that he would have his choice as to what he wanted taken out, but we would have to reduce because it was a security problem at that time.

I explained the security problem, being that we couldn't see in....

[Defendant] said, "You're going to have to talk to my lawyer," in an abrupt manner. I says, "This is a security problem and I'm not going to talk to your attorney."

[Defendant] paced back and forth about twice and then turned around in a very explosive attitude, told me that—well, he used very graphic language.

Q. You can repeat that language....

[A.] "You don't know who you're talking with. I'll have you—I can have you wasted. I'll take your gun away from you and blow your shit away." These are only some of the comments.

Based on the record before us, we find that the trial court did not err in refusing to find defendant's trial demeanor to be a mitigating circumstance sufficiently substantial to call for leniency.

### 4. Defendant's Parents' Support

■■■ Defendant argues that the trial court erred in not finding as a mitigating circumstance the fact that his father and mother supported him during his trial. The record does in fact indicate that defendant's parents went to great lengths to reach out to their son and to support him during his trial. However, we believe that the trial court, after considering defendant's parents' willingness to reach out to defendant and defendant's willingness to accept that reach, reasonably could have concluded that defendant's parents' support did not constitute a mitigating circumstance sufficiently substantial to call for leniency.

### 5. The Cause of the Victim's Death Was Not Established

■■■ Defendant claims that because the cause of Mary's death was not established, he should not be sentenced to death. This claim is meritless. The jury found that defendant caused Mary's death. Although the cause of a victim's death is relevant in determining the existence of aggravating circumstances, we find it irrelevant for purposes of determining mitigating circumstances. *See People v. Manson,* 71 Cal.App.3d 1, 42, 139 Cal.Rptr. 275, 298 (1977) ("The fact that a murderer may successfully dispose of the body of the victim does not entitle him to an acquittal. That is one form of success for which society has no reward."). The trial court did not err in refusing to find as a mitigating circumstance the fact that the cause of Mary's death was not established.

### 6. Defendant's Age

■■■ Defendant urges this court to find that the trial court erred in failing to find his age, 28 years at the time he killed the victim, to be a mitigating circumstance. We refuse to do so. Initially, we note that 28 is not a young or immature age. We have found age not to be a mitigating circumstance in cases involving much younger defendants. *See, e.g., State v. Brewer,* 170 Ariz. 486, 506, 826 P.2d 783, 803 (1991) (age 22 not a mitigating factor); *State v. Walton,* 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989) (age 20 not a mitigating factor), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *State v. Gerlaugh,* 144 Ariz. 449, 460–61, 698 P.2d 694, 705–06 (1985) (age 19 not a mitigating factor); *State v. Clabourne,* 142 Ariz. 335, 348, 690 P.2d 54, 67 (1984) (age 20 not a mitigating factor); *State v. Gillies (Gillies I),* 135 Ariz. 500, 513, 662 P.2d 1007, 1020 (1983) (age 20 not a mitigating factor). In addition to chronological age, however, we also look at such factors as a defendant's intelligence and past experience to deter-

mine whether age is a mitigating circumstance. *Walton,* 159 Ariz. at 589, 769 P.2d at 1035, *citing Gillies I,* 135 Ariz. at 513, 662 P.2d at 1020. In this case, both the defendant's intelligence and his past experience indicate that his age should not be considered as a mitigating circumstance. At the aggravation/mitigation hearing, defendant's father stated that defendant's "I.Q. was well above average, ... around 128, 130." In addition, defendant had obtained the equivalent of a high school diploma.

Moreover, defendant had experienced a great deal in his 28 years. He had been convicted of two sex-related felonies involving children and had spent approximately 7 years in mental hospitals and prison. We believe that, given defendant's well-above-average I.Q. and his extensive criminal experience, the trial court properly found that defendant's age is "not a mitigating factor."

### 7. Lingering Doubt of Guilt

 Defendant contends that "lingering doubt" exists as to his guilt and that the trial court erred in refusing to find this as a mitigating circumstance. This contention has no merit. Although the jury convicted defendant based on circumstantial evidence and, perhaps in part, based on the testimony of alcohol abusers and drug users, we have found that the jury's verdict finding defendant guilty beyond a reasonable doubt is supported by sufficient evidence. Accordingly, under these facts, the trial court properly refused to find lingering doubt to be a mitigating circumstance sufficiently substantial to call for leniency. *See State v. Schad,* 129 Ariz. 557, 573–74, 633 P.2d 366, 382–83 (1981) ("We have already determined that there was sufficient evidence to support the verdict; thus, there is no merit in defendant's contention that there was doubt of guilt.").

### 8. Defendant's Cooperation at the Time of His Arrest

 Defendant argues that the trial court erred in not finding his post-arrest cooperation to be a mitigating circumstance. Although the record indicates that defendant voluntarily gave the FBI a statement, hair samples, fingernail scrapings, and permission to search his car, we believe that the trial judge correctly found that, in this case, defendant's modest cooperation, considered individually or in combination with other proffered mitigating circumstances, was not sufficiently substantial to call for leniency. *See State v. Bishop,* 127 Ariz. 531, 534–35, 622 P.2d 478, 481–82 (1980) (defendant's cooperation with police not a mitigating circumstance sufficiently substantial to call for leniency).

### 9. Defendant's Sympathy for the Victim's Family

 Defendant believes that the trial court erred in not finding his sympathy for Mary's family to be a mitigating circumstance. We disagree. While sympathy or remorse may be considered a mitigating factor, *see State v. Tittle,* 147 Ariz. 339, 344, 710 P.2d 449, 454 (1985), we do not believe defendant's sympathy, on balance, is sufficient to call for leniency given the seriousness of his crimes.

### 10. Defendant's I.Q.

 Defendant asserts that the trial court should have found his intelligence to be a mitigating circumstance. Defendant's father testified that defendant's I.Q. "was well above average, ... around 128, 130." Based on his well-above-average intelligence, defendant concludes that he "can be rehabilitated." Defendant's history, however, belies this conclusion.

There is no evidence that defendant's intelligence was ever anything but well above average. Notwithstanding this natural gift, defendant has repeatedly demonstrated that he is not interested in, nor has he benefited from, rehabilitation. Defendant received parole for his 1981 kidnapping conviction in 1984. That parole required therapy, among other things. The record indicates that defendant repeatedly failed to take advantage of available therapy. In fact, defendant admitted that after 3 years of treatment at Atascadero, he refused to cooperate with Atascadero offi-

cials. In addition, when asked at the aggravation/mitigation hearing if he could recite to the court any therapy program, parole program, probation program, or counseling program that he had successfully completed, defendant replied, "Without going into my juvenile record, I don't think I can."

In sum, we recognize that the purposes of the criminal justice system include both rehabilitation, as raised by defendant's argument here, *and* punishment. A.R.S. § 13–101(6) ("It is declared that the public policy of this state and the general purposes of the provisions of [Arizona's Criminal Code] are: ... To impose just and deserved punishment on those whose conduct threatens the public peace."). We believe that the trial court may have considered both of these purposes and properly concluded that, in this case, defendant's interest in rehabilitation was insufficient to call for leniency when compared to the harm caused by his conduct and his continued threat to the public peace.

## 11. Defendant's Concern for His Parents

 Defendant argues that the trial court erred in failing to find as a mitigating circumstance the fact that defendant is concerned about his parents and that he tried to reduce the stress on his family throughout this ordeal. Although it may be true that defendant showed concern for his parents during his incarceration and trial, the record does not show that defendant expressed a similar concern at any other time since he was 13 years old. And on the numerous occasions that defendant's parents did reach out to him, defendant rejected their offers of help. We believe that the trial court reasonably could have determined that defendant's concern for his parents, even if sincere, was not a

mitigating circumstance sufficiently substantial to call for leniency.

## 12. Defendant's Lack of a Violent Prior Record

 Defendant argues that the trial court erred in sentencing him to death because his two prior convictions were not for violent crimes. We believe defendant incorrectly characterized his prior convictions as non-violent. Although the *trial court* is forbidden on due process grounds from considering the facts underlying a defendant's prior convictions for purposes of establishing a § 13–703(F)(2) aggravating circumstance, *see Gillies I,* 135 Ariz. at 511, 662 P.2d at 1018, this court cannot ignore such facts if the *defendant* asserts on appeal that the non-violent nature of his prior convictions constitutes a mitigating circumstance. Therefore, in order to determine the merit of defendant's argument, we now consider the facts underlying his 1981 kidnapping conviction.[24]

Preliminarily, we note that although attorneys should represent their clients to the best of their ability, defendant's appellate counsel's recitation of the facts underlying defendant's 1981 kidnapping conviction is grossly over-simplified. Appellate counsel, in defendant's opening brief, describes those "facts" as follows: "[Defendant] asked the boy directions. [Defendant] give [sic] him a ride on his motorcycle. Both orally copulated the other. [Defendant] then returned the boy to where he met him." Appellate counsel does not cite to the record or any other source for these assertions. The actual transcript of the preliminary hearing for the 1981 kidnapping,[25] however, includes the following dialogue between the California prosecuting attorney and the 8–year–old victim:

---

**24.** The record does not include the facts underlying defendant's 1975 conviction for lewd and lascivious conduct. We therefore assume, without deciding, that no violence was involved in that case.

**25.** The preliminary hearing transcript was not admitted into evidence, but was made part of the record by the trial judge for purposes of

reconsidering his decision to suppress evidence of defendant's 1981 kidnapping conviction. We use this transcript solely to rebut defendant's version of the facts underlying that conviction. At the preliminary hearing, the victim was subject to cross-examination by defendant's attorney.

Q. [By the prosecutor] Did something happen to you while you were riding home?

A. [By the victim] Yes.

. . . .

Q. What happened?

A. [Defendant] stopped me and he said, "Where is Sunset?"

Q. What did you do? Did you answer him?

A. I said, "I don't know. If you follow me, you can ask my mom and dad."

. . . .

Q. What did [defendant] do when you told him he could come to your mom and find out where it is?

A. He said, "Here, I will give you a ride." And I said, "No. I'll ride home on my bike. Follow me."

Q. Then what happened?

A. And I was halfway on my bike and he threw my bike down and pulled me on the motorcycle.

This dialogue clearly shows that defendant did more than "give [the victim] a ride on his motorcycle." Further, appellate counsel's description of the sex offense, "both orally copulated the other," does not reflect reality. The record reflects that, after kidnapping the victim, defendant *forced* the boy to fellate him, holding his head down so roughly that the boy received visible scratches on his neck, and, when the boy threatened to scream, defendant said, "If you scream, I will kill you." We believe the facts underlying defendant's 1981 conviction for kidnapping render meritless defendant's argument that he lacks a violent prior record. We find no error.

### 13. Defendant's Not Causing His Prior Felonies

■ Defendant argues that his prior felonies were "the result of: (1) [his] drug history and abuse; (2) his [being] molest[ed] as a minor; and (3) his relationship with his parents," and that the trial court erred in not finding these facts to be mitigating circumstances. We have already found that the trial court did not err in refusing to find as mitigating circumstances defendant's drug use and the sup-

port and concern exchanged between defendant and his parents. Thus, we do not consider these circumstances here.

Further, we do not believe that defendant's being molested as a minor justifies, excuses, or otherwise mitigates his crimes here. The remedy for one who has been molested is not to molest others and ask to be excused, but rather to submit to therapy, which, as noted above, defendant has repeatedly refused to do. We find no error.

### 14. Defendant's Adjustment to Incarceration and His Adoption of New Goals

■ Defendant argues that the trial court erred in not finding as a mitigating circumstance his adjustment to incarceration and his adoption of new goals. The fact that a defendant is a model prisoner has previously been considered to be a mitigating circumstance. *See State v. Watson*, 129 Ariz. 60, 63–64, 628 P.2d 943, 946–47 (1981). However, we are not persuaded that defendant has become a model prisoner.

The record indicates that defendant has not used drugs since his September 20, 1984 arrest and has, through his parents, arranged to take college courses. We agree with the *Gillies II* court, however, and find that

[w]hile these changes are commendable, persons sentenced to death frequently change their outlook on life. Balancing these human factors against [defendant's] former behavior militates in his favor, but not such as to require leniency, given the seriousness of his crime.

*State v. Gillies (Gillies II)*, 142 Ariz. 564, 571, 691 P.2d 655, 662 (1984). We therefore find no error.

### D. *Victim Impact Evidence*

■ Defendant argues that his death sentence must be reversed because the trial court improperly received victim impact evidence prior to trial, during trial, and at the sentencing phase of his trial. As a factual basis for his argument, defendant

cites the following as victim impact evidence:

(1) "This community marched on the mall 3,000 strong and ... burn[ed] a trailer that [defendant] spent an evening, one night at, just because his presence was there...."

(2) "[T]he newspapers and the press and the feelings that were all through this case about how [defendant] is guilty...."

(3) "The victim's family was represented by a lawyer who was present throughout the guilt and penalty phase [of the trial]."

(4) "The [victim's] family appeared on [television] newscasts and in newspaper articles."

(5) "The Court ... received numerous letters from 'We the People' and 'Court Watch.'"

(6) "The Judge received letters from the victim's mother, father, step-father, and sister.... Included in [the sister's] letter was a poem she wrote titled 'For [Mary].' It read:

### For [Mary]

Sitting here all alone just thinking about the past; the best years of my life that slipped away too fast.

Growing up with you was the best thing for me. You taught me to be myself and the best that I could be.

I remember all the fights (the ones I would always lose) about whose room was cleaner and whose doll was whose.

But all those days are gone now they're just a memory, of me and my little sis together faithfully.

So please take all my love and a great big hug and kiss cause you deserved the best in life my one and only sis."

As a legal basis for his argument, defendant cites *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). *Booth* held that victim impact evidence may not be presented to the jury during the sentencing phase of a trial unless such evidence relates directly to the circumstances of the crime.

After considering both the factual and legal bases proffered by defendant, we conclude that the trial court did not err, even though it received victim impact evidence. This conclusion is supported by the United States Supreme Court's recent decision in *Payne v. Tennessee,* —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and this court's decision in *State v. Beaty,* 158 Ariz. 232, 762 P.2d 519 (1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989).

In *Payne,* the Supreme Court overruled *Booth* and held that the constitution does not prohibit the admission of victim impact evidence during the sentencing phase of a capital trial. The Court stated, "a State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the ... decision as to whether or not the death penalty should be imposed." *Payne,* —— U.S. at ——, 111 S.Ct. at 2609.

Although a state *may* make victim impact evidence relevant to the decision as to whether or not the death penalty should be imposed, we do not believe that Arizona has done so. Under Arizona's death penalty statute, the trial court may give aggravating weight only to that evidence which tends to establish the aggravating circumstances specifically enumerated in A.R.S. § 13–703(F), *see* A.R.S. § 13–703(E) ("In determining whether to impose a sentence of death, ... the court shall take into account the aggravating ... circumstances included in [§ 13–703(F)] and shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in [§ 13–703(F)] and that there are no mitigating circumstances sufficiently substantial to call for leniency."), and we do not believe that victim impact evidence has such a tendency. Accordingly, and until the legislature says otherwise, in determining whether to impose the death penalty, the trial court may not give aggravating weight to victim impact evidence. The trial court is free, however, to rebut evidence offered in mitigation with relevant victim impact evidence.

*See, e.g., State v. Ortiz,* 131 Ariz. 195, 639 P.2d 1020 (1981).

In applying these principles to this case, we first recognize that "[a]bsent proof to the contrary, the trial judge [in imposing sentence] in a capital case must be presumed to be able to focus on the relevant sentencing factors and to set aside the irrelevant, the inflammatory, and the emotional factors." *Beaty,* 158 Ariz. at 244, 762 P.2d at 531. We have looked for proof indicating that the trial judge failed to set aside the victim impact evidence he received in imposing the death penalty on defendant. We have found none. On the contrary, the trial judge imposed the death penalty on defendant because defendant had previously been convicted of a crime which, if committed in Arizona, would have subjected defendant to life imprisonment, and no mitigating circumstances existed that were sufficiently substantial to call for leniency. *See* A.R.S. §§ 13–703(E), (F)(1). We therefore reject defendant's argument that his death sentence must be reversed because the trial court received victim impact evidence.

### E. Conclusion

In addition to the trial court's consideration of defendant's proffered mitigating circumstances both individually and in combination,[26] we have also considered defendant's proffered mitigating circumstances. We have found no mitigating circumstances sufficiently substantial to call for leniency, and we have found no fundamental error. We therefore affirm the trial court's finding of one aggravating circumstance, A.R.S. § 13–703(F)(1), and no mitigating circumstances sufficiently substantial to call for leniency, and because *we*

believe that the death penalty should be imposed, *see State v. Fierro,* 166 Ariz. 539, 552, 804 P.2d 72, 85 (1990), we affirm defendant's death sentence.

### 19. The Kidnapping Sentence

Defendant argues that the trial court erred in classifying his kidnapping conviction as a class 2 felony and sentencing him to life imprisonment without considering whether the kidnapping should be classified as a class 4 felony under A.R.S. § 13–1304(B). This argument is without merit.

Section 13–1304(B) classifies kidnapping as follows:

B. Kidnapping is a class 2 felony unless the victim is released voluntarily by the defendant without physical injury in a safe place prior to arrest and prior to accomplishing any of the further enumerated offenses in subsection A of this section in which case it is a class 4 felony.

Defendant argues that because the state failed to prove that he did not voluntarily release Mary without physical injury in a safe place prior to his arrest, he should have been sentenced for kidnapping classified as a class 4 felony. The majority rejects this argument because it fails to recognize that by proving that defendant *killed* Mary, the state *a fortiori* proved that defendant did not release her without physical injury in a safe place prior to his arrest. We therefore affirm defendant's sentence for kidnapping classified as a class 2 felony.[27]

### 20. Computerization of the Record

Defendant asserts that he was denied his rights to an adequate appeal, effec-

---

**26.** After finding that neither defendant's age, his drug use, nor the felony murder instruction constituted mitigating circumstances sufficiently substantial to call for leniency, the trial court stated in its special verdict, "No other of the suggested mitigating circumstances even warrant detailed discussion as those matters, even if true, do not *even collectively* support mitigation of Defendant's actions." (Emphasis added.) *See State v. Correll,* 148 Ariz. 468, 482–83, 715 P.2d 721, 735–36 (1986) (mitigating circumstances considered individually and in combination).

**27.** While the majority ends its analysis by holding that the state *a fortiori* proved that defendant did not release Mary without physical injury in a safe place prior to his arrest, the author of this opinion would proceed one step further and hold that *defendant, not the state,* has the burden of proving that he released Mary without physical injury in a safe place prior to his arrest. *See* Part II of the Special Concurrence.

tive assistance of counsel, due process and equal protection because this court declined to order that the record be computerized. He argues that because the record in this case exceeds 20,000 pages, failure to computerize the record deprived him of a "basic tool" necessary to prepare an effective appeal. We find no merit in this claim. In fact, defendant's opening brief, which was mammoth, originally consisting of 279 pages, and later edited to 120 pages pursuant to this court's order, belies his contention that his counsel was unable to review and synthesize the record effectively. Our review of the record, which was not aided by computer technology, reveals that defendant's appellate counsel did not overlook even the slightest indication of error in the record. Indeed, if defendant's appellate counsel failed her client in any way, it was in her inability or unwillingness to apply her considered judgment to evaluating the merit of many of the arguments she raised. Any shortcoming in appellate counsel's judgment, however, would not have been ameliorated by computer technology, regardless of its efficiency.

Although we recognize and welcome the advent of computer technology as an ever increasing component of the judicial and criminal justice systems, we do not believe, as defendant argues, that computers fulfill such an integral role in effective legal analysis that a court's refusal to order the computerization of a trial record amounts to a deprivation of a criminal defendant's constitutional rights. We therefore conclude that defendant's appeal was not impeded by our refusal to order the computerization of the record.

### 21. Limitation on Length of Defendant's Opening Brief

■■■ Defendant's final argument is that this court's limitation on the length of

his opening brief interfered both with his right effectively to present issues on appeal and with his relationship with his appellate attorney. Frankly, we address this argument with a certain measure of incredulity. Defendant's appellate counsel originally requested this court's permission to file an opening brief in excess of the normal limit of 40 pages. Rule 31.13(b)(2), Arizona Rules of Criminal Procedure; *see also* John Foreman & Joel M. Glynn, *Criminal Appeals, Post-conviction Relief, and Habeas Corpus,* 1 Arizona Appellate Handbook § 4.10, at 4–11 (L. Ray Haire & Paul G. Ulrich eds., 2d ed. 1983). Realizing that defendant's case was unusually complex, even for a capital case, the chief justice granted counsel's request and ordered that a 120–page brief could be submitted.[28] Appellate counsel responded to this order by filing a 279–page brief, which we refused to accept. We then afforded her an additional 60 days to edit the brief to comply with our original order. Ultimately, appellate counsel submitted a 110–page opening brief. The brief, however, contained 38 pages of single spaced "endnotes" (complete with their own table of authorities), which were little more than excised portions from the original 279–page brief. In addition, the substitute brief failed to comply with rule 31.13(b)(1), Arizona Rules of Criminal Procedure, which requires that appellate briefs "have a margin of 1.5 inches on each side." Thus, the opening brief finally submitted by appellate counsel on behalf of her client was in essence little more than a reconfigured, slightly less bulky, more tightly printed version of the first, unacceptable brief.

Had the second version of the brief demonstrated a well-reasoned, thoughtful and legally supportable analysis of the record

---

**28.** On November 15, 1991, rule 31.13 was amended to permit 80–page opening and answering briefs in a capital case, and a 40–page reply brief. The amended rule, providing for greatly expanded briefs in death penalty cases, takes into account the uniqueness of such cases and is intended to provide a realistic page limitation in all but the most unusual cases.

Winnowing the record and making discriminating choices concerning the fact or law to be

emphasized are essential elements of the art of appellate advocacy. Lawyers who are unable or unwilling to exercise those skills to present the issues in a reasonably-sized brief should not be appointed to represent indigent defendants on appeal. Contrary to appellate counsel's assertions in this case, a defendant's rights are more likely to be disserved by an excessively long brief than they are by an appropriately condensed one.

generated in this case, we perhaps would have been hesitant to do more than simply dismiss as nonmeritorious the argument that the page limitation violated defendant's constitutional rights. In our opinion, however, defendant's opening brief simply threw at this court every conceivable argument.

Each member of this court is acutely aware of the gravity of the decisions we are called upon to make in capital cases. Therefore, to argue that such deviations from professional appellate practice as occurred in this case are justifiable because the death penalty is at issue is unpersuasive. Rather than aiding our review of defendant's case by judiciously selecting, fully researching, and concisely arguing the colorable issues raised by the trial record, appellate counsel has bombarded this court with a salvo of dubious claims serving little purpose other than to detract from those issues having arguable legal merit. As Justice Robert O. Jackson once commented:

> Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one.... [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one. ·

Jackson, *Advocacy Before the United States Supreme Court*, 25 Temple L.Q. 115, 119 (1951), *quoted in Jones v. Barnes*, 463 U.S. 745, 752, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983).

We do not suggest that defendant's case was either a "good" one or a "bad" one. We do concede, however, that the sheer volume of paperwork generated by this case has made the appellate process somewhat unwieldy, although not unworkable. Our task would have been neither more effective nor more efficient had defendant been permitted to file a more extensive brief. Indeed, defendant does not indicate how he was actually prejudiced by the page limitation placed on his brief. Considering, however, that minimal substantive difference exists between the first and second opening briefs, we fail to see how defendant could have been prejudiced by an order of this court with which his counsel, in substance if not in form, failed to comply. Accordingly, we find no deprivation of defendant's constitutional rights resulting from the page limitation applied to his opening brief. *See State v. Amaya–Ruiz*, 166 Ariz. 152, 182–83, 800 P.2d 1260, 1290–91 (1990) (court-mandated editing of defendant's appellate brief did not violate defendant's constitutional rights).

## DISCUSSION OF ISSUES PRESENTED ON CROSS–APPEAL

In its cross-appeal, the state raises three issues. Initially, the state argues that the trial court erred in suppressing the testimony of an informant to whom defendant made incriminating statements. Next, the state argues that the trial court erred in finding that the state did not establish that defendant killed the victim in an especially heinous, cruel, or depraved manner. *See* A.R.S. § 13–703(F)(6). Finally, the state asks us to overrule the rule set forth in *State v. Gillies (Gillies I)*, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983), that, "[i]n order to constitute an aggravating circumstance under A.R.S. § 13–703(F)(2), the prior conviction must be for a felony which by its statutory definition involves violence or the threat of violence on another person."

### 22. The Informant's Testimony

The state argues that the trial court erred in suppressing the testimony of an informant to whom defendant made incriminating statements. The majority declines to address this argument because the record—even without the informant's testimony—requires us to affirm defendant's conviction for first degree murder and his death sentence.[29]

---

**29.** While the majority declines to address the state's argument, the author of this opinion addresses it in Part III of the Special Concurrence.

23. The Especially Heinous, Cruel, or Depraved Aggravating Circumstance

The state argues that in the sentencing phase the trial court erred in finding that the state did not establish that defendant killed the victim in an especially heinous, cruel, or depraved manner, *see* A.R.S. § 13–703(F)(6), and asks this court to make such a finding. In support of its argument, the state cites exclusively the informant's testimony. *See supra* Part 22. Because the majority of justices have declined to address the admissibility of the informant's testimony because the death sentence is affirmed on another ground, the majority also declines to address the state's especially heinous, cruel, or depraved argument based on that testimony.[30]

24. The Rule in Gillies

The state requests this court to overrule *State v. Gillies (Gillies I)*, 135 Ariz. 500, 662 P.2d 1007 (1983), and hold that in determining whether a prior conviction establishes a § 13–703(F)(2) aggravating circumstance, a trial court may look behind the statutory definition of the offense to the facts underlying the conviction. We recently refused an identical request, *State v. Schaaf*, 169 Ariz. 323, 819 P.2d 909 (1991), and do so again today. We reaffirm *Gillies I.*

## CONCLUSION

In addition to reviewing the issues raised by defendant on appeal, we have independently reviewed the record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California*, 386 U.S. 738, 744–45, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967), and *State v. Leon*, 104 Ariz. 297, 298–99, 451 P.2d 878, 879–80 (1969). We have found none. We therefore affirm defendant's conviction for kidnapping, classified as a class 2 felony, and the trial court's sentence of life imprisonment without possibil-

ity of parole for 25 years based on that conviction. We also affirm defendant's conviction for first degree murder and the trial court's sentence of death based on that conviction.

MOELLER, V.C.J., concurs.

FELDMAN, Chief Justice, specially concurring:

 In cases imposing the death penalty, we conduct a proportionality review to determine whether the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

We have reviewed cases involving comparable crimes, and conclude that Defendant's sentence is not disproportionate to the sentences imposed in those cases. *See, e.g., State v. Beaty*, 158 Ariz. 232, 762 P.2d 519 (1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989); *State v. Castaneda*, 150 Ariz. 382, 724 P.2d 1 (1986); *State v. Roscoe*, 145 Ariz. 212, 700 P.2d 1312 (1984), *cert. denied*, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985).

JAMES DUKE CAMERON and FRANK X. GORDON, JJ., concur.

CORCORAN, Justice, specially concurring:

As indicated in footnotes 23, 27, 29, and 30, I reach the same conclusions as the majority, but do so in four areas based on different analyses.

I

THE ENMUND/McDANIEL FINDING

As noted in Part 18(C)(1)(b), footnote 23, the majority concludes that the jury's im-

---

**30.** The author does not believe that the record in this case allows this court to make a finding that defendant killed Mary in an especially heinous, cruel, or depraved manner. Further, such a factual determination is, in the first instance, properly made by the trial court. However, the author does not believe that the trial court's

refusal to find the especially heinous, cruel, or depraved aggravating circumstance would, as defendant argues, bar it on double jeopardy grounds from making such a finding in the event defendant is resentenced for any reason in the future. *See* Part IV of the Special Concurrence.

plicit finding that defendant actually killed Mary satisfies *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Although I agree that the jury implicitly found that defendant actually killed Mary, I believe that *Enmund* requires an *explicit* finding that defendant did so, and would have this court make that finding based on the record.

The record discloses not only that the jury implicitly found that defendant actually killed Mary, it also reveals that the the trial judge made a like finding. In his special verdict, the trial judge stated,

> While the giving of the felony murder instruction might under some circumstances be a mitigating factor, the court finds it no mitigation here *where the defendant was the only participant in this offense.*

(Emphasis added.)

While I believe that neither the jury's implicit finding nor the trial judge's implicit finding satisfies *Enmund,* these findings coupled with the rest of the record compel a finding that defendant actually killed Mary. Accordingly, and like the records in *McDaniel* and *Gillies I,* the record in this case allows this court to find, beyond a reasonable doubt, that defendant actually killed Mary. *See State v. McDaniel,* 136 Ariz. 188, 199–200, 665 P.2d 70, 81–82 (1983) ("[Based on the record, *we] conclude ... that McDaniel's actions resulted in the victim's death and that for purposes of Enmund ..., he did in fact kill."*) (emphasis added); *Gillies I,* 135 Ariz. at 515, 662 P.2d at 1022 ("While *Enmund* apparently changes the current test in Arizona for imposing the death penalty upon the felony-murderer, *i.e.,* the court must now find that the defendant either killed, attempted to kill or intended to kill the victim, *we are satisfied that this requirement has been met.*") (emphasis added).

Like the majority, I would hold that the trial judge's failure to make an *Enmund* finding is not error. *See State v. Emery,* 141 Ariz. 549, 553, 688 P.2d 175, 179 (1984) ("Though the determination required by *Enmund* ... ought to be made by the trial court ..., we will not remand a case for resentencing whe[re] the record compels an affirmative finding that the defendant killed...").

## II

### THE KIDNAPPING SENTENCE

As noted in Part 19, footnote 27, the majority ends its analysis of the classification of defendant's kidnapping conviction without deciding whether defendant or the state has the burden of proving that defendant released Mary without physical injury in a safe place prior to defendant's arrest. In support of defendant's argument that the state carries this burden, he cites *State v. McMillen,* 154 Ariz. 322, 324, 742 P.2d 823, 825 (App.1987) (burden of proving that defendant did not release the victim without physical injury in a safe place prior to arrest is on the state), and *State v. Sterling,* 148 Ariz. 134, 136, 713 P.2d 335, 337 (App.1985) (same). Because I believe both *McMillen* and *Sterling* were wrongly decided, and because defendant put their continued validity in issue, I would take this opportunity to overrule them.

Subsection A of A.R.S. § 13–1304 sets forth the definition of the offense of kidnapping as follows:

**§ 13–1304. Kidnapping; classification; consecutive sentence**

A. A person commits kidnapping by knowingly restraining another person with the intent to:

1. Hold the victim for ransom, as a shield or hostage; or

2. Hold the victim for involuntary servitude; or

3. Inflict death, physical injury or a sexual offense on the victim, or to otherwise aid in the commission of a felony; or

4. Place the victim or a third person in reasonable apprehension of imminent physical injury to the victim or such third person.

5. Interfere with the performance of a governmental or political function.

6. Seize or exercise control over any airplane, train, bus, ship or other vehicle.

Pursuant to this statutory definition, the trial court gave the jury the following instruction:

The crime of kidnapping requires proof of the following three things.

1. The defendant knowingly restrained another person's movements, and

2. The restraint was accomplished:

A. By physical force, intimidation or deception, and

B. In a manner which interfered substantially with the person's movements, and

3. The restraint was with the intent to inflict death, physical injury or a sexual offense on a person.

This instruction, which mirrors A.R.S. § 13–1304(A)(3), is appropriate; *the state needed to prove no elements other than those set forth in § 13–1304(A)(3) to establish that defendant committed the offense of kidnapping.*

In its verdict, the jury found defendant guilty of kidnapping. Once found guilty, the trial court was required to sentence defendant. In Arizona, sentences are determined by the classification of an offense. Subsection B of A.R.S. § 13–1304 classifies kidnapping as follows:

B. Kidnapping is a class 2 felony unless the victim is released voluntarily by the defendant without physical injury in a safe place prior to arrest and prior to accomplishing any of the further enumerated offenses in subsection A of this section in which case it is a class 4 felony.

Defendant argues that because the state neither contended nor proved that he did not release the victim without physical injury in a safe place prior to arrest, he should have been sentenced for kidnapping classified as a class 4 felony. This argument presupposes that the *state* carries the burden of proving that defendant *did not* release the victim without physical injury in a safe place prior to defendant's arrest. This argument finds support in both *McMillen* and *Sterling.*

The *Sterling* court, on which the *McMillen* court relied, mistakenly believed that Arizona's kidnapping statute created different *offenses* or *degrees* of kidnapping. Based on this mistaken belief, the *Sterling* court held that "the voluntary release by the defendant without physical injury of the victim in a safe place prior to arrest is an *element* of the offense of *second-degree kidnapping.*" *Sterling*, 148 Ariz. at 136, 713 P.2d at 337 (emphasis added). Nowhere in A.R.S. § 13–1304(A), which sets forth the elements of kidnapping, however, is there a safe release requirement. Further, as distinguished from § 13–1304(A), § 13–1304(B) merely sets forth *the classification scheme* for the offense of kidnapping; it has nothing to do with the elements the state must prove to convict a defendant of kidnapping, nor does it create different offenses or degrees of kidnapping. *See State v. Brady*, 299 N.C. 547, 563, 264 S.E.2d 66, 75 (1980) (Construing a kidnapping statute similar to Arizona's, the court stated, "[Subsection (A)] defines the offense of kidnapping. Proof of the elements set forth therein is all that the statute requires for a *conviction* of kidnapping.... [Subsection (B)] merely prescribes the punishment for one convicted of kidnapping. It does not affect the elements of the offense of kidnapping or create a separate offense.") (emphasis in original); *State v. Leslie*, 14 Ohio App.3d 343, 345, 471 N.E.2d 503, 506 (1984) (to convict a defendant of kidnapping, the state need not allege or establish that the defendant failed to release the victim in a safe place unharmed); *State v. Cornute*, 64 Ohio App.2d 199, 200–01, 412 N.E.2d 416, 417–18 (1979) (same).

The effect of § 13–1304(B) is to reduce the penalty imposable upon a defendant if the defendant safely returns his or her victim. Such safe return is thus a type of mitigating circumstance. *See State v. Schneckloth*, 210 Neb. 144, 149, 313 N.W.2d 438, 441 (1981) (Construing a kidnapping statute similar to Arizona's, the court, in a thorough analysis, stated, "The factors listed in subsection ([B]) are not elements of the offense of kidnapping, but are simply mitigating factors which may reduce the sentence of those charged [with kidnapping]."). Accordingly, I would hold

that, similar to the mitigating circumstances in § 13–703(G), the safe return of a victim by a kidnapper prior to the kidnapper's arrest is a mitigating circumstance that must be proved by the kidnapper by a preponderance of the evidence. *See Loomer v. State,* 768 P.2d 1042, 1046–47 (Wyo. 1989) (Construing a kidnapping statute similar to Arizona's, the court stated, "The statute defines a single crime, kidnapping, which carries a sentence of 20 years to life but provides for a reduced sentence based upon defendant's conduct subsequent to the kidnapping.... Therefore, the defendant has the burden of going forward with evidence to show that the circumstances exist."); *see also State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990) (a defendant must prove the existence of mitigating circumstances by a preponderance of the evidence), *citing State v. Jordan,* 126 Ariz. 283, 614 P.2d 825 (1980).

Placing the burden on the defendant to prove mitigating circumstances is not a violation of due process. *See Walton v. Arizona,* 497 U.S. 639, –– – ––, 110 S.Ct. 3047, 3055–56, 111 L.Ed.2d 511 (1990) (placing burden of proof on defendant to prove mitigating circumstances by a preponderance of the evidence is constitutionally permissible), *aff'g State v. Walton,* 159 Ariz. 571, 769 P.2d 1017 (1989). In addition, because the safe return of a victim is not an element of the statutory offense of kidnapping, I would hold that the *trial judge* may make the determination whether a defendant has met this burden. *See State v. Stewart,* 175 Mont. 286, 573 P.2d 1138, 1146 (1977) (Construing a kidnapping statute similar to Arizona's, the court stated, "The release or nonrelease of a kidnapper's victim is [a fact which determines only the severity of punishment], and it is within the power of the state to allow the trial court, rather than the jury, to make this factual determination."); *Brady,* 299 N.C. at 563, 264 S.E.2d at 75 ("Since the factors set forth in subsection ([B]) relate to sentencing, it is for the trial judge to determine their existence or nonexistence from the evidence presented...."); *State v. Williams,* 295 N.C. 655, 669, 249 S.E.2d 709, 719 (1978) ("Normally a jury need only

determine whether a defendant has committed the substantive offense of kidnapping.... The factors set forth in subsection ([B]) relate only to sentencing; therefore, their existence or nonexistence should properly be determined by the trial judge."). To the extent that *McMillen* and *Sterling* are inconsistent with this analysis, I would overrule them.

## III

### THE INFORMANT'S TESTIMONY

As noted in Part 22, footnote 29, the majority declines to address the state's argument that the trial court erred in suppressing the informant's testimony. In this Part III, I address the state's argument by first setting forth the facts surrounding defendant's incarceration in the Pima County Jail, the dates on which the state charged defendant with kidnapping and murder, and the apparent rationale of the trial court's decision to suppress the informant's testimony. I then discuss the scope of the sixth amendment right to counsel and the remedy for its violation.

After laying this factual and legal foundation, I bifurcate the state's argument and analyze first whether the trial court erred in suppressing the informant's testimony during the guilt proceedings against defendant, and second, whether the trial court erred in suppressing the informant's testimony during the sentencing proceedings against defendant as to the murder charge.

A. *The Facts Surrounding Defendant's Incarceration, the Dates on Which the State Charged Defendant with Kidnapping and Murder, and the Trial Court's Ruling on Defendant's Motion to Suppress the Informant's Testimony*

1. The Facts and the Dates

Defendant was arrested on September 20, 1984 in Kerrville, Texas in connection with Mary's disappearance. One week later, on September 27, 1984, the state filed a felony criminal complaint against defendant charging him with Mary's kidnapping,

in violation of A.R.S. §§ 13–1304(A)(3), –1304(B), –701, –702, –801, –803, –604(B), –604(D), and –604.01.

On October 31, 1984, defendant was transferred to the Pima County Jail. Housed in the same pod was the informant, a convicted felon. The informant, who had been transferred to Arizona from another state pending a rule 32 determination, had previously testified for the state as an informant. Although the state knew of his reputation as an informant, it did not deliberately bring the informant and defendant together.

The record indicates that although defendant did not speak to the informant for approximately one week, a "rapport" eventually developed between the two. On November 9, 1984, the informant left a message for Detective Leo Duffner of the Pima County Sheriff's Department stating that he wanted to talk to the detective. The next day, Det. Duffner met with the informant at the Pima County Jail. During that meeting, the informant told Det. Duffner that he, the informant, had obtained and would continue to obtain information from defendant relating to Mary's disappearance. (At that time, Mary's remains had not yet been found.) Det. Duffner replied by telling the informant not to obtain any additional information and that he did not want the informant working for him, the Pima County Sheriff's Department, or the County Attorney's office.

Notwithstanding Det. Duffner's instruction not to obtain additional information from defendant, the informant continued to obtain information, which he recorded in copious notes. In addition, although Det. Duffner had told the informant to stop obtaining information, Det. Duffner continued meeting with the informant to receive the forthcoming information. In fact, Det. Duffner testified that after the November 10, 1984 meeting, he met with the informant again on November 14, November 26, December 3, and December 19 of 1984, and on April 17, 1985.

Det. Duffner's testimony that he did not meet with the informant from December 19, 1984 to April 17, 1985 is significant and consistent with statements made by the informant during a rule 15, Arizona Rules of Criminal Procedure, interview conducted from August 28, 1986 to September 18, 1986 by defendant's trial counsel. During that interview, the informant told of a December 18, 1984 discussion he had with defendant during which defendant detailed the events of September 17, 1984 and admitted kidnapping and murdering Mary. After the informant told about the December 18, 1984 discussion, the following colloquy took place:

Q. [By defendant's trial counsel] Did you talk to [defendant] after that?

A. [By the informant] After a while.

Q. Did you talk to him for the next four months?

A. Off and on, yes.

Q. Did you take any notes?

A. No.

Q. What happened to all the notes that are in the conversations that you had from December until April?

A. What more was there to find out?

Q. More details.

A. I felt I—I felt out that I had known everything that there was to know.

Q. That's it, now. You really didn't (inaudible).

A. No. Not from January to April.

Q. Not one word about it.

A. He surely talked about it from time to time.

Q. But, all of it was repetitious.

A. Redundant.

Q. Not one piece of new information.

A. —

Q. Correct?

A. Not that I can recall.

After learning that the informant had obtained virtually no new information from defendant after December 18, 1984, defendant's trial counsel asked the informant about the April 17, 1985 meeting between Det. Duffner and the informant:

Q. [By defendant's trial counsel] Now, you saw Duffner back on the 17th of April, 1985.

A. [By the informant] That's correct.

Q. You wanted to see him again.

A. Right.

Q. So, for four months you didn't need to see him anymore.

A. That's correct.

Q. Then you called him back. Now, you've got a new message, right?

A. Right.

Q. And what's that now. What do you got for him now?

A. I heard the body had been found. And, I called him and told him I wanted to see him. And I gave him the last—uh, I gave him the notes on what [defendant] had said after the body had been found.

On May 15, 1985—approximately one month after the April 17, 1985 meeting—defendant was indicted by a grand jury and charged with Mary's murder in violation of A.R.S. §§ 13–1105, –703, and –710. Although the record indicates that Det. Duffner and other state agents met with the informant in another state after April 17, 1985, there is no indication that the informant obtained any information from defendant on or after May 15, 1985.

### 2. The Trial Court's Ruling

Before trial, defendant moved to suppress the informant's testimony. In his motion, defendant argued that the informant's conduct violated his fifth amendment right against compelled self-incrimination because the informant did not give him *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This argument has been rendered meritless by the Supreme Court's recent ruling in *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). In *Perkins*, the Court held that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." *Perkins*, 496 U.S. at 296, 110 S.Ct. at 2397. "*Miranda* was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates." *Perkins*, 496 U.S. at 298, 110 S.Ct. at 2398. In addition, defendant has not argued, nor is there any evidence, that his statements to the informant were coerced in violation of the fifth amendment as interpreted by *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 1261, 113 L.Ed.2d 302 (1991) (incriminating statements obtained by paid jailhouse informant through coercion held inadmissible), *aff'g* 161 Ariz. 237, 778 P.2d 602 (1988). Accordingly, I would find no violation of defendant's fifth amendment rights.

Defendant also argued in support of his motion to suppress that the informant was a state agent and, therefore, his deliberate elicitation of incriminating statements from defendant violated defendant's sixth amendment right to counsel. In opposition to this argument, the state candidly recognized that defendant had been charged with kidnapping at the time the informant deliberately elicited the incriminating statements from him and, therefore, his right to counsel *as to the kidnapping charge* had attached. The state argued, however, that defendant had not been charged with murder at the time the informant obtained the incriminating statements and, therefore, defendant's right to counsel *as to the murder charge* had not attached. The state argued that, because defendant's right to counsel as to the murder charge had not attached at the time the informant obtained the incriminating statements from defendant, those statements were not obtained in violation of defendant's sixth amendment right to counsel, and, therefore, the informant's testimony should not be suppressed.

At the hearing on defendant's motion to suppress the informant's testimony, the attention given by the trial court to the state's argument was eclipsed by the attention it gave to defendant's argument that the informant was a state agent. Ultimately, the trial court granted defendant's motion and ruled that "[the informant] will not be a witness as to any of [defendant's incriminating] statements." The trial court granted defendant's motion based on its conclusion that the informant was, in fact, a state agent, and that defendant's right to counsel had attached and was violated as to both the kidnapping charge and the murder charge because those crimes were, as stated by the trial court, "so interrelated."

B. *The Scope of the Sixth Amendment Right to Counsel and the Remedy for its Violation*

1. The Right to Counsel

The sixth amendment right to counsel does not apply to private conduct. *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985) ("[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached."). Rather, it applies only to conduct on the part of the state or its agents. *Moulton,* 474 U.S. at 176, 106 S.Ct. at 487 ("[T]he Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and *a state agent.*") (emphasis added).

The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. 6. The Supreme Court first discussed the sixth amendment right to counsel in *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Since *Powell,* the Court has developed a substantial body of sixth amendment right to counsel law which explains both the purpose of the sixth amendment right to counsel and when that right attaches.

The overarching purpose of the right to counsel is to safeguard those "rights deemed essential for the fair prosecution of a criminal proceeding." *Moulton,* 474 U.S. at 169, 106 S.Ct. at 483. More specifically, the right to counsel affords a defendant charged with a crime the right to be heard. Justice Sutherland expounded on this idea:

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him.

*Powell,* 287 U.S. at 68–69, 53 S.Ct. at 64; *see also Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). More recently, the Court has said that the "core purpose" of the sixth amendment right to counsel is "to assure aid at trial, 'when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor.'" *United States v. Gouveia,* 467 U.S. 180, 188–89, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984), *quoting United States v. Ash,* 413 U.S. 300, 309, 93 S.Ct. 2568, 2573, 37 L.Ed.2d 619 (1973).

As intimated in the language of the sixth amendment itself and in the Supreme Court precedent discussed immediately above, the purpose of the right to counsel is served, and therefore the right to counsel attaches, only after adversary judicial criminal proceedings have been initiated. Prior to that time, there is no "criminal prosecution[ ]," no "accused," and no need for a "defence." U.S. Const. amend. 6.

Likewise, as Justice Sutherland recognized, the right to be heard becomes crucial only "[i]f [a defendant is] *charged* with a crime" for which "he may be put on trial...." *Powell,* 287 U.S. at 69, 53 S.Ct. at 64 (emphasis added). In addition, only after the initiation of adversary judicial criminal proceedings does a defendant need to prepare a "defense" with "the guiding hand of counsel...." *Powell,* 287 U.S. at 69, 53 S.Ct. at 64. Finally, it is only after the initiation of adversary judicial criminal proceedings

> that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a

defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.

*Gouveia,* 467 U.S. at 189, 104 S.Ct. at 2298, *quoting Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). For all of these reasons, the Supreme Court in *Gouveia* expressly held that the sixth amendment right to counsel attaches only after the initiation of adversary judicial criminal proceedings. *Gouveia,* 467 U.S. at 189, 104 S.Ct. at 2298.

### 2. The Exclusionary Rule

Like the substantial body of law that developed around the sixth amendment right to counsel and *Powell,* a substantial body of law has developed since the Supreme Court first created the "exclusionary rule" in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The exclusionary rule, originally applied only in federal prosecutions for fourth amendment violations, *Weeks,* 232 U.S. 383, 34 S.Ct. 341, has been expanded to apply to the states through the due process clause of the fourteenth amendment, *Mapp v. Ohio,* 367 U.S. 643, 654–55, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961), and to fifth amendment, *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), and sixth amendment, *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964), violations.

The purpose of the exclusionary rule is simply stated: it is to discourage unconstitutional acts by law enforcement officials. *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974). The scope of the rule is somewhat more difficult to state. I begin, however, by noting that the Supreme Court has expressly recognized that the rule is not absolute:

> Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its

remedial objectives are thought most efficaciously served.

*Calandra,* 414 U.S. at 348, 94 S.Ct. at 620 (exclusionary rule not applied during grand jury proceedings); *see also United States v. Leon,* 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984) (exclusionary rule not applied when law enforcement officials relied in good faith upon invalid search warrant); *Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976) (exclusionary rule not applied during federal habeas corpus review); *Walder v. United States,* 347 U.S. 62, 66, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954) (exclusionary rule not applied during cross examination of defendant). Under *Calandra* and subsequent cases, then, the question whether to apply the exclusionary rule is determined by weighing the extent to which its application will deter law enforcement officials from committing unconstitutional acts against the extent to which its application will deflect the truthfinding process, free the guilty, and generate disrespect for the law and the administration of justice. *Stone,* 428 U.S. at 485–95, 96 S.Ct. at 3048–53; *see also State v. Bolt,* 142 Ariz. 260, 269–73, 689 P.2d 519, 528–532 (1984) (Cameron, J., and Hays, J., separately specially concurring) (proposing that courts, in determining whether the exclusionary rule should be applied, should weigh the costs of applying the rule against the benefits of applying the rule); *State v. Alfaro,* 127 Ariz. 578, 579–80, 623 P.2d 8, 9–10 (1980) (under weighing analysis, exclusionary rule held not applicable during probation revocation proceedings); James Duke Cameron & R. Lustiger, *The Exclusionary Rule: A Cost Benefit Analysis,* 101 F.R.D. 109 (1984) (reviewing the costs and benefits of the exclusionary rule and concluding that courts should adopt a balancing approach in determining whether the exclusionary rule should be applied).

### C. *Did the Trial Court Err in Excluding the Informant's Testimony During the Guilt Proceedings Against Defendant?*

A trial court's decision on a motion to suppress is reviewed under a "clear abuse

**668**

of discretion" standard. *See State v. Fisher*, 141 Ariz. 227, 236, 686 P.2d 750, 759 (1984) ("It is well established in this state that a trial court's ruling on a motion to suppress will not be disturbed absent a clear abuse of discretion."), *citing State v. Adamson*, 136 Ariz. 250, 665 P.2d 972 (1983); *State v. Ferreira*, 128 Ariz. 530, 627 P.2d 681 (1981). I do not believe that the trial court clearly abused its discretion in excluding the informant's testimony during the guilt proceedings against defendant. I base this conclusion on (1) my finding that the trial court did not clearly abuse its discretion in finding that the informant was a state agent at the time he obtained the incriminating statements from defendant; (2) the fact that defendant's right to counsel as to the kidnapping charge had attached and was violated when the informant obtained the incriminating statements from defendant; and (3) the fact that the weighing required in determining whether the exclusionary rule should be applied tipped in favor of excluding the informant's testimony.

### 1. The Informant as a State Agent

I have reviewed the record to determine whether the trial court abused its discretion in finding that the informant was a state agent. Without giving any more detail than that provided in Part III(A)(1) of this Special Concurrence, but noting that numerous additional phone calls, personal visits, conversations, etc., were held between Det. Duffner and other state agents and the informant than those described in Part III(A)(1), and recognizing that the question whether the informant was a state agent is a close one, I would conclude that the trial court's finding that the informant was, in fact, a state agent at the time he obtained the incriminating statements from defendant is supported by both the facts and the law. *See, e.g., Maine v. Moulton*, 474 U.S. 159, 176–80, 106 S.Ct. 477, 487–89, 88 L.Ed.2d 481 (1985) (Court affirmed trial court's finding that informant was state agent); *United States v. Henry*, 447 U.S. 264, 270–71, 100 S.Ct. 2183, 2187, 65 L.Ed.2d 115 (1980) (Court upheld court of

appeals' finding that informant's conduct was attributable to the government).

### 2. Defendant's Sixth Amendment Right to Counsel

The state charged defendant with Mary's kidnapping on September 27, 1984. Thus, defendant's right to counsel *as to the kidnapping charge* attached at that time. *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984). After being charged with kidnapping, defendant was taken to the Pima County Jail where he met the informant. Because the informant can properly be characterized as a state agent, and because the informant obtained the incriminating statements from defendant after defendant's right to counsel as to the kidnapping charge had attached, all statements obtained by the informant from defendant were obtained in violation of defendant's *right to counsel as to the kidnapping charge*. *See Moulton*, 474 U.S. at 176–80, 106 S.Ct. at 487–89; *Henry*, 447 U.S. at 270–75, 100 S.Ct. at 2186–89.

While defendant's right to counsel had already attached *as to the kidnapping charge* at the time the informant obtained the incriminating statements from defendant, the informant appears to have obtained *no* statements from defendant after defendant's right to counsel *as to the murder charge* attached. In fact, by December 18, 1984, almost 5 full months before defendant's May 15, 1985 indictment for Mary's murder, the informant believed he "[knew] everything that there was to know" about the kidnapping and murder. Further, the only new statements the informant obtained after December 18, 1984 were defendant's statements relating to the finding of Mary's body; and those statements were provided to Det. Duffner on April 17, 1985, almost one month before defendant was indicted for Mary's murder. Accordingly, defendant's sixth amendment right to counsel *as to the murder charge* was *not* violated.

### 3. The Exclusionary Rule

The trial court properly applied the exclusionary rule and suppressed the infor-

mant's testimony during the guilt proceedings against defendant. As stated above, the informant obtained the incriminating statements in violation of defendant's right to counsel as to the kidnapping charge. Although an argument could be made that the appropriate remedy in this case was to suppress the informant's testimony only as it might prejudice defendant as to the kidnapping charge,[31] the trial court did not clearly abuse its discretion in finding that, in this case, the kidnapping charge and murder charge were "so interrelated" that the appropriate remedy was to exclude the informant's testimony in its entirety during the guilt proceedings against defendant.

The trial court reasonably could have concluded that the overarching purpose of the sixth amendment right to counsel—to safeguard those rights deemed essential for the fair prosecution of a criminal proceeding, *Moulton*, 474 U.S. at 169, 106 S.Ct. at 483—would have been frustrated if the informant's testimony was admitted. Specifically, the trial court reasonably could have concluded that any limiting instruction would have been ineffective, and the jury, although instructed otherwise, would have considered the informant's testimony as to the kidnapping charge as well as the murder charge. In fact, there appears to be no way that the jury could have considered the informant's testimony *only* as to the first degree murder charge, given the fact that in order for the jury to find defendant guilty of first degree murder, it had to find and did find that defendant killed Mary *in the course of and in furtherance of the kidnapping, i.e.,* a prerequisite to finding defendant guilty of first degree felony murder was a finding that defendant kidnapped Mary.

Moreover, the trial court reasonably could have concluded that the extent to which the application of the exclusionary rule during the guilt proceedings against defendant would deter unconstitutional acts by law enforcement officials out-

weighed the risk of deflecting the truth-finding process, freeing the guilty, or generating disrespect for the law and the administration of justice. *Stone v. Powell,* 428 U.S. 465, 485–95, 96 S.Ct. 3037, 3048–53, 49 L.Ed.2d 1067 (1976). In sum, I would affirm the trial court's decision to suppress the informant's testimony in its entirety during the guilt proceedings against defendant.

D. *Did the Trial Court Err in Excluding the Informant's Testimony During the Sentencing Proceedings Against Defendant as to the Murder Charge?*

As an initial matter, the state properly preserved for appeal the trial court's decision to suppress the informant's testimony during the sentencing proceedings against defendant as to the murder charge. At the beginning of his remarks to the court during the sentencing proceeding, the prosecutor asked to have the informant's deposition "marked as an offer of proof for appellate purposes." Specifically, the prosecutor believed the deposition would support the state's argument that defendant killed the victim in an especially heinous, cruel, or depraved manner. *See* A.R.S. § 13–703(F)(6). Consistent with its earlier ruling, the trial court did not admit the informant's testimony for sentencing purposes, but, over defense counsel's objection, allowed the informant's deposition to be marked for appellate purposes as requested by the prosecutor. This offer properly preserved the issue for appeal.

I believe that the trial court clearly abused its discretion in excluding the informant's testimony during the *sentencing proceedings against defendant as to the murder charge.* As stated above, defendant's right to counsel as to the murder charge was *not* violated. Thus, as to that charge, the exclusionary rule was not implicated. The critical inquiry thus becomes whether the exclusionary rule, as implicat-

---

**31.** For example, the trial court might have admitted the informant's testimony and instructed the jury that it was to be considered only with regard to defendant's guilt as to the murder charge and not as to the kidnapping charge.

*See, e.g., Moulton,* 474 U.S. at 180 n. 16, 106 S.Ct. at 489 n. 16. ("Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not attached, are, of course, admissible....").

ed by the violation of defendant's right to counsel as to the kidnapping charge, should be applied to suppress the informant's testimony during the sentencing proceedings against defendant as to the murder charge when defendant's right to counsel as to that charge was not violated and such testimony could not prejudice defendant as to the kidnapping charge for which he had already been found guilty and for which he was also being sentenced.

Based on the weighing required under the exclusionary rule, I conclude that the answer to this inquiry is no. I find the analysis in *United States v. Lee*, 540 F.2d 1205 (4th Cir.1976), to be helpful to my weighing analysis. Defendant Lee was convicted of illegal possession of firearms. The district court judge, in sentencing Lee to the maximum term permitted, specifically relied on a prior conviction for possession of heroin, even though that conviction had been reversed on appeal because it was based on the fruits of an illegal search. Lee argued that the district court judge should not have been allowed to consider the heroin conviction in sentencing him. The court of appeals disagreed.

In weighing the costs of applying the exclusionary rule against the extent to which its application fulfills its purpose of deterring unconstitutional acts by law enforcement officials, the *Lee* court first recognized the general rule that a "judge may, before sentencing, 'conduct an inquiry broad in scope, largely unlimited either as to kind of information he may consider, or the source from which it may come.'" *Lee*, 540 F.2d at 1210, *quoting United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). The court then recognized that "[m]ost illegally-obtained evidence ... is not inherently unreliable...." *Lee*, 540 F.2d at 1211. The court considered the restriction on a sentencing judge's inquiry and the loss of potentially reliable information to be a significant cost.

After recognizing the significant cost associated with suppressing the evidence, the court focused on the extent to which application of the exclusionary rule during sentencing would further the rule's purpose. The court concluded:

> We think that if the exclusionary rule were extended to sentencing in the ordinary case, its additional deterrent effect would be so minimal as to be insignificant. Generally, law enforcement officers conduct searches and seize evidence for purposes of prosecution and conviction—not for the purpose of increasing a sentence in a prosecution already pending or one not yet begun. If they are to be deterred from official lawlessness, it would seem obvious that the only effective deterrence is the threat that the prosecution arising out of the specific search and seizure in which they acted illegally would be rendered ineffective. The additional threat that a future sentence might be less severe because they acted unlawfully can be predicted to have little practical effect to accomplish its main objective.

*Lee*, 540 F.2d at 1211; *see also United States v. Graves*, 785 F.2d 870, 876 (10th Cir.1986) (sentencing court entitled to consider prior dismissed charges and alleged offenses for which charges were not filed because of illegally obtained evidence); *United States v. Butler*, 680 F.2d 1055, 1056 (5th Cir.1982) (fruit of illegal search admissible during sentencing because no potential for inaccuracy and deterrent value of excluding illegally obtained evidence at sentencing substantially less than at trial); *United States v. Larios*, 640 F.2d 938, 941–42 (9th Cir.1981) (sentencing judge properly considered illegally obtained evidence).

I now apply these considerations to the facts of this case. Initially, I believe that in determining whether to impose the death sentence, the trial judge should, within the parameters of A.R.S. § 13–703 and rule 15.1(g)(2), Arizona Rules of Criminal Procedure, be able to " 'conduct an inquiry broad in scope, largely unlimited either as to kind of information he may consider, or the source from which it may come.'" *Lee*, 540 F.2d at 1210, *quoting United States v. Tucker*, 404 U.S. at 446, 92 S.Ct. at 591; *see also Larios*, 640 F.2d at 942 (judges given broad discretion during sentencing so

sentence is properly in tune with defendant); *United States v. Schipani*, 435 F.2d 26, 27 (2d Cir.1970) ("A sentencing judge's access to information should be almost completely unfettered in order that he may 'acquire a thorough acquaintance with the character and history of the man before [him].' "), *quoting United States v. Doyle*, 348 F.2d 715, 721 (2d Cir.1965). Because the trial court rejected the informant's evidence on other grounds, no finding was made as to reliability, and the record does not lead me to believe that the incriminating statements made by defendant to the informant are "inherently unreliable." *See Lee*, 540 F.2d at 1211. Thus, the costs associated with applying the exclusionary rule in the *Lee* case are also present here.

Moreover, I believe that the exclusionary rule's deterrent effect was sufficiently achieved by the trial court's suppression of the informant's testimony during the guilt proceedings against defendant. I agree with the *Schipani* court that "applying the exclusionary rule for a second time at sentencing after having already applied it once at the trial itself would not add in any significant way to the deterrent effect of the rule." *Schipani*, 435 F.2d at 28; *see also Lee*, 540 F.2d at 1210–12 (exclusionary rule not applied during sentencing proceeding); *United States v. Lynch*, 934 F.2d 1226 (11th Cir.1991) (same), *cert. denied*, —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992); *United States v. McCrory*, 930 F.2d 63 (D.C.Cir.1991) (same), *cert. denied*, —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992); *United States v. Torres*, 926 F.2d 321 (3rd Cir. 1991) (same); *United States v. Graves*, 785 F.2d 870 (10th Cir.1986) (same); *United States v. Vandemark*, 522 F.2d 1019 (9th Cir.1975) (same); *but see Verdugo v. United States*, 402 F.2d 599 (9th Cir.1968) (exclusionary rule applied during sentencing proceeding when evidence was illegally obtained for the purpose of increasing the defendant's sentence). This is especially true where, as here, the evidence was obtained not in violation of defendant's right to counsel as to the crime for which defendant was being sentenced—murder—but rather in violation of defendant's right to counsel as to the kidnapping.

In concluding that the trial court clearly abused its discretion in suppressing the informant's testimony during the sentencing proceedings against defendant as to the murder charge, I do not rely on the language in *Moulton* that "[i]ncriminating statements pertaining to *other crimes*, as to which the Sixth Amendment right has not yet attached, are, of course, admissible...." *Moulton*, 474 U.S. at 180 n. 16, 106 S.Ct. at 489 n. 16 (emphasis added). I could not, in good faith, call Mary's murder an "other crime[ ]" as I believe the Supreme Court meant that term. *See, e.g., Moran v. Burbine*, 475 U.S. 412, 431–32, 106 S.Ct. 1135, 1146–47, 89 L.Ed.2d 410 (1986) (no sixth amendment violation when the state deliberately instigated meeting between defendant and government informant and recorded incriminating statements relating to ongoing cocaine investigation even though defendant had been charged for the sale of marijuana). Rather, I recognize that Mary's kidnapping and murder were transactionally related. The fact that the crimes were transactionally related, however, does not dilute my belief that, on these facts, the exclusionary rule's application at the sentencing proceedings against defendant as to the murder charge was improper.

Even though I would find that the trial court erred in suppressing the informant's testimony during the sentencing proceedings as to the murder charge, I would not remand this case for a hearing to determine whether the informant's testimony established a § 13–703(F)(6) aggravating circumstance. I would not do so because the state, presumably knowing that a remand in this case would result in additional and unforeseen delays and possibly the proliferation of issues, has not asked this court to remand. However, in the event defendant is resentenced for any reason in the future, I would allow the state to seek to introduce the informant's testimony at that time.

## IV

### DOUBLE JEOPARDY ISSUES IN THE EVENT OF RESENTENCING

As noted in Part 23, footnote 30, defendant argues that the double jeopardy clause would prohibit the trial court from finding that he killed Mary in an especially heinous, cruel, or depraved manner. I would reject this argument, as did the Supreme Court in *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986). In *Poland*, the Court stated,

> We reject the fundamental premise of petitioners' argument, namely, that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution always constitutes an "acquittal" of that circumstance for double jeopardy purposes.... [T]he proper inquiry is whether the sentencer or reviewing court has "decided that the prosecution has not proved its case" *that the death penalty is appropriate....*
>
> Aggravating circumstances are not separate penalties or offenses, but are "standards to guide the making of [the] choice" between the alternative verdicts of death and life imprisonment.... Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself "convict" a defendant (*i.e.*, require the death penalty), and the failure to find any particular aggravating circumstance does not "acquit" a defendant (*i.e.*, preclude the death penalty).
>
> [T]he Double Jeopardy Clause does not require the reviewing court ... to ignore evidence in the record supporting another aggravating circumstance which the sentencer has erroneously rejected.

*Poland*, 476 U.S. at 156–57, 106 S.Ct. at 1755–56 (citations and footnote omitted).

## V

### CONCLUSION

I agree with the majority that defendant's convictions and sentences must be affirmed. Unlike the majority, however, I believe that this court should make the *Enmund* finding instead of relying on the jury's implicit *Enmund* finding. Further, because I believe that the two cases cited by defendant in support of reversing his kidnapping sentence were decided incorrectly, *see State v. McMillen*, 154 Ariz. 322, 742 P.2d 823 (App.1987), and *State v. Sterling*, 148 Ariz. 134, 713 P.2d 335 (App. 1985), I would overrule them. Finally, I believe that the trial court incorrectly suppressed the informant's testimony during the sentencing proceedings against defendant as to the murder charge, and, in the event defendant is resentenced for any reason in the future, I would allow the state to seek to introduce that testimony.